# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

**GARY WAYNE SUTTON,**      )
      )
     Petitioner,      )
      )
**vs.**      )     Case No. _____
      )     Judge Varlan
**RICKY BELL,** Warden,      )
      )
     Respondent.      )

---

## PETITION FOR WRIT OF HABEAS CORPUS
### Hearing Requested

---

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.
Stephen M. Kissinger
Assistant Federal Community Defender
530 S. Gay St., Suite 900
Knoxville, TN 37902
(865) 637-7979

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -i-

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {1}

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {2}

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {2}

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {4}

CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {6}

    I. THE STATE COURT UNREASONABLY FOUND SUFFICIENCY OF THE
        EVIDENCE BASED ON ITS NOVEL LEGAL THEORY THAT "ST[ICKING]
        WITH [YOUR] STORY" ESTABLISHES ALL ELEMENTS OF AN
        OFFENSE, IN VIOLATION OF JACKSON V. VIRGINIA, 443 U.S. 307
        (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {6}

    II. MR. SUTTON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL
        IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH
        AMENDMENTS TO THE UNITED STATES CONSTITUTION. . . . . . . {9}

    III. THE STATE COURT UNREASONABLY FOUND THAT THE PARADE OF
        TWENTY-FIVE WITNESSES TESTIFYING TO UNCHARGED CRIMES
        DID NOT RENDER SUTTON'S TRIAL UNFAIR AND DENY HIM DUE
        PROCESS IN VIOLATION OF THE SIXTH, EIGHTH, AND
        FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . {30}

    IV. THE STATE COURT UNREASONABLY CONCLUDED *BRUTON* IS
        IRRELEVANT WHERE THE COMPLAINING DEFENDANT GIVES A
        STATEMENT, IN VIOLATION OF THE SIXTH AND FOURTEENTH
        AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {39}

    V. THE STATE COURT UNREASONABLY FOUND TRYING SUTTON WITH
        HIS UNCLE, WHO WAS THE PRINCIPAL ACTOR, DID NOT DENY
        SUTTON DUE PROCESS, WHEN EVIDENCE PROPERLY ADMITTED
        ONLY AGAINST DELLINGER WAS IMPUTED TO SUTTON, IN
        VIOLATION OF THE FOURTEENTH AMENDMENT. . . . . . . . . . . . . {39}

    VI. THE JURORS WERE TAINTED BY EXTRINSIC EVIDENCE WHICH
        DENIED SUTTON HIS RIGHT TO A TRIAL BY AN IMPARTIAL JURY, AS

Case 3:07-cv-00030-TAV-CCS    Document 3    Filed 01/31/07    Page 2 of 57    PageID #: <pageID>

MANDATED BY THE SIXTH AND FOURTEENTH AMENDMENTS.    {43}

VII.  THE STATE COURT UNREASONABLY FOUND THAT PROOF OF OTHER
       SUSPECTS DOES NOT UNDERMINE CONFIDENCE IN THE VERDICT,
       IN THIS CIRCUMSTANTIAL EVIDENCE, MOTIVELESS CASE.  . . . {46}

VIII.  SUTTON IS ENTITLED TO AN EVIDENTIARY HEARING.  . . . . . . . . . {48}

IX.  SUTTON' S NEW PROOF OF INNOCENCE WOULD CAUSE ANY JUROR
      TO HAVE REASONABLE DOUBT; HE IS ENTITLED TO HAVE
      DEFAULTED CLAIMS REVIEWED ON THE MERITS.  . . . . . . . . . . . {49}

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {54}

Case 3:07-cv-00030-TAV-CCS     Document 3     Filed 01/31/07     Page 3 of 57     PageID
#: <pageID>

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

**GARY WAYNE SUTTON,**

      Petitioner,

vs.

**RICKY BELL**, Warden,

      Respondent.

)
)
)
)
)
)
)
)
)
)

Case No. _____
Judge Varlan

---

## PETITION FOR WRIT OF HABEAS CORPUS
### Hearing Requested

---

TO THE HONORABLE JUDGE THOMAS A. VARLAN, UNITED STATES DISTRICT COURT JUDGE FOR THE EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE:

COMES NOW the Petitioner, Gary Wayne Sutton, through his undersigned counsel of record, pursuant to all applicable law, including all applicable provisions of 28 U.S.C. § 2241, et. seq. (including 28 U.S.C. § 2254), and moves this Court to issue a writ of habeas corpus for Respondent to bring Petitioner before the Court to the end that he may be discharged from his unconstitutional and invalid conviction for first-degree murder and setting fire to personal property, which resulted in Petitioner being sentenced to a life plus two-year sentence.

### PARTIES

1.    The Petitioner, Gary Wayne Sutton is an adult, resident citizen of the United States of American currently incarcerated at Riverbend Maximum Security

{1}

Institution in Nashville, Tennessee.

2. The Respondent, Ricky Bell, is the warden of Riverbend Maximum Security Institution where Mr. Sutton is detained. Mr. Bell is detaining Mr. Sutton under color of state law, pursuant to the unconstitutional convictions and sentences of Mr. Sutton for first degree murder and setting fire to personal property.

## JURISDICTION AND VENUE

3. This Court has jurisdiction to entertain and grant the relief requested in this petition for writ of habeas corpus pursuant to Article I § 9 of the United States Constitution, Article III of the United States Constitution, the Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Fourteenth Amendments to the United States Constitution, 28 U.S.C. § 1331 and 28 U.S.C. § 2254. Venue is proper in this district pursuant to 28 U.S.C. § 2241(d), because the unconstitutional convictions arose in the Criminal Court of Sevier County, Tennessee.

## STATEMENT OF THE CASE

4. On February 24, 1993, Petitioner was convicted in Sevier County, Tennessee of first degree murder and setting fire to personal property. The trial court imposed a life sentence for the murder conviction and a consecutive two-year term for the setting fire conviction.

5. On July 11, 1995, the Tennessee Court of Criminal Appeals affirmed the convictions and sentences, *State v. Sutton*, 1995 WL 406953.[1] The Tennessee Supreme Court denied review, concurring in results only, on January 22, 1996.

---

[1]Hereafter cites to the direct appeal opinion will be indicated as "*Sutton* DA \*#."

{2}

*Id.*   Counsel did not file a petition for certiorari in the United States Supreme Court and the time to do so expired ninety days later.

6.   Sutton filed a petition for post-conviction relief on January 21, 1997.  The petition was denied.

7.   The Court of Criminal Appeals affirmed the denial on June 19, 2006.  *Sutton v. State*, 2006 WL 1679595.[2]  The Tennessee Supreme Court denied review on October 30, 2006.  *Id.*

8.   The trial transcript consists of twenty-two volumes of testimony, which will be cited as  "TT Vol.--, p. –."  There are two volumes of technical record, which will be cited as "Ttech, Vol.–, p.--."  There are three volumes of pretrial motions, which will be cited at "MT, date, p.–."

9.   There are three volumes of post-conviction testimony, which will be cited as "PCT, date, Vol. —, p.–."  There are two volumes of post-conviction technical record, which will be cited as either "Sutton PCTech, p.–" or "Dell. PCTech, p.–."

10.   Sutton and Dellinger each filed a petition for post-conviction relief and they each offered proof at the hearing.  The post-conviction court granted Sutton's motion that Sutton adopt all of Dellinger's allegations and proof.  PCT, 2/25/04, Vol.II, p. 256-257.

11.   Sutton and Dellinger each filed a notice of appeal of the denial of post-conviction relief.  The Court of Criminal Appeals consolidated the cases under the number E2004-01068-CCA-R3-PC.

---

[2]Hereafter cites to the post-conviction opinion will be indicated as *"Sutton* PC *#."*

{3}

# INTRODUCTION

A Sevier County jury convicted Gary Sutton and James Dellinger of the first degree murder of Connie Branam and setting fire to personal property based solely on circumstantial evidence. The State's case rested primarily on the fact that Sutton and Dellinger were with Branam on the date of her disappearance; a white truck similar to Dellinger's was seen near where Branam's body was discovered; and a rifle shell in Branam's car was fired from a rifle found in Dellinger's trailer. The rifle shell is irrelevant because the State agreed there was no evidence Branam was shot. TT Vol. 15, p. 1494-95.

Recognizing its proof of the Branam murder was wholly insufficient, the State persuaded the trial court to allow it to present volumes of inflammatory evidence of prior bad acts. Of the thirty-six witnesses the state offered in its case in chief, twenty-five testified about irrelevant, prejudicial prior bad acts. Twenty-one of the witnesses were offered solely in an attempt to establish Sutton and Dellinger's guilt of the Tommy Griffin murder, for which they were not on trial. The amount of proof on the irrelevant Griffin murder was so great, the trial judge stated they were trying two trials within one. PCT, 6/30/03, p. 37. The State offered more witnesses to establish the Griffin death than it did to establish the Branam death. Sutton and Dellinger both offered reasonable doubt defenses. The jury found Sutton and Dellinger guilty of the Branam murder but, significantly, did not impose the death penalty.

The proof at trial did not answer three troubling questions. First, the proof failed to demonstrate Sutton's personal culpability. Dellinger, who was Sutton's uncle, was the dominant of the two and the principal actor. The State's proof, if believed, did no

{4}

more than establish Sutton's mere presence.

Second, the State placed great emphasis on showing Dellinger and Sutton's guilt of the Griffin murder; but the proof never established their motive for killing Griffin. Tommy Griffin was Sutton's closest friend. TT Vol. 18, p 1780-81. Sutton looked out for Griffin and "made sure he was taken care of." *Id.* at p. 1781. The State never offered a motive for Sutton to act in concert with Dellinger and kill Griffin.

Third, Sutton and Dellinger were convicted of premeditated first degree murder; yet the facts and circumstances leading up to Branam's death, and even the cause of death, are unknown. The State posited Sutton and Dellinger first killed Griffin; yet the facts and circumstances leading to his death are unknown.

The State's case hinges upon Tommy Griffin being killed at 11:55 pm on Friday, Feb 21, 64 hours before his body was found. The court may understandably be confused that the State's case for Branam's death hinges on Griffin being killed at a specific time. Yet it was the State that made Griffin's death front and center in a trial which purportedly was to determine responsibility for Branam's death. Scientific evidence establishes this time of death for Griffin is objectively impossible. Accordingly, the State's circumstantial evidence case for the Branam death, which the State contends is inextricably bound with the Griffin death, cannot stand.

The real story about what happened to Branam and Griffin is unknown. What is known is that the state court unreasonably denied Sutton a fair trial by allowing twenty-five witnesses to testify about prior bad acts. The state court also unreasonably denied Sutton a fair trial by forcing Sutton to stand trial with his uncle, James Dellinger, and also unreasonably denied Sutton his right to confrontation by allowing Dellinger's

{5}

statements to be used against Sutton. Sutton's counsel failed to present objective, persuasive scientific evidence demonstrating his innocence. Counsel failed to offer witnesses who would have impeached the State's case. Counsel presented tangible evidence which was discovered and exposed by the jury during trial to be inconsistent with a defense theory. Counsel failed to protect Sutton's right to an impartial jury by failing to object and appeal when an unbiased jury could not be selected, when the trial court's refusal to allow individual *voir dire* tainted the jury pool, when the trial court employed an illegal, arbitrary method for bringing in the emergency *venires*, and when the jury's deliberations were tainted by exposure to extrinsic evidence.

In addition to ineffective assistance of counsel, this case contains significant *Brady* claims. Specifically, the State failed to turn over evidence that the murder was a contract/revenge killing orchestrated by Lester Johnson. The State also failed to turn over *Brady* evidence related to other suspects. Proof of another suspect would have bolstered the reasonable doubt defense and the jury's ignorance of this evidence undermines confidence in the outcome.

Relief is warranted.

## CLAIMS

I. THE STATE COURT UNREASONABLY FOUND SUFFICIENCY OF THE EVIDENCE BASED ON ITS NOVEL LEGAL THEORY THAT "ST[ICKING] WITH [YOUR] STORY" ESTABLISHES ALL ELEMENTS OF AN OFFENSE, IN VIOLATION OF JACKSON V. VIRGINIA, 443 U.S. 307 (1979).

The evidence is insufficient to allow a jury to conclude beyond a reasonable

{6}

doubt that Gary Sutton is guilty of first degree murder.[3]  The State has shown nothing more than possible mere presence.  Taken in its best light, the Sate's case against Sutton is this: Sutton and Dellinger were with Branam on the day she disappeared; Sutton gave a statement that he was with Dellinger that same weekend; Sutton gave a statement that he did not see Dellinger kill Branam; and there were minute inconsistencies between Dellinger and Sutton's statements to law enforcement.  None of this evidence shows premeditation, intention, or deliberation.

The state court ruled:  "Sutton had the opportunity to reveal Dellinger's crimes and exonerate himself, but he did not.  He 'stuck to his story.' ...  The only reasonable hypothesis is that the appellants acted in concert and with a common intent."  *Sutton DA* at *4.  The state court opinion is contrary to or an unreasonable application of federal law by holding that Sutton's failure to inculpate his uncle demonstrated that he shared Dellinger's intent to kill Branam or that he even knew of Dellinger's plans in advance.

The state court opinion also finds sufficient evidence of first degree premeditated murder because Sutton originally failed to tell law enforcement he was with Branam the night before her disappearance and because he did not tell Branam he had seen her brother the night before.  *Id.*  This evidence also does not establish the elements of the offense.

Finally, the state court found sufficient evidence because Sutton and Dellinger were with Branam at the bar a couple of hours before the car fire and because a truck

---

[3]This claim was raised on direct appeal and addressed on the merits.  *State v. Sutton*, DA *4 (*citing Jackson v. Virginia*, 443 U.S. 307 (1979)).

{7}

like *Dellinger's*, with two occupants, was seen leaving the area of the car fire the next day. *Id.* (Emphasis added). Sutton and Dellinger were never identified as the passengers in this truck; but assuming Sutton was in the truck, mere presence in the truck near the area of the car fire the next day does not show that Sutton intended Branam's death, that he knew about it in advance, or that he assisted Dellinger or participated in carrying it out.

Can Sutton's lack of candor establish the elements of first degree murder? No, it cannot. Can it be the springboard that catapults the State over the elements of premeditation, deliberation, intent, and aiding and abetting Dellinger? No, it cannot. "The constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless .... Under our system of criminal justice even a thief is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar." *Jackson v. Virginia, supra*, at 324-25.

At the time of Sutton's trial, first degree murder required proof of intent, premeditation and deliberation. TENN. CODE ANN. § 39-13-202(a)(1)(1991). The aiding and abetting statute required proof that Sutton acted with intent to promote the offense and that he aided in committing the offense. TENN. CODE ANN. § 39-11-402(2)(1991). In Tennessee, a conviction may rest on circumstantial evidence so long as the evidence excludes all other reasonable theories except that of the defendant's guilt. *See State v. Crawford*, 470 S.W.2d 610, 612 (Tenn.1971). In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the

{8}

defendant beyond a reasonable doubt." *Id.* at 613.

Due process demands proof of each element of the offense. *In Re Winship*, 397 U.S. 145 (1968). This proof is missing in Sutton's case. There is no proof as to how Branam's death occurred. Witnesses at Howie's Hideaway testified that Dellinger did most of the talking, that Branam, Sutton and Dellinger appeared to be enjoying themselves, that Branam was "with" Dellinger, that Sutton kept to himself, and that all seemed normal when they left in Dellinger's truck. What proof is there that Dellinger harmed Branam? What proof is there that Sutton knew of Dellinger's plan to harm Branam and that he assisted? The convictions rest on mere conjecture and must be set aside and the charges dismissed.

II. MR. SUTTON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Counsel were ineffective for failing to investigate, discover, and present proof of Gary Sutton's innocence. The State's theory at trial was that Dellinger and Sutton murdered Branam after she discovered they had murdered her brother Griffin. The State was allowed to put on over twenty witnesses to link Dellinger and Sutton to Griffin's murder. Griffin's death had to be an integral part of the State's case to achieve a conviction for Branam's death. The trial judge characterized it as "two trials within one." PCT, 6/30/03, p. 37.

Counsel failed to investigate the circumstances surrounding Griffin's death, even though the State's prosecution of the Branam death was inextricably bound with proof that Dellinger and Sutton killed Griffin. **The circumstances of Griffin's death were so**

{9}

**irrelevant to counsel that counsel agreed to admission by stipulation of Dr. Eric Ellington's autopsy findings.** TT Vol. 14, p. 1385. The stipulation that was read in to evidence for the jury was that Griffin died of a shotgun wound to the head. Attachment A (autopsy report).

**Counsel conducted no investigation into the time of Griffin's death, a key element of the State's case in the Branam trial.** This circumstantial evidence case hinged upon Griffin being murdered at 11:55 p.m. on Friday, February 21. Lt. Thomas Defoe testified that Dellinger bailed Griffin out of jail at approximately 11:45 p.m.. Jason McDonald testified that he was writing in his journal and heard gunfire (presumably the fatal gunshot to Griffin) near the area where Griffin's body was found at 11:55 p.m. ; he was certain of this time because he wrote the time in his journal. Jason's mother corroborated her son's testimony. TT Vol. 1, p. 1174-75. Griffin's body was discovered at 3:30 pm on Monday, February 24. According to the State's theory, Griffin had been dead 64 hours before his body was discovered.

Counsel failed to present to the jury scientific evidence demonstrating that Griffin did not die at 11:55 pm on the night of Friday, February 21, but must have died much closer to the time the body was discovered. Two different highly respected experts have reviewed the evidence and records in this case and have concluded that it is scientifically impossible that Griffin died at this critical time.

Dr. Stanton Kessler, board certified Anatomic and Forensic Pathologist, (CV attached), reviewed the evidence in this case, including crime scene and autopsy photos and the autopsy report. Several factors lead him to conclude Griffin was killed

{10}

within 12 to 24 hours of when his body was found. Attachment B, Kessler Affidavit; Attachment C, Kessler curriculum vitae.

A forensic pathologist looks at several factors in determining time of death, including the presence of lividity, the presence of rigor mortis, the presence or absence of food in the stomach, the appearance of the wound itself, and the amount of decomposition.

When Griffin's body was discovered, lividity had not yet fixed. Lividity is the process whereby the capillaries break down and the blood seeps out and into surrounding tissue. When Griffin's body was found, lividity was in the face. When the body was shifted from face-down to the back while in transit to the morgue, lividity shifted to other parts of the body, "making it a very fresh body." Attachment B. Lividity is fixed within twelve hours of death. *Id.*

Griffin's body had rigor mortis when it was discovered. It sets in during a period of 6 to 12 hours after death and disappears on its own in 24 to 36 hours. *Id.* Counsel were ineffective for failing to call Randy Webb to testify. At the post-conviction hearing, Webb testified he worked for Rural Metro in 1992 and retrieved the body of Griffin from the Manning Lane area. The body was in rigor mortis at the time of the retrieval. PCT, 2/25/04, Vol. 2, p. 236. As Dr. Kessler, states, rigor disappears within twenty-four to thirty-six hours. Attachment B. Webb also testified that based on his experience as a police officer in that area, gunshots "happened quite a bit." *Id.* p. 235. This testimony would have explained how the State's witnesses could have heard a gunshot on the Friday night in question but that it was not the shot which killed Griffin.

Griffin's stomach contained partially digested food. A living person normally

{11}

digests food within 2 hours. After death, gastric enzymes that assist in digesting food continue to break down any remaining food and the food would have been completely digested in two and one-half days. Attachment B.

Dr. Kessler notes the wound was fresh when the body was found. A wound two and a half days old would have dried out. There was blood found at the autopsy in the mouth and nose, which would have dried up after a day. *Id.*

Finally, Dr. Kessler noted the amount of bodily decomposition reflected in the autopsy report and photos was inconsistent with death 64 hours earlier. *Id.*

Counsel were ineffective for failing to investigate the Griffin autopsy report's notation that Griffin's stomach contained partially digested food and for failing to discover that Griffin did not eat any food while at the jail. PCT, 2/25/2004, Vol. 1, p. 119 Vol. 2, p. 213. As Dr. Kessler explains, a living person normally digests food within two hours. Because he did not have any food at the jail, it is impossible that Dellinger bailed Griffin out and then killed him. Further, Dr. Kessler states that by 64 hours after death, the food would have been completely digested by enzymes still active in the body after death. Because partially digested food was still present at the time of the autopsy, the State's timeline is physically impossible.

This issue was presented to the state court and rejected because of a failure to "offer any medical testimony at the evidentiary hearing in support of his contention as to the length of a person's digestive process...." *Sutton*, PC * 17. The court also stated "it is not inconceivable that Mr. Griffin ate something after he was released from jail at 11:25 pm...." *Id.* The court concluded, "Petitioners are not entitled to relief on this issue." *Id.* at *18.

{12}

This issue was presented to the state court, which ruled as follows:

Even assuming that Petitioners' Sevier County counsel should have investigated Mr. Griffin's murder in Blount County more thoroughly ..., Petitioners have failed to establish that there is a reasonable probability that such investigation would have led to any different result in Petitioners' Sevier County trial. *Sutton*, PC *18.

The state court opinion is unreasonable because that same state court denied funding for expert testimony in an order dated September 15, 2003, appeal no. E2003-01914-CCA-R9-CD. Tennessee Supreme Court Rule 13 § 5(a)(2) bars authorization of expert and investigative services in non-capital post-conviction cases. The post-conviction court denied expert and investigative services. Sutton PCTech. p. 42. The Court of Criminal Appeals declined to overrule that decision. The state court opinion is unreasonable to deny relief for failing to prove something (medical testimony) when it previously denied the resources required to present that proof.

The state court opinion is also unreasonable in positing its own timeline wherein Dellinger bailed Griffin out of jail, took him to get something to eat, and then killed him. There is absolutely nothing in the record to suggest this scenario; yet, as a basis for denying relief, the state court manufactured this theory.

There is additional scientific proof of innocence. Dr. Neal Haskell, a renowned forensic entomologist, opines that the earliest Griffin could have died was the late afternoon of Saturday, February 22nd and as late Monday morning on the day the body was found. Attachment D, Haskell Affidavit. Dr. Neal Haskell is one of only eight board-certified forensic entomologists in North America and has worked on more than 500 death investigations around the world. Attachment E, Haskell curriculum vitae.

{13}

Forensic entomologists look to the insect activity on the decaying corpse to determine the time of death. Dr. Haskell reviewed crime scene and autopsy photographs, a crime scene report, climatological data for the location where Griffin's body was found, the autopsy report, and other documents. Dr. Haskell found it significant that the crime scene photos and the autopsy report contain no mention of any insect activity, other than ant colonization. Based on the temperature and location of the body, one would expect to find large bluebottle flies and fly eggs on the body after 64 hours. The fly eggs are large enough that a photograph would detect them and a pathologist could not miss them. Based on the lapsed time (64 hours) and the warm weather (above 50 degrees for most of the daylight hours for the time in question), he would have expected extensive egg masses to be on the remains. That there were none reveals the State's time of death is wrong. Dr. Haskell believes, to a reasonable degree of scientific certainty, the time of death could have been as late as sometime after sunrise on the 24th (the day the body was found) to as early as sometime during the late afternoon of Saturday, the 22nd. Attachment D.

Counsel were ineffective for failing to present this evidence. It would have affected the outcome because it further demonstrates the scientific impossibility of the State's case.

The state court opinion denying relief for failing to challenge the time of Griffin's death is unreasonable because it fails to acknowledge the evidence in question casts the case in an entirely different light. Rather than the stipulation regarding Dr. Ellington's autopsy findings, the jury would have heard evidence dramatically challenging the State's theory about Griffin's death. The evidence attacking time of

{14}

death is not duplicative of any other defense proof offered. The jury did not have the opportunity to consider this evidence. The evidence challenging Griffon's time of death has a "pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." *Strickland v. Washington*, 466 U.S. 668, 695-96(1976). The evidence shows Griffin's death could not have been connected to Branam's, as argued by the State. Since the State relied upon the Griffin-Branam connection to achieve a conviction, it is likely this evidence would have produced a different result. The jury struggled with the verdict in this case; Juror Ballinger testified that several jurors wept during deliberations. PCT, 2/25/04, Vol. 1, p. 102.

Counsel were ineffective for failing to investigate all suspects, including but not limited to Eddie Blair. Martha Blair, the wife of Eddie Blair, would have testified that shortly after Griffin's death, law enforcement came to their house, searched Eddie Blair's car and the grounds, and took away 12 gauge shotgun shells that they picked up from the ground. Eddie Blair always carried a shotgun in his car; the shotgun was not there when law enforcement searched his car. During the time of the deaths, Eddie Blair returned home late one night and threw his clothes in the trash. The next morning, he took out the trash and put it in the car. In the twenty years she lived with him, he never took out the trash.[4]

Counsel were ineffective for failing to present the testimony of Danny Sutton to bolster the defense theory that Bill Cogdill was responsible for the deaths. Counsel did present some evidence in support of this theory, including testimony by Joyce Tipton

---

[4]This new evidence of innocence is also relevant to showing Sutton meets the *Schlup* standard. *See, supra* page 49.

{15}

that Cogdill threatened her that she should be careful or she would end up like Connie Branam.   Counsel also cross-examined Cogdill on his statements to Danny Sutton that he needed help burning his truck to destroy fingerprints.  However, counsel failed to call Danny Sutton to testify.  Sutton would have testified that on March 2, 1992, he met up with Cogdill and as they were driving to Cogdill's house, they saw that it was on fire and that the fire department had responded.  That fire was determined to be an arson.  Counsel also failed to investigate whether Cogdill had been in a fight with Griffin at his trailer the night before he disappeared.[5]

Counsel were ineffective for failing to present testimony of Johnny Wade McCarter, who would have testified that state witness Barbara Gordon's testimony that a white truck she saw was (1) influenced by law enforcement and (2) was grossly inconsistent with the terrain of the area in question.  Barbara Gordon testified that she was housesitting on the evening of the Saturday, the 23rd/Sunday, the day of 24th.  She testified that she saw a fire in the woods on Saturday evening and that she saw a white truck with two occupants leaving the area Sunday morning.  TT Vol. 13, p. 1275-80.

McCarter testified at the post-conviction hearing that he was staying with the Gordons when they were housesitting.  He recalled that Barbara Gordon told the police she had seen a Chevy Blazer or Ford Bronco leaving the area; law enforcement, however, strongly suggested to her it was a white Dodge truck without a camper on it.  The next morning, after the police showed her Dellinger's truck, she changed her statement to be consistent with the State's theory.  The change in her statement was

---

[5]This new evidence of innocence is also relevant to showing Sutton meets the *Schlup* standard.  *See, supra* page 49.

{16}

unexpected and dramatic, as McCarter stated it "stuck with [him] forever since it first happened." PCT, 2/25/04, Vol. 2, p. 215.

McCarter also testified that the unpaved logging road Ms. Gordon claimed to have seen the white truck traveling was impassable. He specifically recalled that he and Mr. Gordon had tried to drive the logging road when he they tried to investigate the fire but that the road was "growed up and you couldn't really get in there." *Id.*, p. 219. They had to approach the scene from the main road.

The State court denied this claim, stating simply that issued related to Barbara Gordon's credibility were resolved at trial against the petitioners. *Sutton*, PC *11. The opinion overlooks the fact that trial counsel failed to investigate this aspect of the case and that the State's case against Sutton was very weak.

Counsel were ineffective for failing to investigate and examine car headlights before admitting them into evidence and tendering them to the jury. The State's witnesses testified that the Camaro seen alongside Alcoa Highway in Blount County where two or three men people were arguing was missing one headlight. The State contended at trial that the Camaro belonged to Sutton. Near the close of Sutton's trial, defense counsel admitted into evidence the headlights from Sutton's Camaro to demonstrate they were all working on the weekend in question. Defense counsel instructed a police officer to confirm they were functioning before bringing them into the courtroom to introduce to the jury. TT Vol. 19, p. 1820. After the headlights were passed to the jury, a juror removed the evidence sticker and noticed a code on one of the headlights revealed it was manufactured only a week before the weekend in question, undermining the defense theory. The juror who noticed the date discrepancy

{17}

pointed it out to the juror sitting beside him and then all of the jurors reexamined the headlights and discussed the headlights amongst themselves, in open court, in front of defense counsel, the state, and the judge. PCT 2/25/04, Vol. 1, pp. 15-17, 112. In rebuttal, the State called a witness to testify that the headlight was manufactured only a week before the weekend in question. TT Vol. 21, p. 2046-47. The post-conviction judge, who had conducted the trial, observed the introduction of the headlights was "devastating" to Sutton's case. PCT 2/25/04, Vol. 1, p. 17, Vol. 2, p. 265.

At the post-conviction hearing, defense counsel accepted responsibility for admitting the headlight. PCT, 2/25/04, Vol. 1, pp. 86, 97. He admitted there had been no investigation into the headlight itself. *Id.* p. 94. Counsel contacted the Board of Professional Responsibility after that devastating day of trial. *Id.* p. 19.

The post-conviction judge denied relief on this issue, stating the problem was of Sutton's own making. *Id.* Vol. 2, p. 270. The Court of Criminal Appeals affirmed the ruling. *Sutton* PC *15.

The state court is wrong as a matter of fact and law. As a factual matter, Sutton had been in custody for approximately one year at the time of trial. PCT, 6/30/03, p. 35. Counsel testified that family and witnesses indicated the headlights worked. PCT, 2/25/04, 2/25/2004, Vol. 1, p. 88. Counsel stated the "family says it did work." *Id.* p. 89. When asked at post-conviction whether Sutton wanted the headlights admitted, counsel responded, "I don't know that he objected to it one way or the other." *Id.* Counsel's statement at post-conviction that Sutton did not specifically authorize the headlight defense is consistent with his statements at trial, where he stated the headlight issue

{18}

was "not the making of this defendant" and that someone had changed the headlights, "but it's not our client." TT Vol. 21, p 2085, 2078. Further, counsel stated there was "no explanation, but a lot of possibilities" as to why one headlight had a more recent manufacture date. PCT, 2/25/04, Vol. 1, p. 97.

As a matter of law, counsel has an absolute duty to investigate. Investigation does not end with the client interview. ABA Standards for Criminal Justice: The Defense Function, Standard 10-7 A (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). In *Rompilla*, relief was warranted, even though the client sent counsel on"false leads." *Id.* at 381. The critical determination is whether the decision not to investigate is the result of "inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Here, counsel admitted he conducted no investigation into the tangible evidence presented to the jury. PCT, 2/25/04, Vol. 1, p. 94-97. This lack of counsel's failure to inspect the headlights was based upon inattention. Counsel were ineffective. Prejudice is patent given the trial judge's finding that the headlight mishap was "devastating." PC Relief of Writ: Findings of Fact, 2/25/04, p. 5. Relief is warranted.

Counsel were also ineffective for failing to object to the juror's testifying to the other jurors about the manufacturer's code and to the jury's deliberating before the end of proof. The juror who removed the sticker from the headlight and interpreted the manufacturer's code for the other jurors provided evidence against Sutton. The juror was not placed under oath and was not cross-examined. Once the other jurors received this new information, they began deliberating in open court. Counsel were

{19}

ineffective for failing to object and appeal this issue as well.[6]

Counsel failed to preserve and appeal numerous meritorious issues. Sutton has a constitutional right to counsel on appeal and this right includes the right to effective counsel. *Evitts v. Lucey,* 469 U.S. 387 (1985). When considering a claim of ineffective assistance for failure to raise issues, the court must look to the merits of the omitted issue. *Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006). Counsel were ineffective for failing to appeal several issues.

Counsel were ineffective for failing to protect Sutton's right to a trial by an impartial jury by failing to appeal the denial of a change of venue, failing to object to the manner in which the *venires* were selected, and for failing to appeal the denial of individual *voir dire*. The small town of Sevierville was inundated with media coverage of the two deaths. Headlines such as "Mother Convinced Body is Daughter," Ttech. Vol. 1, p. 299; "Sister Focus of Massive Manhunt" *Id.* p. 303; and "Victim's mother: 'I want them caught'" *Id.* p. 301 were common. Public outcry was so great that Sutton and Dellinger had to be relocated to a detention facility in Greeneville for "security reasons." *Id.* p. 317. There were no less than 27 newspaper articles about the deaths. *Id.* pp. 296-332.

So many prospective jurors had prejudged the case and had been excused, that two special "emergency" *venires* were summoned on two separate days. TT, Vol. 4, p. 361, Vol. 6 p. 513. When the emergency *venires* were ordered, the trial court simply directed the clerk to summon people to appear the next day. *Id.* The court did not

---

[6]See *infra* pages 24-25 for a more developed discussion of this issue.

{20}

follow the statutory procedure for doing so. TENN. CODE ANN. § 22-2-308(a)(2). The court was in such need of additional prospective jurors who had not been tainted that when the problem of summoning a second emergency *venire* was discussed, one of co-defendant's attorneys suggested "all the courthouse authorities to come." TT Vol. 6, p. 513. Of the twelve jurors who sat, eight had heard about and read about the case in the media.[7] Further, the prospective jurors were questioned in pools of twelve and prejudicial responses were heard by all prospective jurors. Specifically Juror Seaton commented on the defendants' prior criminal activity and insisted they were not innocent of the present charges. This information was shared with two jurors who deliberated. TT Vol. 1, p. 69, 76.

Counsel filed a motion for change of venue. Ttech. Vol. 1, p. 294. The motion was denied. TT Vol. 6, p. 502-03. Counsel failed to appeal the denial of the change of venue. That jurors literally had to be tracked down the eve of trial in violation of Tennessee's statute, shows the need for a change of venue. Being contacted the eve of trial to serve impressed upon the jurors the need to for the case to be resolved quickly. It likely caused the jurors to believe Sutton was particularly dangerous and also likely caused the jury to be aware of a strong public sentiment against Sutton. Counsel were ineffective in failing to appeal this issue. The deficiency prejudiced Sutton by denying him the right to an impartial jury. Relief is warranted.

This issue was addressed on the merits by the state court: "Both Petitioners

---

[7]Juror Gaps, TT Vol. 1, p. 71; Juror Cole, TT Vol. 2, p. 191; Juror Maples, TT Vol. 3, p. 239; Juror Ballenger, TT Vol. 4, p. 367; Juror Ogle, TT Vol. 5, p. 410; Juror Yarnell, TT Vol. 5, P. 444; Juror Justus, TT Vol. 6, p. 559; and Juror Johnson, TT Vol. 6, p. 561.

{21}

argue that their appellate counsel were ineffective because they failed to appeal the trial court's denial of their motion for a change of venue." *Sutton* PC *19-20. The state court denied relief, stating the "grant or denial of a motion for a change of venue is left to the sound discretion of the trial court" and that prejudice had not been shown. *Id.* at *20.

The state court opinion fails to acknowledge the unorthodox measures the trial court took at the last minute to find jurors who could utter the magic phrase that they could be fair, even though they were exposed to media coverage. That the trial court disregarded the statutory method for obtaining the venire shows the trial court abused its discretion. Jurors summoned at the last minute were placed on the panel and served under the impression that there was a strong community sentiment against Sutton. Relief is warranted.

Counsel also failed to preserve and appeal the erratic, unlawful manner in which the emergency *venires* were comprised. Had they appealed the manner of selecting the emergency *venires*, they would have won a new trial for Sutton. The Tennessee Supreme Court enforces the statutory procedure for selecting emergency *venires* scrupulously. *State v. Bondurant*, 4 S.W.3d 662, 668 (Tenn. 1999). In *Bondurant,*, the trial court instructed the clerk to summon additional jurors to appear the next day. According to statute, the clerk is to draw the names in open court, in the presence of the judge, and then issue summons. If time will not allow the clerk to do the summons the ordinary way, the judge is to direct the sheriff to summon the individuals in person. However, in *Bondurant*, out of the presence of the court, the clerk drew names and

{22}

summoned the jurors by telephone. *Id.* The Tennessee Supreme Court found this deviation illegal and reversible error because the process "could have inherently caused jurors to speculate that the defendant was more dangerous or that the alleged crime was more serious than other criminal cases." *Id.* at 670. The process used in Sutton's case is identical to that condemned in *Bondurant*. It was a violation of Sutton's Sixth Amendment right to an impartial jury. Had counsel appealed this issue, Sutton would have won a new trial.[8]

Counsel were ineffective for failing to appeal the denial of the motion for individual *voir dire*. The trial court questioned prospective jurors in groups of twelve. During *voir dire*, prospective juror Seaton stated, "I've formed an opinion. I even know stuff that the boys done before they even committed the crime. Not being innocent, I don't believe." TT, Vol. 1, p. 76-77. Although prospective juror Seaton did not sit on the petit jury, he shared this information with two people who did serve, David McClellan and Bruce Gaps. TT Vol. 1, p. 69; Ttech. Vol. 1, p. 491.

When Seaton blurted out the prejudicial information, counsel renewed the motion for individual *voir dire*. TT Vol. 1, p. 77. The trial court denied the motion. Counsel were ineffective for failing to appeal this issue.[9]

Counsel were ineffective for failing to object to and appeal when jurors were tainted by extrinsic evidence, which denied Sutton his right to a trial by an impartial jury,

---

[8]This issue is intertwined with the venue issue and is thus exhausted. Should the court find this issue not exhausted, review on the merits is still appropriate pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995). See *infra* p. 49

[9]This issue is intertwined with the failure to appeal venue claim and was presented to the state court. *See, e.g.,* PCT 02/25/04 p. 21.

{23}

as mandated by the Sixth and Fourteenth Amendments. Juror Seaton communicated objective extrinsic facts about Sutton's prior criminal behavior and became an unsworn witness again Sutton. *United States v. Howard*, 506 F.2d 865, 866 (5th Cir. 1975).

Juror knowledge of prior criminal behavior is inherently prejudicial. Before opening statements had even begun, jurors McClellan and Gap had information that Sutton had previously committed unrelated criminal behavior. Counsel failed to appeal this issue. Relief is warranted.

During trial, Sutton's counsel introduced the headlights to show they were all working on the weekend in question. Counsel did not object and appeal when a juror investigated and discovered that the manufacture date on one of the headlights undermined this theory and then educated the other jurors about it. Testimony at the post-conviction hearing established that several jurors had looked at the headlights before one juror removed an exhibit sticker and noticed the manufacture date. PCT, 6/30/03 p. 27-28. That juror pointed it out to the other jurors. The jurors talked "among themselves about the headlight" in open court before the jury was sent to deliberate. PCT, 2/25/04 p. 100. The juror that discovered the issue "made it known to everybody there that there was something amiss." PCT 2/25/04, Vol. 1, p.16.

The juror who removed the sticker to discover the manufacturer's code and then informed the other jurors became a witness against Sutton and introduced evidence into the trial. The right to a jury trial demands the verdict be based on the evidence produced at trial. *Turner v. State of Louisiana*, 379 U.S. 466, 472 (1965). The juror's unsworn testimony about the date of manufacture of the headlights was not subject to procedural safeguards of a fair trial, such as the right of confrontation, cross-

{24}

Case 3:07-cv-00030-TAV-CCS   Document 3   Filed 01/31/07   Page 27 of 57   PageID #: <pageID>

examination and of counsel. *Id.*

The State's closing argument focused solely on the headlights. TT Vol. 21, p. 2067-68. The trial court found the jurors' comments about the headlight rendered their admission devastating. There is no question of prejudice. Relief is warranted.[10]

Counsel did not interview jurors post-trial to learn that the jurors consulted a Bible during the deliberation process. During deliberations at the guilt phase, at least two jurors consulted a Bible and prayed. Juror Ballinger testified that juror Larry Gibson brought a Bible into the deliberation room. PCT, 2/25/04, p. 102. Gibson was crying and having a "real hard time, and he went off to be by himself with his Bible, and he was praying." *Id.* p. 103. Gibson had his Bible open and Ballinger and Gibson "prayed together." Ballinger and Gibson discussed "dealing with decision process and judgements process ... [which was a] heavy weight, and how to deal with this weight. And hand it to the Lord and let the Lord have it an not us." *Id.* p. 105.

The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial. *Turner v. State of Louisiana*, 379 U.S. 466, 472 (1965). The presence of the Bible in the jury room and the prayer for guidance in the judgment process violate this rule. Counsel were ineffective for failing to discover and appeal this issue. Relief is warranted.[11]

---

[10]This issue was presented to the state court. Dell.PCTech, p. 46-47, incorporated into Sutton's case by order of the court, PCT, 2/25/04, Vol. 2, p. 256-57.

[11]This issue was presented to the state court as a violation of the right to have an impartial jury. *See Sutton* PC *21-22. Should this court conclude this presentation was insufficient to embrace counsel's failure to appeal the issue, the claim must still be reviewed on the merits pursuant to *Schlup*. *See* page 49.

{25}

Counsel were ineffective for failing to appeal the suppression issue. Law enforcement obtained a search warrant to search Dellinger's property for ballistic evidence. MT, 11/13/92, Vol. 2, p. 147. When law enforcement arrived at Dellinger's house to execute the warrant, they first searched Dellinger's yard and recovered ballistic evidence, including the shells that were sent to the lab for comparison with the shells found at the scene in Blount County. TT Vol. 1, p.10. About ten minutes after law enforcement arrived, Linda Dellinger returned home. MT 11/13/92, Vol. 2, p. 157-58. Law enforcement followed Ms. Dellinger into the trailer and continued the search.

Counsel filed a suppression motion alleging the officer procured the warrant through fraud and alleging the reliability of the allegations supporting the warrant could not be determined. MT, 11/13/92, Vol. 2, p. 148. At the first motion hearing, the State introduced evidence that Linda Dellinger gave consent to the search. MT, Suppression Hearing, 11/13/92, Vol. 2, p. 158. Law enforcement searched Dellinger's yard for "five or ten" minutes before Ms. Dellinger returned home. Although Linda Dellinger was present at the hearing, counsel failed to call her as a witness. *Id.* p. 197. The court ruled that because Ms. Dellinger did not testify, there was "uncontradicted evidence" of consent. MT, 11/20/92, p. 10 . The court found the validity of the warrant "moot." *Id.* Counsel sought a ruling on the validity of the search warrant and the court refused to rule. *Id..* Counsel later filed a motion to suppress evidence seized prior to consent being given, including shot gun shells and rifle casings. Ttech. Vol. 1, p. 388. The trial court found the motion, filed the first day of trial, "comes too late." TT Vol. 1, p.12. Counsel failed to raise this issue on appeal.

At the post-conviction hearing, the parties stipulated that Linda Dellinger would

{26}

testify that she did not consent to the search. PCT, 2/25/04, vol. 2, p. 241.

The state court ruled on this issue: "Both Petitioners argue that their appellate counsel were ineffective because they failed to appeal the trial court's denial of ... their motion suppress the evidence found as a result of the search of Petitioner Dellinger's residence." *Sutton*, PC *19. The court held that because the Tennessee Supreme Court had upheld the search as it related to the Blount County trial, there was no error. *Id.*, *21

The state court opinion is unreasonable because it failed to review the issue as raised in Sutton's case and instead relied on the separate proceedings in Blount County. The state court opinion does not acknowledge that the proof and issues in the Blount County case were different issues than what Sutton raised, nor does it acknowledge that counsel failed to file the motion until the day of trial, forfeiting any review of the issue.

Sutton's issue is whether counsel were ineffective for failing to timely file the motion seeking to suppress items seized before consent and failing to appeal the ruling on whether evidence obtained prior to consent being given is admissible. Because the state court failed to review this issue, this court may review it *de novo*. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003). Evidence obtained before a purported consent is inadmissible. "Searches conducted outside the judicial process ... are per se unreasonable." *Katz v. United States*, 389 U.S. 347, 357 (1967). If counsel had timely filed the suppression motion and appealed this issue, the court would have barred admission of items obtained before Ms. Dellinger purportedly gave consent.

{27}

Counsel were ineffective for failing to appeal jury instructions that diluted the beyond a reasonable doubt standard. In state criminal trials, the due process clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358 (1970). The reasonable doubt standard "plays a vital role in the American scheme of criminal procedure." *Id.*

In this case, the jury was instructed that reasonable doubt should be considered under the following definition:

> A reasonable doubt is an honest doubt which remains after investigation of all of the evidence, which will not permit the mind to rest easily as to the certainty of guilt. A reasonable doubt does not include a captious, possible, or an imaginary doubt. Absolute certainty of guilt is not required to convict, but moral certainty is required, and this certainty extends to every element necessary to constitute the offense. TT Vol. 22, p. 2108.

These instructions on the constitutional requirement of a finding "beyond a reasonable doubt" referred to the required degree of proof as being to a "moral certainty," and the instructions excluded from the definition of reasonable doubt a "possible" doubt and a "doubt that may arise from possibility." There is a reasonable likelihood that these instructions diluted the constitutional standard and that the jury convicted Sutton without finding that the State met the constitutional requirement.

Excluding from the realm of reasonable doubt, a "possible" doubt arbitrarily raised the threshold of doubt above that required for acquittal. Possible doubt is not so unlikely that it should be excluded from the definition of reasonable doubt. This context given by the court violated Gary Sutton's due process rights by making the notion of reasonable doubt far too narrow.

{28}

In addition, the Supreme Court has expressed concern with the use of the phrase "moral certainty" in connection with the definition of reasonable doubt. *Victor v. Nebraska*, 511 U.S. 1 (1994). The Court recognized that while "moral certainty" was traditionally "an equivalent phrase with 'beyond a reasonable doubt,'" it is "not a mainstay of the modern lexicon." *Id*, at 12. The instruction on "moral certainty" in *Cage v. Louisiana*, 498 U.S. 39 (1990), contributed to a holding that the definition of reasonable doubt was unconstitutional because "moral certainty" would be understood very differently from "evidentiary certainty." *Id*. at 41. The instruction containing this phrase was upheld in *Victor* because "moral certainty" was defined in terms of the evidence and was therefore given meaning in the context of the instructions as a whole. *Victor*, 511 U.S. at 16. No such context was given in Gary Sutton's case. In the context of the instructions given in this trial, there is a reasonable probability that the jury understood the term "moral certainty" to be a lesser burden of proof than that required by the constitution.

Instructing the jury that a reasonable doubt is not a "possible" doubt, in combination with the "moral certainty" phraseology, created a reasonable likelihood that the jury viewed the degree of proof necessary for a verdict to be below that which is required by the Due Process Clause. Counsel's failure to object and raise this issue on appeal qualifies as ineffective assistance. Relief is warranted.

Counsel were deficient for failing to present lay witness and expert testimony to rebut the State's theory on the time of the Griffin death. Because a conviction on the Branam murder hinged on the Griffin death, the failure to challenge the Griffin death

{29}

prejudiced Sutton. Further, counsel were ineffective for failing to present evidence to challenge the state's case for the Branam murder, including witnesses to rebut proof that a white truck was seen the next day near the area of the car fire as well as witnesses to establish other possible suspects. In addition to failing to challenge the State's case, counsel's failure to inspect the headlights undermined the defense that was offered. This failure to investigate and present relevant evidence denied Sutton the right to effective assistance of counsel. Finally, counsel failed to object and raise on appeal critical issues. Relief is warranted. *Strickland v. Washington*, 466 U.S. 668 (1984).

III. THE STATE COURT UNREASONABLY FOUND THAT THE PARADE OF TWENTY-FIVE WITNESSES TESTIFYING TO UNCHARGED CRIMES DID NOT RENDER SUTTON'S TRIAL UNFAIR AND DENY HIM DUE PROCESS IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

The critical question for the jury was whether Gary Sutton was guilty of first degree premeditated murder of Branam. The trial court, however, admitted proof of several other instances of alleged criminal behavior by both Sutton and Dellinger. In fact, two thirds of the state's case-in-chief (**25** witnesses) was directed at proving other uncharged crimes. This parade of witnesses testifying to the uncharged crimes rendered Sutton's trial unfair and denied him due process.

Evidence properly admitted related to Connie Branam consists of the following. Georgia Elaine Mayes testified that on Saturday February 22, Branam stopped by her house to ask if she could watch her children while she looked for Tommy Griffin. Ms. Mayes stated Ms. Branam told her Griffin was with a girl in Blount County. TT Vol. 13,

{30}

p. 1204.

Nancy Bryant testified that while she was working at the Townsend Shopping Center that same afternoon, a woman came in and asked if she could leave her car there while she looked for her brother. Bryant responded she would have to ask Gary Sullivan for permission. Bryant did not remember the car or if it was there when she left. TT Vol. 13, p. 1214. Gary Sullivan, owner of the shopping center, testified that he saw a lady come in and ask about her brother. He saw her talking to two men in a white pickup truck in the parking lot but did not see her leave. The car was still there when he left around 6:15 that evening. TT Vol. 13, p. 1218, 1220-21.

Jamie Forsythe, a waitress at Howie's Hideaway bar in Blount County testified that Sutton, Dellinger and Branam came into the bar that day. TT Vol. 13, p. 1229. Dellinger said Griffin was last seen with a short fat girl. *Id.* p. 1230. Branam drank more than the men. *Id.* p. 1232. Dellinger told her they were at the bar last night with Griffin after they bailed him out of jail.[12] *Id.* p. 1230. Terri Lilly, another waitress at Howie's Hideaway, testified similarly. *Id.* p. 1260-75.. Lilly did, however, comment that Branam danced with Dellinger , was very friendly with him, and they appeared to be "together." *Id.* p. 1266.

Barbara Gordon testified that on Saturday evening, around 8:00 or 8:30 pm she saw a fire in the woods but did not investigate. The next day she thought she saw a Bronco or Blazer leaving the same area. After talking with law enforcement and looking at Dellinger's truck, she changed her statement so that she saw a white truck, not a

---

[12]Testimony about what Dellinger said violated Sutton's Confrontation Rights and should not be considered as evidence against Sutton. *See Bruton* issue, p. 38.

{31}

long bed, in the same area as the fire. *Id.* p. 1278-80. She was at the house all day and heard no gunshots. She could not identify the occupants. A few days later she and her husband went into the woods to investigate but she did not go all the way back. James Gordon confirmed this testimony. A few days after the fire, he went into the woods to investigate and found a burned out car. He notified authorities. He also did not hear gunshot on the day of the fire. TT Vol. 15, p. 1403,1408.

Gary Clabo, arson investigator, testified that the car fire was arson. *Id.* p. 1418. Dr. William Bass, forensic anthropologist, testified that the body was Branam's. He did not know how or when she died. There was no evidence she had been shot. TT Vol. 15, p. 1495. Murray Marks, a doctoral student, testified that he assisted Dr. Bass and that he found a .303 shell casing in the passenger floor board of Branam's car. TT Vol. 15, p. 1500-Vol. 16, p. 1501. TBI Agent Donald Carmen testified that the shell casing was fired from the rifle retrieved from Dellinger's trailer. TT Vol. 16, p. 1595.

TBI Agent David Davenport testified that Sutton told him he was with Dellinger all weekend and they did not kill anyone. TT Vol. 16, p. 1539-40. Detective Widener testified that both defendants told him that had been with Branam on Saturday at the bar. They had not revealed this earlier because Branam did not want it revealed that she was with them at a bar. TT, Vol. 14, p. 1323. Both defendants stated they took Branam back to her car and she headed to Maryville, indicating she had one more place to look. *Id.* p. 1324-25.

Rather than focus the jury's attention on proof of the crimes for which the defendants were charged, the jury heard proof about no less that six separate alleged crimes: a Christmas season 1991 altercation between Sutton and Bill Griffin, TT Vol.

{32}

11, p.1064-65; an early 1992 incident wherein Sutton shot out a street light; TT Vol. 13, 1208-09; a threat by Dellinger that he would "wipe out the whole hill of Griffins"; an alleged fight between Griffin and Dellinger or Sutton on Hunt Road off of Alcoa Highway in Blount County the night before Griffin failed to return home; the burning of Griffin's trailer the same night; and the alleged murder of Tommy Griffin.

This evidence distracted the jury from its essential task of determining Sutton's guilt of Branam's alleged murder. It served no other purpose than to show Sutton was a bad apple and had propensity to commit the crime.

Admission of this evidence was governed by TENN. R. EVID. 404(b) which requires this: a jury out hearing to determine admissibility; a finding that the evidence is relevant to deciding a material issue other than propensity or character; a finding that the proof shows the crime by clear and convincing evidence, and exclusion of the evidence if the danger of unfair prejudice is too great. The trial court refused to hold jury out hearings, stating "in the normal case I think the Court could have a jury-out hearing and hear a single witness, two witnesses, three witnesses, maybe even ten witnesses. To ask a trial court to have two or three days of hearings on that issue ... [is not] mandated ...." TT (Supplemental Transcript of the Evidence to Replace Pages 650-809 of Previously Filed Transcript), p. 670.

The court disregarded controlling law and denied the jury out hearings. It goes without saying that the court did not comply with the remaining requirements of the rule: a finding of relevance and exclusion if prejudice is too great. The trial court's refusal to follow well-established state law and first consider the proof of prior bad acts in a jury out hearing further demonstrates the lack of due process.

{33}

A. 1991 Fight. Sandy Branam testified that she observed Gary Sutton and Bill Griffin get into a fight around Christmas 1991 and that Sutton stomped Bill Griffin in the head. TT Vol. 11, p. 1064-65. She stated that Bill Griffin went to the hospital for medical treatment as a result of the fight. At that time, counsel objected and the court had a jury out hearing. At the jury out hearing, it is revealed that Sutton also had to seek medical treatment and that the grand jury had refused to indict Sutton for the crime, finding it justified. *Id.*, p. 1065. The trial court agreed testimony about seeking treatment for injuries was irrelevant and barred the proof. *Id.*, p. 1066. However, the damage was already done. In the first paragraph of the fact statement of the Court of Criminal Appeals opinion, the court notes, "As a result this incident, Bill Griffin was hospitalized." *Sutton*, PC *1. That the Court of Criminal Appeals relied upon the previously ruled inadmissible testimony about the hospitalization demonstrates the error in the trial court's refusal to conduct a jury out hearing. There are limits to the human mind. A panel of the judges versed in law could not disregard this inadmissible inflammatory evidence; a jury of lay persons can do no better.

Further, the evidence is irrelevant. Sandy Branam testified that Tommy Griffin was present during the argument and left with Sutton. She also testified that when Bill Griffin brought charges against Sutton, Tommy Griffin went to court to testify on Sutton's behalf. TT Vol. 11, p. 1086. Also, there is no proof that Connie Branam was present when the fight happened or that she even know about it. The fight with Bill Griffin does not demonstrate Sutton possessed ill will toward Tommy Griffin or Connie Branam.

B. Shooting Streetlights. Georgia Mayes was allowed to testify that several

{34}

weeks before Branam's death, Sutton shot at a street light across the road toward her bank. TT Vol. 13, p. 1207-09. This evidence was also irrelevant.

Both instances of prior criminal behavior that related specifically to Sutton were stale and did not involve Connie Branam. They also did not involve Tommy Griffin. They did not establish motive or intent. They were irrelevant.

C. Alcoa Highway fight. The State attempted to prove a fight on Alcoa Highway on Friday, February 21, 1992, between Tommy Griffin and either Sutton or Dellinger. The state called Cynthia Walker, TT Vol. 10, 929-944; Kenneth Walker, II, TT Vol 10, 944-948; Sharon K. Davis, TT Vol. 10, 949-56; Steven F. Brooks, TT Vol. 10, 958-965; Drew Roberts, TT Vol. 10, p. 966-97; and Sandy Hicks, TT Vol 10, p. 977-979.

The witnesses testified they saw a dark Camaro stopped along the side of Alcoa Highway and that there appeared to be a fight in progress. They were unable to positively identify Sutton or Dellinger. Law enforcement responded to the fight and found Tommy Griffin, who stated he had a fight with friends and they had put him out. When law enforcement asked who the friends were, he declined to identify them by name. TT Vol. 10, p. 968.

The State did not prove this crime by clear and convincing evidence as TENN. R. EVID. 404(b) requires. None of the witnesses positively identified Dellinger or Sutton. The witnesses' testimony was equivocal on the model of car involved. Tommy Griffin did not inculpate Dellinger or Sutton, when asked by law enforcement. Connie Branam was not present at this fight and there is no evidence that she ever knew of it.

This evidence is irrelevant and highly prejudicial. A possible fight by Sutton or Dellinger with Griffin has no bearing on whether Sutton is responsible for Branam's

{35}

death.

D. Trailer Fire. Next, the State attempted to prove an alleged arson of Tommy Griffin's trailer by offering the testimony of the following witnesses: Alvin Henry, TT Vol. 10, p. 979-1022; Sherry Russell, TT, Vol. 11, p. 1028; Jennifer Branam, TT, p. 1035-1062; Sandy Branam, TT, Vol, 11, p. 1063-1089; Herman Lewis, TT Vol. 11, p. 1114-1144; Georgia Elaine Mayes, TT. Vol. 12, p. 1176-Vol. 13, p. 1212; and Gary Clabo, TT Vol. 15, 1409-1476.

The witnesses testified that on Friday evening, Tommy Griffin's trailer caught on fire and that a white truck left Griffin's trailer and drove to Dellinger's trailer. Jennifer Branam stated that when she went to Dellinger's trailer to ask him for help, Dellinger and Sutton's pant legs were wet. The relevance of wet pant legs was never shown. Arson investigator Gary Clabo opined that the fire was arson, based on the burn patterns.

The trial court refused to join the trailer arson with the other crimes, finding it would unnecessarily confuse the jurors. Ttech, Vol. 1, p. 342-343. The trial court, however, refused to apply this reasoning to admission of the proof of the trailer arson under 404(b).

E. Griffin Death. Finally, the State attempted to demonstrate Sutton and Dellinger were responsible for Griffin's death. John Brown testified that Dellinger stated he would wipe out the hill of Griffins. TT Vol. 9, 883-Vol. 10. Terri Lilly testified that she served Sutton, Dellinger and Griffin at Howie's Hideaway on Friday, February 21. TT Vol. 10, p. 919. Jamie Forsythe testified similarly. TT Vol. 13, p. 1226-1259. They also both testified that the next day, when Dellinger and Sutton showed up with

{36}

Branam, they were acting suspicious.

Jennifer Branam testified that after the trailer fire, she saw Dellinger move something from his truck into the back of his wife's car and then on Saturday, either Sutton or Dellinger removed the item from his wife's car and put it under the house. TT Vol. 11, p. 1043-45. Herman Lewis agreed something was moved from Dellinger's truck to Linda Dellinger's car but he could not say who moved what. TT Vol. 12, p. 1121.

Several witnesses testified about phone calls back and forth between various family members in an attempt to locate Griffin. TT Vol. 11, p. 1072-73, Vol. 17, p. 1674, Vol. 18, p. 1760, 1769, 1781.

Ray Herron testified that Griffin was booked at the Blount County jail at 7:40 pm and that someone asked about him an hour later. He also stated Dellinger came in with another man to bail Griffin out of jail. TT Vol. 12, p. 1145-47. Griffin left the jail at 11:25 p.m. *Id.*, p. 1149. Thomas David Defoe of the Blount County Sheriff's Department testified that he saw both Dellinger and Sutton at the jail. He heard one of them said he needed to get Griffin back to Sevierville. TT Vol. 12, p. 1164-66.

Jason McDonald heard gunfire (purportedly the fatal shot) in the Manning Road area in Blount County on Friday evening at 11:55 pm. TT Vol. 12, p. 1169-71. His mother confirmed this testimony. TT Vol. 12, p. 1174-75.

Thomas Carter testified that he discovered Griffin's body on Monday, February 24, around 2 -3 pm near the Manning Road area and notified the police. Detective Widener testified that Griffin had a gunshot wound to the head the size of a silver dollar. There were two 12 gauge buck spent shotgun shells within 10 to 12 feet of the body.

{37}

TT Vol. 14, p. 1306-07. Detective Widener questioned both Sutton and Dellinger. They both indicated Griffin left them at a Citgo Station with a girl. Dellinger stated Branam contacted him to bail Griffin out; Sutton stated Branam called asking where her brother was. *Id.*, p. 1313-14.[13]

Dr. Ellington's autopsy report was entered by stipulation. It did not identify the time of death and confirmed the death was due to gunshot. TT Vol. 14, p. 1385. TBI Agent Carmen testified that spent gunshot shells found near Griffin's body were shot from the same weapon as spent shells recovered around Dellinger's residence. TT Vol. 16, 1593-95.

The admission of this vast amount of evidence, literally volume upon volume upon volume, of other alleged crimes rendered Sutton's trial fundamentally unfair. This claim was presented to the state court. The appellate court found the evidence relevant and also that compliance with TENN. R. EVID 404(b) was not necessary because it was too cumbersome to consider the proof prior to trial, as "some twenty-five (25) to thirty (30) witnesses were expected to testify at trial as to the prior crimes." *Sutton*, DA *8.

The appellate court stated the evidence showed motive and intent. The two prior bad acts specifically involving Sutton, shooting at street lights and the fight with Bill Griffin, establish nothing about motive or intent as it relates to Branam. Also, they occurred as much as two months before Branam's death.

Further, the evidence about Griffin was voluminous and inflammatory. The court could have easily minimized the proof. The state called 35 witnesses. Twenty-five to

---

[13]This evidence was admitted in violation of *Bruton v. United States*, 391 U.S. 123 (1968). This issue overlaps with Sutton's *Bruton* claim, *see* page 39.

{38}

thirty of those witnesses testified to prior bad acts. If the state court found it too burdensome to consider the evidence pretrial, as the rules require, it is doubtful the jury could properly sort out the evidence. The court did not consider the probative value versus the prejudice. This is not a case where a small portion of the proof involved prior bad acts; nor is this a case where half of the proof involved prior bad acts. Three-fourths of the proof involved prior bad acts. The prejudice cannot be understated. The evidence was irrelevant and inflammatory.

When an error in applying state law rises to the level of depriving the defendant of due process and fundamental fairness in the trial process, habeas relief is warranted. The sheer volume of irrelevant prejudicial evidence "infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo* 416 U.S. 637, 643 (1974). Where three-fourths of the state's case is irrelevant, inflammatory evidence, due process is denied. Relief is warranted.

IV. THE STATE COURT UNREASONABLY CONCLUDED *BRUTON* IS IRRELEVANT WHERE THE COMPLAINING DEFENDANT GIVES A STATEMENT, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS.

V. THE STATE COURT UNREASONABLY FOUND TRYING SUTTON WITH HIS UNCLE, WHO WAS THE PRINCIPAL ACTOR, DID NOT DENY SUTTON DUE PROCESS, WHEN EVIDENCE PROPERLY ADMITTED ONLY AGAINST DELLINGER WAS IMPUTED TO SUTTON, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS.

The trial court's joinder of the trials of Sutton and Dellinger abridged Sutton's constitutional rights in two ways: first, his confrontation rights were violated when he

{39}

was convicted in large part based upon his nontestifying codefendant's statements; second, his rights to due process and fundamental fairness where violated when evidence properly admitted only against Dellinger was unfairly imputed to him.

Approximately one week before Branam's death, James Dellinger called law enforcement to his trailer to complain that the Griffins had shot at his storage building. TT Vol. 9, p. 897. He informed law enforcement that "If I have to, I'll wipe out the entire hill of Griffins." *Id.* p. 898. The state contended the statement was relevant to both defendants. *Id.*

The State also used other statements by Dellinger to suggest Sutton's guilt. Jamie Forsythe, a waitress at Howie's Hideaway testified that Dellinger told her Griffin was last seen with a short fat girl. She also testified that Dellinger at one point stated that after they bailed Griffin out of jail, they went to Howie's but that he later stated they might have gone by Howie's. TT Vol 13, p. 1230-31. Terri Lilly, another waitress at Howie's Hideaway, also testified that Dellinger told her they came to Howie's after bailing Griffin out. *Id.* p. 1262.

Detective Widener took statements from Sutton and Dellinger. Widener testified that while Dellinger stated Branam called him to make Tommy's bail, Sutton stated Branam called to ask where her brother was. TT Vol. 14, 1313, 1316.

Because Dellinger did not testify, Sutton did not have the opportunity to cross-examine him about any of these statements. Further, the State argued the statements could be considered against both defendants: "[T]hey fell together ... even by their own statements given to law officers. .... They are either both guilty, or they're both innocent." TT Vol. 21, p. 2068. Admission of these statements violated Sutton's

{40}

confrontation rights. *Bruton v. United States*, 391 U.S. 123 (1968).

The error is not harmless. This was an extraordinarily close case. Juror Ballinger testified at post-conviction that the jury was devastated by the judgment process. PCT, 2/25/04, Vol. 1, p. 103. Dellinger's stated desire to eliminate all of the Griffins establishes motive and intent, *as to Dellinger.* There is no comparable evidence properly admitted against Sutton. Tommy Griffin was Sutton's best friend. Absent Dellinger's threat, there is no proof of motive or intent, as to Sutton. The proof affected the outcome.

Further, the State went to great effort to point out the most minute inconsistencies between Sutton's and Dellinger's statements. Why? Because its case was so weak that was the only basis for finding guilt. The inconsistencies were a part of the State's case for guilt. Sutton was not allowed to cross-examine Dellinger about the inconsistencies. Admission of Dellinger's statements against Sutton affected the outcome in this extremely close, circumstantial evidence case.

The state court addressed the *Bruton* issue as follows:

> In *Bruton*, the Court held that admission of a non-testifying codefendant's statement implicating the defendant is a violation of the latter's right to confrontation. ... In the instant case, there is no *Bruton* problem because the statement in question does not implicate Sutton in any way. Sutton was implicated by his own statements that he was with Dellinger continuously during the relevant time periods.[14] Thus, admission of Dellinger's statement did not violate Sutton's constitutional right of confrontation.

*Sutton*, DA *7.

---

[14]Sutton's statement that he was with Dellinger the whole weekend is contradicted by the testimony of Linda Dellinger, TT Vol. 18, p. 1701, Carolyn Weaver, *Id.* P. 1786, and Amy Franklin, TT Vol. 19, p. 1870-76.

{41}

The state court unreasonably denied relief by finding there is no *Bruton* issue where the complaining defendant gives a statement. The existence of Sutton's own statement does not obviate the Sixth Amendment error. *Cruz v. New York*, 481 U.S. 186, 193 (1987). Further, the court does not acknowledge the nature of Dellinger's statement; that is, that it establishes motive and intent. The court also does not acknowledge that there is no similar proof anywhere in the record properly admitted against Sutton. It does not acknowledge that the State urged the jury to consider the evidence against both defendants. It is an unreasonable application of or is contrary to federal law. Relief is warranted.

The state court also unreasonably found the joinder of defendants did not deny Sutton his due process right to a fair trial.[15] There is no question that without joinder, Sutton's case would never make it to a jury. The State had statements by Dellinger showing intent and motive and the State had ballistics evidence linking Dellinger to both deaths (albeit tenuously). The State also had the statement of Alvin Henry that he was afraid of Dellinger. TT Vol. 11, p. 1019-20. The State has no comparable evidence against Sutton. The weaker the case against Sutton, the more prejudicial the joinder is.

The evidence against Dellinger includes Dellinger's statement that he would "wipe out the whole hill of Griffins"; that a white truck was seen leaving the trailer fire, that Dellinger bailed Griffin out of jail, that Branam left the Townsend Shopping Center in Dellinger's truck, that a white truck was seen the next day leaving the area of the car fire, that shot gun shells found near Griffin's body matched shells found near Dellinger's

---

[15]Sutton presented his due process claim to the state courts. Direct Appeal Brief, p. 69.

{42}

house, and that a rifle casing found in Branam's car matched Dellinger's rifle.  There is no similar evidence against Sutton.

The joinder denied Sutton his day in court.  Relief is warranted.

VI.  THE JURORS WERE TAINTED BY EXTRINSIC EVIDENCE WHICH DENIED SUTTON HIS RIGHT TO A TRIAL BY AN IMPARTIAL JURY, AS MANDATED BY THE SIXTH AND FOURTEENTH AMENDMENTS.

During deliberations at the guilt phase, at least two jurors consulted a Bible and prayed.  Juror Ballinger testified that juror Larry Gibson brought a Bible into the deliberation room.  PCT, 2/25/04, Vol. 1, p. 102.  Gibson was crying and having a "real hard time, and he went off to be by himself with his Bible, and he was praying."  *Id.* p. 103.  Gibson had his Bible open and Ballinger and Gibson "prayed together."  Ballinger and Gibson discussed "dealing with decision process and judgements process ... [which was a] heavy weight, and how to deal with this weight.  And hand it to the Lord and let the Lord have it an not us."  *Id.* p. 105.

This claim was addressed on the merits by the state court, which concluded that "there is no evidence that any juror was improperly exposed to extraneous information during the deliberation process."  *Sutton* PC * 22.[16]  The state court opinion is unreasonable because it makes the unsubstantiated factual conclusion that there was no extraneous information introduced into the deliberation process.  Juror Ballinger testified that Juror Gibson had his Bible open and that the two prayed for guidance in

---

[16]*See also* Sutton's post conviction brief p. 20 (jurors' use of Bible entitles Sutton to relief under Fifth, Sixth, and Fourteenth Amendments to the United States Constitution).

{43}

dealing with the judgment process. The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial. *Turner v. State of Louisiana*, 379 U.S. 466, 472 (1965). The presence of the Bible in the jury room and the prayer for guidance in the judgment process violate this rule. Relief is warranted.

During trial, Sutton's counsel introduced the headlights to show they were all burning on the weekend in question. Testimony at the post-conviction hearing established that several jurors had looked at the headlights before one juror removed an exhibit sticker and noticed the manufacture date was inconsistent with the defense theory. PCT, 6/30/03 p. 27-28. That juror pointed it out to the other jurors. The jurors talked "among themselves about the headlight" in open court before the jury was sent to deliberate. PCT, 2/25/04 Vol. 1, p. 100. The juror that discovered the issue "made it known to everybody there that there was something amiss." *Id.* p. 17.

The juror who removed the sticker to discover the manufacturer's code and then informed the other jurors became a witness against Sutton and introduced evidence into the trial. The right to a jury trial demands the verdict be based on the evidence produced at trial. *Turner v. State of Louisiana*, 379 U.S. 466, 472 (1965). The juror's unsworn testimony about the date of manufacture of the headlights was not subject to procedural safeguards of a fair trial, such as the right of confrontation, cross-examination and of counsel. *Id.*

The State's closing argument focused solely on the headlights. TT Vol. 21, p. 2067-68. The trial court found the jurors' comments about the headlight rendered their

{44}

admission devastating. There is no question of prejudice. Relief is warranted.[17]

Finally, during *voir dire*, prospective juror Seaton stated, "I've formed an opinion. I even know stuff that the boys done before they even committed the crime. Not being innocent, I don't believe." TT Vol. 1, p. 76-77. Although prospective juror Seaton did not sit on the petit jury, he shared this information with two people who did serve, David McClellan and Bruce Gaps. *Id.* p. 69; Ttech. Vol. 1, p. 491. Juror Seaton communicated objective extrinsic facts about Sutton's prior criminal behavior and became an unsworn witness again Sutton. *United States v. Howard*, 506 F.2d 865, 866 (5th Cir. 1975).

Juror knowledge of prior criminal behavior is inherently prejudicial. Before opening statements had even begun, jurors McClellan and Gap had information that Sutton had previously committed unrelated criminal behavior. Relief is warranted.

Sutton's Sixth Amendment right to an impartial jury was also denied because the jury was not properly sequestered. The jury was allowed to have "family night" and allowed to visit with family members without being "monitored. PCT, 2/25/04, Vol. 1, p. 102. One juror recalled that he "did not believe" family night was "supervised." *Id.* p. 110.

The state court denied this claim. *Sutton*, PC *23. "The right to a jury free of improper outside influence ... is grounded in the federal Constitution ... and thus this claim is cognizable in this habeas proceeding." *King v. Bell*, 392 F.Supp.2d 964, 997 (M.D.Tenn. 2005). Violation of the sequestration rule denied Sutton his right to an

---

[17]This issue was presented to the state court. Dell. PCTech p. 46, incorporated by order of the trial court. PCT, 2/25/04, Vol. 2, p. 256-57.

{45}

impartial jury. Relief is warranted.

VII. THE STATE COURT UNREASONABLY FOUND THAT PROOF OF OTHER SUSPECTS DOES NOT UNDERMINE CONFIDENCE IN THE VERDICT, IN THIS CIRCUMSTANTIAL EVIDENCE, MOTIVELESS CASE.

The state suppressed law enforcement records favorable to Sutton, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

The state did not disclose records suggesting the deaths were "contract/revenge killings in retaliation for the arrest of ... Lester Johnson." PCT 2/25/04, Vol. 1, p. 51, Exhibit 4 (Bates #410235). Blount County law enforcement records reveal investigation into whether Lester Johnson could have been responsible for the death. Chief Detective Dale Gourley of the Blount County Sheriff's department dictated a memorandum describing an offense in North Carolina involving Lester Johnson and Christina Hartman. When Hartman refused to engage in a sexual act with Johnson, he slit her throat. Johnson faced trial in North Carolina for attempted first degree sexual offense. The State of North Carolina had subpoenaed both Griffin and Branam to testify at the trial. Neither appeared. Johnson was acquitted at 5:57 pm on February 21, 1992, and was released from custody. The memo indicates some of Hartman's family had been threatened that they "were next after the disappearance of Griffin and Branam." *Id.* Detective Gourley concludes the memo by suggesting the deaths of Griffin and Branam may have been "contract/revenge killings in retaliation for the arrest of" Lester Johnson. *See also* the North Carolina charging instruments, PCT 2/25/04, Vol. 1, p. 54, Collective Exhibit 8.

This claim was presented to the state court. The state court denied the claim,

{46}

stating "testimony ... clearly placed Ms. Branam in Petitioners' company shortly before the fire from her car was spotted by the Gordons." *Sutton*, 2006 WL 1679595 *25. The state court resolution of this claim is unreasonable because it fails to recognize the highly contested nature of the case. There is no question the evidence is exculpatory: it points to another suspect who actually had a motive for the killings. The question is whether the evidence is material. Materiality is not determined by merely stating there is still evidence in favor of guilty; materiality exists if the suppressed evidence undermines confidence in the verdict. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Evidence of another suspect with a motive is evidence that undermines confidence in the verdict. Relief is warranted.[18]

Federal inmates Troy Turner, Bobby Floyd, and Jim Alexander had contacted either the prosecuting attorney and/or investigating detectives indicating they had information regarding the deaths. The prosecuting attorney apparently thought the contact was significant, as he visited them in federal custody prior to trial. PCT, 2/25/04, Vol. 1, p. 57. This information was not disclosed to the defense. *Id.*

The information regarding Floyd was particularly important because Sutton had offered proof at trial that Griffin had previously bought drugs from Floyd and when Floyd was arrested for dealing drugs, there were rumors that Griffin provided the information needed to make the arrest. TT Vol. 14, p. 1346-47. Detective Widener acknowledged he was aware of the rumors regarding Floyd's animosity toward Griffin. *Id.* p. 1347-48. Despite the apparent relevance to Sutton's defense, the state court denied relief on this

---

[18]This new evidence of innocence is also relevant to showing Sutton meets the *Schlup* standard. *See, supra* page 49.

{47}

issue, finding no error because counsel attempted to explore the Floyd/Griffin drug connection at trial. *Sutton*, PC *24. The state court opinion is unreasonable because it overlooks the fact that the *additional* evidence would have bolstered counsel's efforts to support this defense and would have made this defense more credible. The evidence is material, *Kyles v. Whitley, supra*. Relief is warranted. [19]

VIII. SUTTON IS ENTITLED TO AN EVIDENTIARY HEARING.

Sutton is entitled to an evidentiary hearing. Under 28 U.S.C. § 2254(e)(2) courts have discretion to grant an evidentiary hearing unless a petitioner "has failed to develop the factual basis for a claim in State court proceedings." However, an evidentiary hearing may be required if the petitioner's claims fall within the criteria set out in *Townsend v. Sain*, 372 U.S. at 312-318, *overruled in part on other grounds, Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992) (setting forth that the cause and prejudice standard, rather than the deliberate bypass standard, is the correct standard for excusing a habeas petitioner's failure to develop material facts in state court proceedings) *codified by* 28 U.S.C. ss 2254(e)(2). Because Sutton is not to blame for failing to develop all of the facts showing ineffective assistance of counsel in state court, then *Townsend's* mandatory hearing standards control.

Sutton presented to the state court the facts showing the state's timeline in this case is impossible, including proof that there was partially digested food in Griffin's stomach, that lividity was not present, and that the body was in rigor mortis when discovered. The state court, however, denied funding to establish the meaning of these

---

[19]This new evidence of innocence is also relevant to showing Sutton meets the *Schlup* standard. *See, supra 49.*

{48}

facts. Sutton PCTech., p. 41; Tenn. Sup. Ct. Rule 13, Section 5(a)(2) (no funding for expert services in non-capital post-conviction cases). On appeal, the state court used the lack of expert proof as a basis to deny relief. *Sutton*, PC *17.

An evidentiary hearing is required under *Townsend*, if (1) the petition alleges facts that, if proved, entitle the petitioner to relief; (2) the fact-based claims should survive summary dismissal because their factual allegations are not "palpably incredible" or "patently frivolous or false"; and (3) for reasons beyond the control of the petitioner, the factual claims were not previously the subject of a full and fair hearing in state court or, if a hearing was held, it did not result in state court fact findings that resolve all the controlling factual issues in the case. *Townsend v. Sain*, *supra*.

Here, Sutton presents evidence that shatters the State's solely circumstantial evidence case. The State's theory at trial was that Dellinger bailed Griffin out of jail at around 11:30 pm and then killed him at 11:55. Objective, scientific evidence demonstrates it is impossible that Griffin died at that time. Counsel failed to investigate Griffin's death, allowing the autopsy to be admitted into evidence by stipulation. Had counsel investigated, they could have shown the jury that the state's theory was objectively impossible. Recognizing that the jury struggled to reach a verdict on guilt and declined to impose the death sentence, this compelling evidence would have made a difference. This court must allow an evidentiary hearing for Sutton to show the ineffective assistance of counsel which has made his conviction unreliable.

IX. SUTTON' S NEW PROOF OF INNOCENCE WOULD CAUSE ANY JUROR TO HAVE REASONABLE DOUBT; HE IS ENTITLED TO HAVE DEFAULTED CLAIMS REVIEWED ON THE MERITS.

{49}

In light of Sutton's proof of innocence, it is more likely than not that "any juror would have reasonable doubt." *House v. Bell*, 126 S.Ct. 2064, 2077 (2006). In *House*, the United States Supreme Court confirmed that if the petitioner can present new proof of innocence that would cause any juror to have reasonable doubt, he is entitled to have defaulted claims reviewed on the merits. Sutton has presented sufficient proof to meet this standard. Accordingly, any claim the court deems defaulted should be reviewed on the merits.

Sutton's new evidence shows the State's entire theory about Griffin's death is scientifically, objectively impossible. Sutton has also presented new evidence pointing the finger of guilt at other potential suspects. If the jury had known this, it would not have convicted Sutton. Because Sutton has met the *Schlup* standard, he is entitled to have the merits of any defaulted claims reviewed. *Id.*

In determining whether Sutton meets the *Schlup* standard, this court must keep in mind that it is not determining what "really happened"; instead, this court must examine the effect the new evidence would have had on the jury. *House*, 126 S.Ct. at 2077. Here, Sutton maintained his innocence from the beginning. He offered proof that he loved Griffin and had no reason to kill his best friend. The State presented the ominous theory that Dellinger bailed Griffin out of jail and then almost immediately killed him. Then, when Branam discovered their crime, they killed her to silence here. Dellinger and Sutton offered evidence that Dellinger had frequently bailed his friend out of jail and this instance was no different. TT Vol. 17, p. 1674. Had Sutton and Dellinger been able to rebut the ominous theory of an immediate killing upon release

{50}

with objective, reliable scientific evidence, the State's theory for the Branam murder would fail.

If Griffin did not die Friday night, then the testimony that Branam, Dellinger, and Sutton went to the bar on Saturday evening changes from a sinister scene where Dellinger tries to keep the waitresses from talking too much to what Sutton and Dellinger have contended all along: they were there with Branam looking for Griffin. If Griffin did not die Friday night, then the motive for the Branam death is eliminated. It also calls into question the state's theory that Dellinger and Sutton left the bar Saturday evening and killed Branam.

Dr. Stanton Kessler, concludes Griffin was killed within 12 to 24 hours of when his body was found. *See* Attachment B. There is additional scientific proof of innocence. Dr. Neal Haskell, a renowned forensic entomologist, opines that the earliest Griffin could have died was the darkness hours of the night of the Saturday February 22nd /morning of the Sunday February 23rd and as late Monday morning on the day the body was found. *See* Attachment D. Lay witnesses impeaching the state's witnesses and demonstrating different possible suspects also create reasonable doubt.

Proof that Griffin died as much as two and one-half days later has a pervasive effect on the case. The State linked together a circumstantial evidence case; each link in the chain is essential. The chain is as strong as its weakest link. The chain is broken because the link that Griffin's death was at 11:55 pm on Friday evening has snapped in two. This court must either conclude Sutton has established the *Schlup* gateway or this court must grant an evidentiary hearing on this issue.

{51}

Respectfully submitted,

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY:_____

Stephen M. Kissinger
Asst. Federal Community Defender
530 S. Gay Street, Suite 900
Knoxville, TN 37902
(865)637-7979

I hereby certify under penalty of perjury that the foregoing Petition for Writ of Habeas Corpus is true and correct.

_____1/26/07_____
Date

_Gary Wayne Sutton_
Gary Wayne Sutton

## CERTIFICATE OF SERVICE

I, Stephen M. Kissinger, hereby certify that a true and correct copy of the

foregoing Petition for Writ of Habeas Corpus was mailed to:


Alice Lustre, Senior Counsel
Office of Attorney General & Reporter
P.O. Box 20207
Knoxville, TN 37202

this the 26th day of January, 2007 by postage prepaid delivery.


_____
Stephen M. Kissinger