# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

|  |  |  |
|---|---|---|
| GARY WAYNE SUTTON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 07-cv-00030 |
| v. | ) | Judge Varlan |
| | ) | |
| RICKY BELL, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |

## ANSWER

### I. PRELIMINARY STATEMENT

On January 31, 2007, petitioner filed his original petition for writ of habeas corpus challenging the legality of his convictions and sentences resulting from a criminal trial in Sevier County, Tennessee. (Doc. 3) Respondent Ricky Bell, Warden of the Riverbend Maximum Security Institution, is the officer currently charged with the custody of the prisoner. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2241, as the crimes for which petitioner received the conviction and sentence occurred in Sevier County, Tennessee.

Pursuant to this Court's Order entered on March 28, 2007, (Doc. 8) and Rule 5 of the Rules Governing § 2254 Cases in the United States District Courts (Habeas Rules), respondent submits the following answer to the petition for writ of habeas

1

corpus.

**A. Exhaustion of State Remedies**

Habeas relief may be granted only where a state prisoner is being held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under 28 U.S.C. § 2254(b)(1)(A), an applicant for habeas relief must first exhaust the available remedies in the state courts, including appeal through the highest state appellate court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728 (1999). The exhaustion requirement mandates that a criminal defendant "fairly present" both the factual and legal bases of his claim to the state courts. "A state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 124 S.Ct. 1347, 1350 (2004).

Petitioner is deemed to have exhausted his state remedies under 28 U.S.C. § 2254(b), since there is no procedure available under Tennessee law for petitioner to present any claim in the Tennessee state courts challenging the convictions and sentence at issue in this case. Although petitioner has alleged grounds for relief that have not been fairly or adequately presented to the state courts in satisfaction of § 2254(b)'s exhaustion requirement, those claims are now barred from presentation to the state courts by the statute of limitations under Tenn. Code Ann. § 40-30-102(a) and the "one petition"

2

limitation of § 40-30-102(c) and, thus, are procedurally defaulted in this proceeding, as alleged more specifically in the Warden's response to specific claims in Part V, *infra* p. 15, *et seq*.

### B. State Court Records

Pursuant to Habeas Rules 5(c) and (d) respondent is manually filing all relevant portions of the state court record under separate cover for use in these proceedings. Respondent encloses the following list of those addenda for ease of reference. Citations to these records will be by Addendum, volume, page, and paragraph numbers where appropriate.

### 1. Criminal Trial and Direct Appeal

Addendum 1:  Technical record from petitioner's criminal trial on direct appeal, including trial exhibits (Volumes 1-2 of Appellate Records;

Addendum 2:  Transcript of the Evidence from petitioner's criminal trial submitted on direct appeal (22 volumes) (Appellate Record Volumes 3-24);

Addendum 3:  Volumes 25-28 of petitioner's record on direct appeal including Memorandum opinion from petitioner's Bond Hearing, September 8 , 1993 Hearing on Motion for New Trial Based on Newly Discovered Evidence, Hearing on pretrial motions, and July 23, 2003 Hearing on petitioner's Motion for New trial;

Addendum 4:  Transcript of hearing on Motions to Suppress (Volumes 29-31 of petitioner's record on direct appeal);

Addendum 5:  Supplemental Transcript (Volume 32 of petitioner's record on direct appeal);

3

| | |
|---|---|
| Addendum 6: | Petitioner's appellate brief before the Court of Criminal Appeals in *State v. Gary Wayne Sutton,* No. 03C01-9403-CR-00090; |
| Addendum 7: | State's appellate brief before the Court of Criminal Appeals in *State v. Gary Wayne Sutton,* No. 03C01-9403-CR-00090; |
| Addendum 8: | Slip Opinion and Judgment of the Court of Criminal Appeals on direct appeal: *State v. Gary Wayne Sutton,* No. No. 03C01-9403-CR-00090, 1995 WL 406953 (Jan. 11, 1995); |
| Addendum 9: | Petitioner's Rule 11 application to the Supreme Court for review of the Court of Criminal Appeals opinion; |
| Addendum 10: | State's opposition to petitioner's application; |
| Addendum 11: | Order denying Rule 11 Application. |

### 2. Post-Conviction Evidentiary Hearing and Appeal[1]

| | |
|---|---|
| Addendum 12: | Technical record from Petitioner's State post-conviction evidentiary hearing (Volumes 1-5 of Record on appeal from the trial court's denial of post-conviction relief including findings of fact and conclusions of law); |
| Addendum 13: | Transcript of evidence from petitioner's post-conviction evidentiary hearing ; |
| Addendum 14: | Exhibits filed in petitioner's post-conviction action; |
| Addendum 15: | Petitioner's application for interlocutory appeal pursuant to Tenn. R. App. P. 9; |
| Addendum 16: | State's Response to petitioner's application for interlocutory appeal pursuant to Tenn. R. App. P. 9; |

---

[1]Petitioner and his co-defendant Dellinger filed separate petitions for post-conviction relief which were heard on separate days, and comprised to separate evidentiary records, yet were consolidated on appeal. For the purposes of the instant petition, respondent will only include those portions of the records pertaining to petitioner.

4

Addendum 17:   Order Denying petitioner's application for interlocutory appeal pursuant to Tenn. R. App. P. 9;

Addendum 18:   Petitioner's appellate brief before the Court of Criminal Appeals in *Sutton v. State,* No. E2004-1068-CCA-R3-PC;

Addendum 19:   State's appellate brief appellate brief before the Court of Criminal Appeals in *Sutton v. State,* No. E2004-1068-CCA-R3-PC;

Addendum 20:   Slip Opinion and Judgment of Court of Criminal Appeals in *Sutton v. State,* No. E2004-1068-Court of Criminal Appeals-R3-PC, 2006 WL 1679595 (June 19, 2006);

Addendum 21:   Petitioner's Application for Permission to appeal from the judgment of the Court of Criminal Appeals;

Addendum 22:   Order denying Rule 11 application.

## II.  STATEMENT OF THE CASE

A Sevier County jury convicted petitioner and his co-defendant, James Dellinger, of premeditated first degree murder and felonious burning of personal property.  (Add. 1, v. II, pp. 486-87)  The jury sentenced petitioner to life imprisonment for the murder and two years imprisonment for the felonious burning.  The Court of Criminal Appeals affirmed the conviction and sentence (Add. 8), and the Tennessee Supreme Court denied petitioner's application for permission to appeal from the Court of Criminal Appeals' judgment.  (Add. 11)

On January 21, 1997, petitioner, through counsel, filed a petition for post-conviction relief. (Add. 12, v. 1, pp. 1-6) Counsel filed an amended petition on July 10, 1998.  On March 16, 2000, after petitioner dismissed his original counsel, the trial court

5

appointed new counsel (Add. 12, v. 1, pp. 35-36), who likewise filed an amendment to the petition. (Add. No. 12, v. 1, pp. 37-38) Following an evidentiary hearing on May 25 and 26, 2004, the trial court denied relief. (Add. No. 12, v. 1, pp.44-45; v.3, pp. 1-11) On appeal the Court of Criminal Appeals affirmed the denial of relief. (Add. No. 39) Petitioner filed an application in the Tennessee Supreme Court for permission to appeal from the judgment of the Court of Criminal Appeals. (Add. No. 40) The application was denied on October 2, 2006. (Add. No. 40) Petitioner then sought relief in this Court.

### III. SUMMARY OF THE EVIDENCE

**A. TRIAL**

The facts of the murder are set forth in the opinion of the Court of Criminal Appeals on direct appeal.

> The record shows that during the Christmas season of 1991, Sutton was involved in a fight with Bill Griffin. Sutton repeatedly stomped on Bill Griffin's head and injured him. Dellinger was present during the fight, but he apparently did not participate. As a result of this incident, Bill Griffin was hospitalized.
>
> On February 15, 1992, an officer from the Sevier County Sheriff's Department responded to a complaint involving Dellinger. When the officer arrived, Dellinger showed him a storage building adjacent to his trailer. When the officer asked Dellinger who had shot into the building, he opined that one of the Griffins was responsible. He stated that the Griffins had done it before and that if he had to, he would wipe out the whole hill of Griffins.
>
> Both of the appellants and Tommy Griffin were out drinking in Blount County on February 21, 1992. They were driving Sutton's dark colored

6

Camaro, which only had one headlight burning. The three stopped at a bar called Howie's Hideaway. They stayed there until approximately 7:00 p.m., at which time they all left together.

A short period of time later, witnesses saw a dark colored Camaro with one headlight parked on the side of the road near the Hunt Road overpass. An individual outside the car was scuffling with someone inside the car. Another witness passing through the same area later saw a stumbling man with no shirt. When an officer arrived to investigate a report concerning the fight, he found Tommy Griffin sitting in the back of a pickup truck. Griffin had no shirt on, and he had scrapes and scratches on his ribs, abdomen, and face. Griffin had a strong odor of alcoholic beverage about him. He told the officer that he had been in a fight with his friends and that he "got put out of the car." When the officer asked Griffin to identify his friends, Griffin refused, saying that they weren't good friends and that he didn't know their names. The officer than asked Griffin what the fight was about. Griffin because upset and, close to tears, repeatedly said, "I just can't tell you." The officer arrested Griffin for public intoxication and put him in the Blount County Jail.

At approximately 9:00 p.m. that same evening, a neighbor living between Tommy Griffin's trailer and Dellinger's trailer saw a white truck at Tommy Griffin's trailer. The truck's headlights were on and the passenger side door was open. Someone closed the passenger door. The truck left Griffin's trailer and drove to Dellinger's trailer. As the truck passed, the neighbor was able to identify it as Dellinger's white Dodge truck. Moments later, the neighbor saw fire coming from Tommy Griffin's trailer and had his wife call 911. An investigator later determined that the fire at the Griffin trailer was the result of arson.

Jennifer Branum testified that when she saw Tommy Griffin's trailer burning, she ran to Linda and James Dellinger's trailer to tell them about the fire. Linda Dellinger opened the door, and Branum saw the appellants had their jackets on and they appeared to be out of breath. Their pants were wet almost to the knees.

Branum told the appellants that Tommy Griffin's trailer was on fire, and appellant Dellinger stated that they couldn't go down there because they were already in enough trouble. Branum asked the appellants if Tommy might be in the burning trailer. Sutton replied that he was not because he

7

was with a girl in Blount County. Later, Jennifer Branum's older sister, Sandy, called the Dellinger residence to ask if Tommy Griffin had been in the trailer when it burned. Appellant Dellinger told her not to worry, because Tommy was in Blount County Jail and he and Sutton were going to get him out. Jennifer Branum saw appellant Dellinger remove a long object wrapped in a sheet from behind the seat of his truck and place it in the front seat of Linda Dellinger's car. The appellants then left the Dellinger residence in the car. The next day, she saw both appellants remove the same object from the car and place it under Dellinger's trailer.

At approximately 11:25 p.m., the appellants arrived at the Blount County Jail. Dellinger posted a cash bond, and Tommy Griffin left the jail with the appellants. Thirty minutes later, a witness some nine miles away from the jail heard two shots fired near his home. The witness testified that the sound of the shots came from the direction of Manning Lane. These events transpired on a Friday night. The following Monday, Tommy Griffin's body was discovered near Manning Lane. Griffin had been shot in the head with "00" buckshot. Officers found two spent Remington Peters 12 gauge shotgun shells near Griffin's body. A forensics expert from the Tennessee Bureau of Investigation determined that the spent shells were fired from the same shotgun as spent shells recovered from near Dellinger's trailer.

When Sutton and Dellinger returned from the jail without Tommy Griffin, Griffin's sister Connie Branum became concerned. When Griffin still had not returned the next day, she went to look for him. She left her two children with a friend and took a picture of Tommy Griffin with her. She stopped at the Townsend Shopping Center and asked an employee if Griffin had been there the previous day. She met the appellants there at the shopping center and left with them.

Connie Branum and the appellants went to Howie's Hideaway. A waitress testified that Connie Branum was upset when they first arrived. Branum asked her if she had seen with whom her brother had left the bar the previous day. The waitress became confused, and when she attempted to answer, Dellinger told her to go and get their beers. Another waitress heard Dellinger say:

> The last time we seen [Griffin] was up the road a piece, and he was with a short, fat, dark haired girl, and she was real ugly . . . . Well, we figured that he'd come back here because

8

> yesterday we picked him up from jail and come here and had a drink, and he doesn't know the area, so we thought he'd come back here."

Connie Branum left the bar with the appellants at approximately 7:00 p.m. Witnesses said that by the time the three left, Branum was intoxicated and boisterous. A waitress asked Branum if she was going to be driving and told her that she didn't need anything else to drink. The appellants told the waitress not to worry and that they would take care of Branum.

A couple living in the Clear Fork area heard a high-pitched whistling noise coming from the woods near their house and saw a large fire burning there sometime between 8:00 and 8:30 p.m. that same evening. The next morning, the wife saw a white truck leaving the woods. There were two people in the truck. She later identified this truck as appellant Dellinger's.

A week later, after hearing reports of Connie Branum's disappearance, the husband and the couple's son went to investigate the fire. They discovered a burned out car. They did not investigate further, because they were concerned that if they approached the car and examined it more closely, they would destroy evidence. Investigators found the body of Connie Branum in the driver's seat of her burned car.

The state arson examiner determined that the car fire was the result of arson. He concluded that an accelerant was poured on both the body and the interior of the car because of the extreme temperature required to produce the amount of damage present. Burn patterns on the floor of the vehicle also indicated that a liquid accelerant had run under the seats and burned there. He specifically eliminated the possibility that a cigarette or other smoldering ignitor had initiated the fire. While samples taken from the interior of the vehicle revealed no accelerant when tested, the examiner testified that accelerants are sometimes completely consumed in a fire. Accelerants may also evaporate when exposed to the elements.

A forensic anthropologist who examined the remains in the car was able to identify the body as Connie Branum.  The intense heat of the fire had partially cremated the body and "cooked" the internal organs to the point that it was impossible to determine the cause of death. Investigators discovered a spent .303 British shell casing inside the car. A forensics expert later determined that this shell casing was fired from a rifle seized

from appellant Dellinger's residence.

(Add. 8, pp. 2-7)

The Court of Criminal Appeals affirmed the conviction, and the Tennessee Supreme Court denied petitioner's application for permission to appeal.

## B. POST-CONVICTION

The Court of Criminal Appeals provided the following summary of proof presented at the petitioner's state post-conviction hearing:

### A. Petitioner Sutton's Proof

David Webb, one of Petitioner Sutton's trial counsel, was retained before charges were brought against Petitioner Sutton and was responsible for the filing of the pre-trial motions, including a motion to suppress Petitioner Sutton's statement to the police and a motion for change of venue. Mr. Webb acknowledged that he was concerned about pre-trial publicity but he did not specifically recall a juror saying that he knew about "the stuff" Petitioners were doing before they committed the current offenses. Mr. Webb said that it was his recollection that Petitioner Sutton did not have standing to challenge the search warrant issued against Petitioner Dellinger's residence, but he recalled that Ed Miller, counsel for Petitioner Dellinger, filed a motion to suppress.

Mr. Webb visited the scene of the crime prior to trial. Although he did not specifically remember what type of vehicle he was driving, Mr. Webb did not remember having any trouble traveling the logging road leading to the spot where Ms. Branum's burned car was discovered. Mr. Webb acknowledged that he did not personally verify Barbara Gordon's testimony that she saw a white truck exiting the woods the morning after she and her husband spotted the fire.

Mr. Webb said that he did not see a memorandum dictated by Chief Detective Dale Gourley of the Blount County Sheriff's Department prior to trial. The memorandum was dated March 4, 1992, and reflected the substance of a telephone call that Detective Gourley received from Agent

10

Sam Gregory, with the North Carolina State Bureau of Investigation.  The memorandum described an offense in North Carolina involving Lester Johnson and Christina Hartman, the victim in that case.  According to the memorandum, Ms. Hartman witnessed Lester Johnson's cousin slash Mike Vaughan's throat at a "biker party" in Sevier County, Tennessee.  Ms. Hartman herself was later the victim of an attack by Lester Johnson at a "biker rally" in Cherokee, North Carolina.  Ms. Hartman refused Mr. Johnson's attempts to force her to engage in a sexual act, and he cut her throat.  Mr. Johnson was arrested and tried in North Carolina for attempted first degree sexual offense.  Ms. Hartman proposed calling Tommy Griffin and Connie Branum as her character witnesses, but neither appeared at Mr. Johnson's trial.  The jury found Mr. Johnson not guilty of the charged offense at 5:57 p.m. on February 21, 1992, apparently because of a misunderstanding of the trial court's instructions, and Mr. Johnson was released from custody.  According to the memorandum, Mr. Johnson was "supposedly a close associate of James Dellinger and Gary Sutton of Sevier Co[unty]."

The memorandum also states that "Agent Gregory advised that he understood that some of [Ms.] Hartman's family had been threatened that they were next after the disappearance of [Tommy] Griffin and [Connie] Branum."  Agent Gregory suggested that the murders of Mr. Griffin and Ms. Branum may have been "contract/revenge killings in retaliation for the arrest of Lester Johnson."  Mr. Webb acknowledged that he would have investigated Mr. Johnson had he seen Detective Gourley's memorandum.

Mr. Webb also stated that he did not see a letter written by Troy Turner, dated January 24, 1993, to Don Ogle and Jeff McCarter, with the Sevier County Sheriff's Department, or an undated letter from Bobby Floyd to Sevier County District Attorney General Al C. Schmutzer, Jr.  Mr. Turner and Mr. Floyd were incarcerated in a federal penitentiary in Ashland, Kentucky, at the time the letters were written.  Mr. Turner wrote:

> You need to get in touch with me.  It's about Garry Sutton and James Dellinger.  Bobby Floyd and I have agreed we should contact you before this goes on any longer.  Bobby has a lot, but won't agree to it without me, and together we can help.  P.S. Bobby Floyd is here with me now.  Contact both of us or neither one.

11

Mr. Floyd's letter, although lengthier, is along a similar vein. The letter is apparently in response to a visit from Mr. Schmutzer. Mr. Floyd stated that he has "changed in many ways" since his incarceration, and that he realized that he needed to "start helping" himself. He stated that he was willing to provide certain information, apparently in return for a sentence reduction or release from incarceration, but he warned that he would need "some Government protection because people would have to believe that [he] had won [his] appeal." Mr. Floyd stated that he had information on "stolen vehicles and truck highjackings in Sevier [County], and other drug and illegal activity that would make [his] case seem like small times." He also noted that he realized "that information about the Griffins is also of top priority to you."

Mr. Webb stated that it was impossible to prepare for Petitioner Sutton's trial in Sevier County without talking to the witnesses for the Blount County trial. Mr. Webb said that there were timing issues with Mr. Griffin's murder, and he personally timed the drive from the Blount County Detention Center to the location where Mr. Griffin's body was discovered. Mr. Webb, however, did not interview any of the other residents on Manning Lane and did not have an independent recollection of reviewing the report on Mr. Griffin's autopsy. Mr. Webb said that he visited Petitioner Sutton many times prior to trial.

On cross-examination, Mr. Webb stated that ninety percent of his time was spent on preparing for Petitioner Sutton's case in the months before trial. Mr. Webb said that he was "totally absorbed" in trial preparation. Mr. Webb testified that he discussed with Petitioner Sutton the testimony of various witnesses who reported that the [camaro] spotted on the night of Mr. Griffin's murder only had one headlight. Petitioner Sutton and his family members insisted that all four of the headlights of Petitioner Sutton's [camaro] were working at the time of the offenses. Mr. Webb said that he relied on this information as support for introducing the headlights as an exhibit. Mr. Webb acknowledged that he did the bulk of the work on appeal and stated that he chose the issues which he felt had the best chance of success on appeal.

Zane Daniel testified that he had practiced law for nearly forty years, and approximately fifty percent of his practice was devoted to criminal work. He joined Petitioner Sutton's defense team after the pre-trial motions had been filed. Mr. Daniel said that although counsel for both Petitioners

12

worked together closely, there was no formal agreement not to introduce evidence that was favorable to one defendant but not the other. Mr. Daniel stated that he was aware that the officials from Blount and Sevier Counties coordinated their investigative efforts for the two trials, and he recollected that Blount County law enforcement officials testified at the Sevier County trial. Mr. Daniel said that he did not see the memorandum about Lester Johnson or the letters written by Mr. Floyd and Mr. Turner. Mr. Daniel said the defense team investigated other potential suspects, and he would have pursued Mr. Johnson as a possible suspect had he seen the memorandum. Mr. Daniel, however, did review other information pertaining to the Blount County case and employed an arson and ballistics expert. Mr. Daniel said that he did not review the report on Mr. Griffin's autopsy or interview the emergency medical personnel who retrieved his body.

Mr. Daniel said that it was his decision to introduce into evidence the headlights of Petitioner Sutton's Chevrolet [camaro]. He stated that although there was no evidence that Petitioners were in the [camaro] when the Sevier County offenses occurred, evidence concerning Mr. Griffin's murder in Blount County was introduced to establish the motive for the charges arising out of Ms. Branum's murder. Mr. Daniel said that he examined the headlights when they were brought into the courtroom, but he did not notice the manufacturer's date stamped on one of the headlights.

We observe at this point that at the post-conviction hearing both the State and the witnesses expressed a belief that the manufacturer's date stamp indicated that the headlights were manufactured after the offenses occurred. At trial, however, William Martin Barnes, testifying as a rebuttal witness, stated that the headlights were manufactured on February 13, 1992 according to the date stamp. Petitioner Sutton testified at trial that he purchased the [camaro] approximately six months prior to the offenses, or August 1991, and replaced one headlight at the time he purchased the car. Petitioner Sutton testified that the headlights were working at the time of the offense and when he was arrested. Five defense witnesses testified that all four of the [camaro]'s headlights were working at the time of the offenses, and none of the headlights had been changed. Mr. Barnes testified at trial, however, that based on the manufacturer's date stamp, the headlight could not have been installed in the [camaro] six months prior to February 13, 1992.

13

Mr. Daniel testified at the post-conviction hearing that a juror recognized the significance of the date stamp. Mr. Daniel acknowledged that the date stamp was prejudicial to Petitioner Sutton's case.

On cross-examination, Mr. Daniel said that he discussed the headlights with Petitioner Sutton, his family members, and other witnesses who insisted that all of the [camaro]'s headlights were working at the time of the offenses. The [camaro] was brought to the courthouse, and Mr. Daniel and a police officer tested the headlights in the parking lot. All four headlights were working.

On redirect examination, Mr. Daniel said that all of the [camaro]'s headlights were removed and brought into the courtroom in a box. Mr. Daniel said that the police officer did not label any of the individual headlights as to the headlight's position on the vehicle when he removed them from the [camaro].

(Add. 20, pp. 5-8)

The Court of Criminal Appeals affirmed the trial court's denial of relief, and the Tennessee Supreme Court denied petitioner's application for permission to appeal. (Add. 22)

## IV. ISSUES PRESENTED FOR REVIEW

Petitioner asserts the following issues:

1.  The state court unreasonably found that evidence was sufficient to convict petitioner. (Doc. 3, pp. 6-9)

2.  Petitioner was denied effective assistance of counsel in violation of the Sixth, Eighth and Fourteenth amendments. (Doc. 3, pp. 9-30)

3.  Admission of unduly prejudicial evidence violated petitioner's due process rights under the Sixth, Eighth, and Fourteenth amendments. (Doc. 3 pp. 30-39)

14

4-5.    The state court unreasonably concluded *Bruton* is irrelevant where the complaining defendant gives a statement in violation of the Sixth and Fourteenth Amendments; the state court unreasonably found that trying petitioner with his uncle/ co-defendant did not deny petitioner due process, when evidence properly admitted against the uncle was imputed to the petitioner in violation of the Sixth and Fourteenth amendments.  (Doc. 3 pp. 39-43)

6.    Jurors were tainted by extrinsic evidence which denied petitioner his right to trial by an impartial jury as mandated by the Sixth and Fourteenth amendments. (Doc. 3, pp.43-46)

7.    The State court unreasonably found that proof of other suspects does not undermine confidence in the verdict.  (Doc.3, pp. 46-48)

8.    Sutton is entitled to an evidentiary hearing due to actual innocence.  (Doc. 3 pp. 48-49)

9.    New proof of innocence would cause any juror to have reasonable doubt as to the verdict.  Petitioner is therefore entitled to have defaulted claims reviewed.  (Doc. 3, pp. 49-53)

## V.  ARGUMENT

### A.    Availability of the writ

Federal courts may only grant a writ of habeas corpus under 28 U.S.C. § 2254 on grounds that a state prisoner "is in custody in violation of the Constitution or laws or treaties of the United States."  Habeas corpus relief is not available to correct an error of fact.  *Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 860 (1993).  Likewise, a court may not grant the writ to remedy an error of state law.  28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 480 (1991).

### B.    Standard of Review

Review of petitioner's claims is governed by 28 U.S.C. § 2254(d) which states that

15

an application for habeas relief shall not be granted:

unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's adjudication is "contrary to" Supreme Court precedent under §2254 (d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495 (2000). A state court's adjudication involves "an unreasonable application of" Supreme Court precedent under § 2254(d)(1), "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case," or if the court unreasonably refuses to extend, or unreasonably extends, existing legal principles from the Court's precedents to a new context. *Williams*, 529 U.S. at 407. The state court's application must be more than incorrect or erroneous; it must be "objectively unreasonable." *Williams*, 529 U.S. at 409.

The Tennessee state courts have made relevant findings of fact on the issues

16

presented in this habeas petition. The factual determinations of the state courts are presumed to be correct, and Petitioner must rebut that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Unless Petitioner can plead and prove facts meeting this burden, the federal court must presume the state courts' determination of the facts to be true and review the reasonableness of the state courts' application of federal law. *Dukes v. Hunt*, 952 F.Supp. 276, 280 (E.D.N.C. 1996); *see also Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004) (federal court presumes state court's factual determinations are correct unless rebutted by clear and convincing evidence). In the absence of express findings, federal courts must give appropriate deference to implicit findings of the state courts that can be inferred from the record. *Fowler v. Jago*, 683 F.2d 983, 987-89 (6th Cir. 1982). This presumption of correctness for both explicit and implicit findings of fact extends to credibility findings, *Smith v. Jago*, 888 F.2d 399, 407 (6th Cir. 1989), and applies to findings of both the trial and appellate courts. *Loveday v. Davis*, 697 F.2d 135, 139 (6th Cir. 1983).

### C. RESPONSE TO SPECIFIC CLAIMS

      1.    THE STATE COURT's DETERMINATION THAT THE EVIDENCE WAS SUFFICIENT TO CONVICT PETITIONER WAS REASONABLE IN LIGHT OF THE EVIDENCE AT TRIAL. (Doc. 3, pp. 6-9)

Petitioner alleges that the state showed nothing more than petitioner's presence with his co-defendant and the victim on the day she disappeared. Petitioner argues that the

evidence does not establish premeditation, intention, or deliberation. Petitioner characterizes the Court of Criminal Appeals's ruling to the contrary as holding that Sutton's "sticking to his story"and refusing to inculpate his co-defendant uncle demonstrated the requisite intent. Petitioner alleges that the failure to tell law enforcement that he was with Branum the night she disappeared, and the failure to tell Branum that he was with Griffin on the night he disappeared does not establish the elements of the offense. Petitioner challenged the sufficiency of the convicting evidence on his direct appeal. (Add. 8, pp. 7-11) Applying the controlling standard in *Jackson v. Virginia*, 443 U.S. 307 (1979), the state court found that the challenge was without merit.

> Appellant Sutton maintains that the evidence does not establish that he was present at the time of Connie Branum's death or that he participated in causing her death. The record shows that Sutton was with Branum less than two hours before witnesses sighted the car fire. There were two people in Dellinger's truck the next morning when a witness saw the truck leaving the area where the car burned.
>
> In a statement given to the authorities, Sutton stated that he was with Dellinger the whole weekend. He failed to mention that he was with Connie Branum at Howie's Hideaway on the evening of her death. He stated that he had been there with her before, but that this was two or three weeks prior to her disappearance. Sutton also concealed from Connie Branum that he and Dellinger were the last people to be seen with Tommy Griffin. He shared Dellinger's motive to prevent Branum from discovering and revealing that the appellants killed her brother, Tommy Griffin. The circumstantial evidence is sufficient to establish that Sutton was present at the time of Connie Branum's death and that he participated in causing her death.

18

Sutton also contends that the evidence is insufficient to establish that he intended to kill Connie Branum or shared Dellinger's intent to kill her. He proposes an alternate scenario in which Dellinger forced him at gunpoint to assist in concealing both murders. This theory is simply not reasonable. Sutton had the opportunity to reveal Dellinger's crimes and exonerate himself, but he did not. He "stuck to his story." Based on the evidence introduced at trial, the only reasonable hypothesis is that the appellants acted in concert and with a common intent.

Both appellants argue that the state failed to prove the *corpus delicti* for murder because the evidence was insufficient to show that Connie Branum's death resulted from a criminal instrumentality. . . . The *corpus delicti* must be proven beyond a reasonable doubt to sustain a conviction. In a homicide case, the *corpus delicti* consists of: (1) the death of a human being; and (2) criminal agency in producing that death. *State v. Shepherd,* 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992); *State v. Driver,* 634 S.W.2d 601, 605 (Tenn. Crim. App. 1981); *Kyle v. State,* 344 S.W.2d 537 (Tenn. 1961).

Specifically, the appellants assert that neither suicide nor accidental death were conclusively ruled out by the evidence introduced at trial because the state did not prove the cause of death. While it is true that Connie Branum's remains were so completely burned that it was impossible to determine whether she was shot or burned to death, the exact method or cause of death is not part of the state's burden of proof. As we noted in *State v. Shepherd*:

> [A]lthough submitting direct evidence of the cause of death, as a practical matter, may be the best way to show involvement of criminal agency, it is not always necessary, and such agency may be shown by circumstantial evidence even if the exact cause of death remains unproven.

862 S.W.2d 557, 564 (Tenn. Crim. App. 1992) (citations omitted).

At trial, the state introduced uncontradicted testimony that some type of liquid accelerant was applied to the body and to the interior of the car. The fire was not started by a cigarette or other smoldering initiator. Accidental death is therefore not a reasonable possibility. Furthermore, while Connie Branum had previously attempted suicide, it is unreasonable

19

to suppose that she abandoned her search for her missing brother, drove to a remote location, doused herself and the interior of her car with an accelerant, somehow disposed of the container that she used to transport the accelerant, and then immolated herself.  This is particularly true in light of the other evidence presented at trial.  A witness saw Dellinger's truck leaving the area the next morning with two people inside.  Both Sutton and Dellinger initially gave statements to the police in which neither admitted to having been with Connie Branum at Howie's Hideaway that evening.  They later claimed that they had not mentioned going to the Hideaway with Branum because she had asked them not to tell anyone and they did not think that it was important anyway.

Finally, the appellants allege that the evidence does not show the criminal intent, premeditation, or deliberation required to sustain their convictions for murder.  First-degree murder is "an intentional, premeditated and deliberate killing of another."  T.C.A. § 39-13-202(a)(1) (1991).  Once a homicide is proven it is presumed to be second degree murder and the state bears the burden of proving premeditation and deliberation.  *State v. Brown,* 836 S.W.2d 530, 543 (Tenn.1992).

Premeditation requires a previously formed design or intent to kill.  *State v. West,* 844 S.W.2d 144, 147 (Tenn. 1992); *McGill v. State,* 475 S.W.2d 223, 227 (Tenn. Crim. App. 1971).  *See also* T.C.A. § 39-13-201(b)(2) (1991).  Deliberation requires a cool purpose; the killing must be without passion or provocation.  *West,* 844 S.W.2d at 147; *Brown,* 836 S.W.2d at 543.  *See also* T.C.A. § 39-13-201(b)(1) (1991).  Although no specific amount of time is required, deliberation cannot be formed in an instant. *West,* 844 S.W.2d at 147. The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. *Taylor v. State,* 506 S.W.2d 175, 178 (Tenn. Crim. App. 1973).

In the instant case, the evidence indicates that the appellants killed Connie Branum to prevent her from discovering that they were responsible for the murder of her brother, Tommy Griffin. The appellants "ran into" Branum while she was searching for her brother. They did not tell her that they had left the Hideaway with Griffin the night before. Witnesses established that the fire which consumed Branum's body and her car started a short period of time after the three left the bar. Branum's car was concealed in a remote location. Finally, the appellants voluntarily gave statements during the investigation of the Griffin murder in which they neglected to mention that

they had been with Connie Branum the day after Griffin's disappearance. The existence and execution of a plan to kill Connie Branum establishes the required intent, premeditation, and deliberation. This issue is without merit. The evidence adduced at trial is sufficient to support the appellants' convictions for first degree murder.

(Add. 8, pp. 8-11)

This decision recounted the facts in the record supporting the conviction and applied the standard as enumerated in *Jackson.* Petitioner cannot show that the decision of the Court of Criminal Appeals with regard to this claim is "contrary to" or "an unreasonable application of" well-settled Supreme Court precedent. 28 U.S.C. § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. at 407. Relief should be denied.

2. THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL. (Doc. 3, pp. 9-30)

Petitioner raises several errors of trial and appellate counsel in his petition. Petitioner alleges that trial counsel failed to investigate, discover and prove Sutton's petitioner's innocence. Specifically, petitioner urges that trial counsel failed to investigate the circumstances of Tommy Griffin's death. (Doc. 3, pp. 9-15) Petitioner challenges trial counsel's investigation and presentation of evidence concerning other suspects. (Doc. 3, pp. 15-16) Petitioner challenges trial counsel's failure to call Danny Sutton and Johnny Wade McCarter. (Doc. 3, pp.16-17) Petitioner also alleges counsel were ineffective for to properly investigate and examine evidence presented to the jury on petitioner's behalf which eventually discredited the defense's theory that petitioner's

21

camaro was not identified by witnesses during the altercation with Tommy Griffin. (Doc. 3, pp. 17-19)  In connection with this claim, petitioner alleges counsel was ineffective for failing to object to jury misconduct in its examination of the evidence. (Doc. 3, pp. 19-20)

Petitioner also alleges several errors on the part of appellate counsel.  He claims that Counsel failed to protect his right to an impartial jury.  (Doc. 3, pp. 20-23) Specifically, he argues counsel failed to appeal the trial court's denial of petitioner's motion for change of venue, failed to object and preserve an appellate issue concerning the manner of venire selection, and failed to appeal from the denial of individual voir dire. Petitioner also claims that counsel's failure to investigate and discover improper use of a bible during jury deliberations prejudiced him.  (Doc. 3, p. 25)

Finally, petitioner claims that counsel was ineffective in failing to appeal the trial court's denial of a motion to suppress evidence seized from his co-defendant's property pursuant to a search warrant (Doc. 3, pp.26-27) and failing to appeal jury instructions on reasonable doubt and failing to (Doc. 3, pp. 28-29)

### A.    Failures at trial

#### 1. Investigation of Tommy Griffin's Murder

The state put on proof which linked the two murders together into a common scheme in which the Branum homicide was used to cover up the Griffin homicide. Petitioner argues that counsel's failure to disprove that time line proffered by the state

22

was a material failure prejudicing petitioner's case. Petitioner offers the affidavits of Stan Kessler Neal Haskell which he claims should have been presented at trial. Petitioner did not present these affidavits in his state post-conviction action as part of his claim of ineffective assistance ineffective assistance. (Add. 12-13) The claim is therefore defaulted. His Present attempt to rely on a different factual basis is barred by default. *See Duncan v. Henry* 513 U.S. 1032 (1995) Petitioner's attempt to present additional proof is barred by 28 U.S.C. § 2254(e)(2). The only challenge to trial counsel's investigation of the murder of Tommy Griffin came by way of petitioner's co-defendant Dellinger. Nevertheless, petitioner proffers the affidavits of two experts which posit opinions conflicting from the state's expert proof at trial, and which were not presented to any state court prior to being appended to this petition. As a result consideration of the affidavits in this court is not appropriate. *Holland v. Jackson*, 542 U.S. 649, 652 (2004)(Assessment in habeas corpus of reasonableness of state court's decision must be made "in light of the record the court had before it.") The facts raised in these affidavits constitute factual bases for his ineffective assistance claim which petitioner did not fairly present to the state courts, the claim has not been properly exhausted. The time to present these bases has passed. As a result the claim is defaulted. Should this court find to the contrary, the state courts denied relief on Dellinger's claim, holding:

> Even assuming that Petitioners' Sevier County counsel should have
> investigated Mr. Griffin's murder in Blount County more thoroughly (as

23

was purportedly done by Petitioners' counsel at the Blount County trial), Petitioners have failed to establish that there is a reasonable probability that such investigation would have led to any different result in Petitioners' Sevier County trial. The evidence does not preponderate against the trial court's finding that Petitioners failed to establish that they were prejudiced by their counsel's conduct in this regard. Petitioners are not entitled to relief on this issue.

(Add. 20, p. 21-2) Petitioner cannot show that the decision of the Court of Criminal Appeals with regard to this claim is "contrary to" or "an unreasonable application of" well-settled Supreme Court precedent. 28 U.S.C. § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. at 407. Relief should be denied.

### 2. *Failure to investigate other suspects*

Petitioner argues that the failure to investigate Eddie Blair as a suspect, and the failure to call Martha Blair and Danny Sutton prejudiced his defense. Petitioner never presented these claims to the state courts. (Add. 6-8, 12-20) The time to present them has passed. The claims, therefore are procedurally defaulted. Petitioner argues that his default should be excused pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995) In order to overcome the default, petitioner must show either cause and prejudice or that his case falls into the "narrow class of cases... implicating a fundamental miscarriage of justice." *McCleskey v. Zant,* 499 U.S. 467, 494 (1991) (*quoted in Shlup,* 513 U.S. at 315). Presentation of other possible suspects is not the same class of evidence presented by the petitioner *Schlup. Schlup* concerned a videotape that showed the petitioner in the prison cafeteria at the time he was supposed to have been murdering a fellow prisoner. This

24

video "showed conclusively" that Schlup "could not have participated in the murder. *Schlup*, 513 U.S. at 303. The petition presents no "exculpatory scientific evidence, trustworthy eyewitness account, or critical physical evidence" showing innocence. *Schlup*, 513 U.S. at 324 Petitioner fails to show that "no reasonable juror would have found the defendant guilty." *Schlup,* 513 U.S. 329. As a result default is not excused and relief should be denied.

Petitioner's claim of ineffective assistance arising out of the failure to call witness McCarter was presented at his post-conviction action. Petitioner urged that the failure to call McCarter hampered the defense's ability to discredit the state's trial witness Barbara Gordon. The Court of Criminal Appeals considered the issue on appeal and denied relief. Applying the *Strickland* test to petitioner's claims, the Court of Criminal Appeals affirmed the finding of the trial court that no prejudice resulted from any alleged failure on the part of counsel. (Add. 19, p. 12-13) Petitioner cannot show that the decision of the Court of Criminal Appeals with regard to this claim is "contrary to" or "an unreasonable application of" well-settled Supreme Court precedent. 28 U.S.C. § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. at 407. Relief should be denied.

*3. The presentation of car headlights*

Petitioner alleges in his petition that counsel's failure to inspect the headlights of petitioner's camaro before submitting them to the jury was due to "inattention." (Doc. 3, p.19) to the contrary, as the Court of Criminal Appeals discussed:

25

[S]ix defense witnesses, including Petitioner Sutton, were interviewed prior to trial and each testified at trial that all four of the [camaro]'s headlights were working on or near February 21, 1992, and none of the headlights had been changed since that date. Jimmy Sutton, Petitioner's brother, and a police officer tested the headlights in the courthouse parking lot before they were removed and brought into the courtroom. Jimmy Sutton testified that the headlights were flecked with paint prior to Mr. Griffin's murder, and he identified at trial the paint spots on the headlights removed from Petitioner Sutton's [camaro].

Nor is it clear from the record, as Petitioner Sutton contends, that "even a brief examination of the headlight by counsel would have revealed the problem." Petitioner Sutton did not introduce the [camaro]'s headlights as an exhibit at the post-conviction hearing. At the hearing, Counsel Daniel testified that he examined the headlights when they were brought into the courtroom, but he did not notice a manufacturer's stamp. Counsel Miller stated that although a manufacturer's stamp was visible on the headlight, without specialized knowledge, a lay person probably would not have known what the numbers meant. The headlights were passed to several jurors before one of the panel noticed the stamp. The State called a rebuttal witness to explain the significance of the manufacturer's coding on the headlight.

Petitioner Sutton submits that it was not necessary to introduce the headlights as an exhibit at trial, and counsel's conduct in this regard was "careless and not the result of trial strategy." Despite his assertion that there was no reason to physically introduce the headlights, the decision to do so reflected sound trial strategy based on Petitioner Sutton's and Jimmy Sutton's testimony at trial concerning the unique paint markings on the headlights of Petitioner Sutton's [camaro]. Clearly, from Petitioner Sutton's viewpoint, it would have been prudent to stop with the testimony of the defense witnesses. However, as the trial court found, "for [Petitioner Sutton] to say that [counsel] failed to protect him from his own misguided attempts to undermine the judicial system through fraud is disingenuous." Based on all of the foregoing, we conclude that the evidence does not preponderate against the post-conviction court's finding that Counsel Daniel's actions in this regard did not fall below the objective standard of reasonableness demanded of defense attorneys.

26

(Add. 20, p. 19)

Counsel not only interviewed petitioner, but also other witnesses. These interviews led him to submit the headlights to the jury. He had no notice that the headlights in the control of his client's family would have been tampered with. Even if, as petitioner would suggest, an attorney should count on his client being uncooperative and dishonest, *see Rompilla v. Beard* 545 U.S. 374, 381 (2005), petitioner's trial counsel would have had to assume that all six witnesses interviewed were lying. Petitioner cannot show that the decision of the Court of Criminal Appeals finding no ineffective assistance is "contrary to" or "an unreasonable application of" well-settled Supreme Court precedent. 28 U.S.C. § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. at 407. Relief should be denied.

### 4. *Juror testimony*

In connection with his ineffective assistance claim concerning the submission of physical evidence to the jury, petitioner complains that the failure to object to a jury panel's statements concerning the manufacturing code on those headlights prejudiced his defense. This claim was not presented to the state courts on direct appeal or in his state post-conviction action. (Add. 6-8, 12-20) The time to present them has passed. The claims, therefore are procedurally defaulted. Relief should be denied.

27

### B. Appellate errors

#### 1. *Failure to appeal the denial of a change of venue*

Petitioner raised this claim in his state post-conviction proceeding. The trial court denied relief and the Court of Criminal Appeals affirmed the ruling. After recounting the testimony in the record concerning juror knowledge of the case, the Court, applying the standard in *Strickland* found no prejudice resulting from any error on trial counsel's part.

> [Petitioner's Counsel] David Webb recollected at the evidentiary hearing that some of the prospective jurors expressed familiarity with the case. Susanna Webb also had similar recollections, but she did not recollect whether or not she had used all of her peremptory challenges. The prospective jurors were extensively questioned to determine if any of them had been prejudiced by pretrial publicity. Petitioner Dellinger points to Juror Seaton's voir dire as an example of the extent of pretrial publicity. Juror Seaton, like many jurors, stated that he had formed an opinion as to the case, and that he would not be able to change that opinion based on the evidence presented at trial. The trial court excused Juror Seaton from the venire as well as several other prospective jurors who expressed similar viewpoints.
>
> The grant or denial of a motion for change of venue is left to the sound discretion of the trial court. *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993). The mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue, nor will prejudice be presumed on a mere showing of extensive publicity. *State v. Kyger*, 787 S.W.2d 13, 19 (Tenn. Crim. App. 1989); *State v. Stapleton*, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982). "The ultimate test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." *Kyger*, 787 S.W.2d at 18-19 (citing *State v. Garland*, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981)).
>
> Based on our review of the record and the extensive voir dire of the venire, we conclude that Petitioner Dellinger has failed to show that he was

28

prejudiced by appellate counsel's failure to raise this issue on appeal. Petitioner is not entitled to relief on this issue.

(Add. 20, p. 23)

Petitioner cannot show that the decision of the Court of Criminal Appeals finding no ineffective assistance is "contrary to" or "an unreasonable application of" well-settled Supreme Court precedent. 28 U.S.C. § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. at 407. Relief should be denied.

### 2. *Failing to object to the method of venire selection*

Petitioner did not raise this claim in his post-conviction petition. Neither the factual basis nor the legal basis of the claim was presented to the state courts in the first instance. The time to present them has passed. The claim, therefore, is procedurally defaulted. Relief should be denied.

### 3. *Failure to appeal the denial of individual voir dire*

Petitioner did not raise this claim in his post-conviction petition. Neither the factual basis nor the legal basis of the claim was presented to the state courts in the first instance. The time to present them has passed. The claim, therefore is procedurally defaulted. Relief should be denied.

### 4. *Failure to challenge the extraneous influence on the jury*

Petitioner did not raise this claim in post-conviction as an ineffective assistance

29

of counsel claim.[2]  The legal basis of the claim was not presented to the state courts in the first instance. The time to present the claim has passed.  The claim, therefore, is procedurally defaulted.  Relief should be denied.

> 5.  *Failure to appeal the denial of Dellinger's motion to suppress*

Petitioner alleged in his post-conviction petition that his trial counsel's failure to appeal the trial court's denial of his co-defendant's motion to suppress constituted ineffective assistance. (Add. 12, pp. 37-8, ¶¶ 4-5) Petitioner questioned counsel about pre-trial motions to suppress the evidence seized from Dellinger's property.  Petitioner had several appointed counsel by the time of trial.  David Webb and Zane Daniel handled the case through trial and on appeal.  Both counsel testified that motions to suppress were filed. (Add. 13, v. 1, pp. 23-4; 51-52) The trial court denied relief, and the petitioner appealed, arguing, without citation to authority, that Sutton had standing to contest the search and "the issue was not properly argued and appealed.  (Add. 18, p.20) The Court of Criminal Appeals affirmed the denial of relief as to petitioner's co-defendant Dellinger, but made no specific ruling as to petitioner.  (Add. 20, p.23) In petitioner's application for permission to appeal from the judgment of the Court of Criminal Appeals, he makes no argument concerning this issue. Petitioner did not, therefore, properly preserve this claim of ineffective assistance on appeal.  Petitioner's

---

[2]As is noted on Doc. 3, p. 45, petitioner Sutton adopted and amended his complaints to include averments made petitions filed in the companion post-conviction action of his co-defendant James Dellinger.  This adoption occurred at the conclusion of proof in both cases.  The averments in Dellinger's petition are specific to Dellinger, alleging no claim on the instant Petitioner's behalf.  Respondent urges such amendment does not serve to adequately present any habeas claim Petitioner raises here which were not raised in his own pleadings.

failure to comply with established state procedural rules for preserving claims for appellate review results in the procedural default of this claim, which should be dismissed. Notwithstanding this default, the merits of petitioner's ineffective assistance claim under *Strickland* hinge upon the allegation that Petitioner would have achieved a different result had counsel attempted to preserve an appeal as to Dellinger's motion to suppress. The Court of Criminal Appeals's determination of Dellinger's claim of ineffective assistance is enlightening.

> Petitioner Dellinger argues that his appellate counsel's assistance was ineffective because he failed to appeal the trial court's denial of his motion to suppress the evidence found at his residence. Counsel Miller stated at the evidentiary hearing that he was surprised that the State defended the search of Petitioner Dellinger's residence under the theory that Linda Dellinger had consented to the search. Counsel Miller acknowledged that he was prepared to argue at the suppression hearing that the affidavit supporting the request for a search warrant lacked probable cause because it included material misrepresentations of fact. Counsel Webb did not testify during the second day of the evidentiary hearing. The State, however, entered a stipulation, agreed upon by Petitioners' counsel, that Counsel Webb would testify if called that she did not interview Ms. Dellinger prior to the suppression hearing. Petitioners' counsel entered a stipulation, agreed upon by the State, that Linda Dellinger would testify if called that she did not consent to the search of her residence, and that the investigating officers searched the premises pursuant to a search warrant.
>
> At the suppression hearing, the State argued that the search warrant was valid, but, in any event, that Linda Dellinger consented to the search. Detective Widener and Officer McMahan testified that Ms. Dellinger arrived at her home soon after they did, and gave the officers permission to search her residence. Detective Widener said that after Ms. Dellinger granted them entry to the house, he read the search warrant to her. Agent Griswold, with the T.B.I., later interviewed Ms. Dellinger concerning the property discovered in her home. Agent Griswold read Ms. Dellinger her

31

Miranda rights, and she executed a written waiver.  In her statement, Ms. Dellinger stated, "I told Blount County/Sevier County that they had permission to search our house when it was searched."  David Hutchison, a criminal investigator with the District Attorney's Office, subsequently telephoned Ms. Dellinger and taped the conversation.  During this conversation, Ms. Dellinger again stated that she had consented to the investigating officers' search of her residence.  Ms. Dellinger was present at the suppression hearing but was not called by defense counsel to testify.

Petitioner Dellinger has failed to show that he was prejudiced by the failure of his counsel to challenge the trial court's denial of the motion to suppress on appeal.  Assuming arguendo that counsel's conduct was deficient in this regard, the Tennessee Supreme Court has concluded that the challenged search warrant was valid, and that no error occurred in its execution.  *State v. Dellinger,* 79 S.W.3d at 472.  Petitioner Dellinger is not entitled to relief on this issue.

(Add. 20, p. 24)

Petitioner cannot show that the decision of the Court of Criminal Appeals finding no prejudice to Dellinger  is  "contrary to" or "an unreasonable application of" well-settled Supreme Court precedent. 28 U.S.C. § 2254(d)(2).  *See Williams v. Taylor*, 529 U.S. at 407.  Relief should therefore be denied.

### 6. *Failure to appeal jury instructions*

Petitioner did not raise this claim in post-conviction as an ineffective assistance of counsel claim.  The legal basis of the claim was not presented to the state courts in the first instance. The time to present the claim has passed.  The claim, therefore, is procedurally defaulted.  Relief should be denied.

### 7. *Failure to present lay or expert testimony rebutting time of death*

32

Petitioner did not raise this claim in post-conviction as an ineffective assistance of counsel claim. The legal basis of the claim was not presented to the state courts in the first instance. The time to present the claim has passed. The claim, therefore, is procedurally defaulted. Relief should be denied.

3. PETITIONER'S DUE PROCESS RIGHTS UNDER THE SIXTH EIGHTH AND FOURTEENTH AMENDMENTS WERE NOT VIOLATED BY INTRODUCTION OF UNDULY PREJUDICIAL EVIDENCE. (Doc. 3, pp. 35-39)

Petitioner argues that the admission of certain "prior bad acts" evidence denied him due process. The petitioner specifically challenges the presentation of evidence concerning (a) a December 1991 altercation between petitioner and Bill Griffin; (b) an event in early 1992 where a neighbor noticed petitioner shooting out street lamps nearby; (c) a fight between petitioner or Dellinger and the victim Tommy Griffin on the last night Griffin was seen alive; (d) the burning of Tommy Griffin's trailer; and (e) the murder of Tommy Griffin. These claims were not presented as constitutional claims in state court. (Add. 6, pp. 72-75) "A state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). The Court of Criminal Appeals applied the state rules of evidence and found no error. (Add. 13-14) The state courts held that this proof was relevant to show a common motive in this criminal enterprise that involved two defendants, spanned two

33

counties and claimed two lives.  No constitutional claim concerning this evidence was presented to the state courts in the first instance.  (Add. 12-22) The claim is defaulted here.

### 4 & 5. THE STATE COURT REASONABLY CONCLUDED *BRUTON* IS IRRELEVANT TO PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT CLAIMS.  (Doc. 3 pp. 39-43)

Petitioner alleges that the use of an out of court statement by Dellinger threatening to "wipe out the entire hill of Griffins" unduly prejudiced his defense, denying him the ability to confront his co-defendant who did not testify.  Petitioner argues that the state's use of this statement at trial violates the confrontation clause as interpreted and applied in *Bruton v. United States,* 391 U.S. 123 (1968).  In *Bruton,* the Supreme Court held that extrajudicial statements by co-defendants implicating their partner in crime were inadmissible, and a curative instruction was not enough to protect the implicated co-defendant's right to confrontation.  *Bruton,* 391 U.S. at 126.  In this case, however, nothing in Dellinger's statement inherently implicates petitioner.  Petitioner implicates himself by insisting that neither he nor his co-defendant committed a crime where the evidence pointed solidly to a criminal scheme, jointly pursued by both individuals, to murder Tommy Griffin and then murder Connie Branum when she came looking for her  brother.  As the Court of Criminal Appeals found:

> Sutton also contends that admission of the statement of appellant Dellinger, who did not testify, that he would "wipe out" the Griffins violated his constitutional right to confront witnesses against him and contravened the rule announced by the United States Supreme Court in

34

> *Bruton v. United States,* 391 U.S. 123 (1968). In *Bruton,* the Court held that admission of a non-testifying codefendant's statement implicating the defendant is a violation of the latter's right to confrontation. Id. In the instant case, there is no *Bruton* problem because the statement in question does not implicate Sutton in any way. Sutton was implicated by his own statements that he was with Dellinger continuously during the relevant time periods. Thus, admission of Dellinger's statement did not violate Sutton's constitutional right of confrontation.

(Add. 8, pp.12-13) Petitioner cannot show that the state courts' denial of relief is "contrary to" or "an unreasonable application of" well-settled Supreme Court precedent. 28 U.S.C. § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. at 407. Relief should be denied.

Petitioner likewise challenges the trial court's joinder of the defendants. Although improper joinder was raised as an issue on direct appeal, no due process claim was raised. As a result, this constitutional claim was not fairly presented to the state courts in the first instance. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). The Court of Criminal Appeals applied the state rules of criminal procedure and affirmed the action of the trial court finding no abuse of discretion. (Add. 8, pp. 11-13) "Improper joinder does not, in itself, violate the Constitution." *United States v. Lane,* 474 U.S. 438, 446, n.8 (1986) Misjoinder must be of such a character as to deny petitioner due process. *U.S. v. Lane,* 474 U.S. at 446. Petitioner raised no 5th amendment claim on direct appeal, or in his post-conviction action resulting from the joinder. To the extent petitioner raises such a due process claim in this Court which was not exhausted in the state courts, the same is hereby defaulted. 28 U.S.C. §2254(e)(2) Should this Court find to the contrary, the

35

state court found no due process violation, resolving the question on separate state law grounds. Petitioner cannot show that the denial of relief is "contrary to" or "an unreasonable application of" well-settled Supreme Court precedent. 28 U.S.C. § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. at 407. Relief should be denied.

> 6. THE STATE COURT REASONABLY DENIED RELIEF AS TO PETITIONER'S CLAIMS THAT THE JURY WAS TAINTED BY EXTRINSIC EVIDENCE. (Doc. 3, pp. 43-45)

As his sixth claim, petitioner makes several allegations of improper juror influence. The first concerns the use of a Bible and prayer by two jurors. The second concerns the examination of headlights by one juror and discussion among the jurors about the significance of a code on that headlight noting date of manufacture. The third involves statements made by an excused prospective juror to other seated jurors about the petitioner and his co-defendant. The last concerns the trial court's sequestration of the jury and the use of a so-called "family night" during which jurors could meet with their families unmonitored.

### A. Bible and Prayer

Petitioner alleges that the opinion of the Court of Criminal Appeals is objectively unreasonable in its conclusion that no extraneous influence was placed upon the jury. In his state post-conviction action, petitioner challenged the use of a Bible by one juror, Larry Gibson, and the use of prayer by two jurors, Gibson and Juror Ballinger. Petitioner did not raise this claim in his direct appeal as required by state statute. Tenn. Code Ann.

36

§ 40-30-206(g).  On appeal from the post-conviction evidentiary hearing, the state argued that any claims as to juror misconduct had been waived.  The Court of Criminal Appeals found this argument to be waived under state law, and decided the issue on the merits. Said the court:

> At the evidentiary hearing, Mr. Ballinger, a member of the jury at Petitioners' trial, testified that one of the jurors, Larry Gibson, possessed a Bible during deliberations at the guilt phase of Petitioners' trial.  We observe at the outset that portions of both the State's and defense counsel's examinations of Mr. Ballinger on this issue exceeded the parameters of permissible evidence set forth in *Walsh*.
>
> Rule 606(b) of the Tennessee Rules of Evidence provides that:
>
>> [u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.
>
> In *Walsh*, our Supreme Court concluded that Rule 606(b) "permits juror testimony to establish the fact of extraneous information or improper influence on the juror; however, juror testimony concerning the effect of such information or influence on the juror's deliberative processes is inadmissable."  *Walsh*, 166 S.W.3d at 649.  Once the petitioner proves that "a juror was exposed to extraneous prejudicial information or

37

subjected to improper influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or demonstrate that it was harmless." *Id*. at 647 (citing *State v. Blackwell*, 664 S.W.2d 686, 689 (Tenn. 1984)). Although the State may not inquire as to the effect of the improper influence on a juror's deliberative process, the State may rebut a presumption of prejudice by questioning other members of the jury as to whether or not they heard or saw the improper influence. *Id*. at 649.

Although Mr. Ballinger acknowledged that Mr. Gibson physically possessed a Bible during deliberations, he testified that Mr. Gibson did not read from the Bible during deliberations, and that he and Mr. Gibson did not discuss any specific scriptures during deliberations. Mr. McClelland, another member of the jury panel, testified that he did not observe or hear any individual jurors discussing scripture during deliberations.

Petitioners contend that the mere presence of a Bible in the jury room during deliberations constituted an impermissible extraneous prejudicial influence on the jury, citing *State v. Harrington*, 627 S.W.2d 345 (Tenn. 1981). We conclude, however, that under the facts presented in this case, Petitioners have failed to make an initial showing that the jury was exposed to extraneous prejudicial information. Petitioners' case is distinguishable from the situation presented in *Harrington*. In *Harrington*, the jury foreman "buttressed his argument for imposition of the death penalty by reading to the jury selected biblical passages," warranting a new sentencing hearing. *Harrington*, 627 S.W.2d at 350. In the case *sub judice*, there is no evidence that any juror was improperly exposed to extraneous information during the deliberation process. Petitioners are not entitled to relief on this issue.

(Add. 20, pp. 25-26).

Juror Ballinger testified that juror Gibson had a Bible in his hand at one point in the deliberations. He had separated from the rest of the group to be alone with his Bible and pray. (Add. 13, v. 2, pp. 102-3) The two jurors prayed together. No scripture was read to advocate either the state's or petitioner's position. Petitioner fails to show that

38

this determination is an "objectively unreasonable" determination of fact.  *Williams*, 529 U.S. at 409.  Relief should be denied.

### B.  Juror's examination and discussion as to the manufacture date of petitioner's exhibits— headlights

Petitioner's filings contain no specific allegation of juror misconduct centering around the handling of petitioner's headlights which were submitted as defense exhibits at petitioner's trial. While petitioner's co-defendant raised this claim in an amendment to his post-conviction petition, and petitioner adopted all of those amendments in open court (Add. 13, v. 3, pp. 256-7), the trial court made no specific factual findings as to this claim as to either petitioner or his codefendant.  On appeal from the post-conviction hearing petitioner filed his own brief in the Court of Criminal Appeals, and this brief raises no challenge to the trial court's denial of relief as to this instance of juror misconduct.  The Court of Criminal Appeals made no holding as to this issue other than to affirm the denial of relief.  It is therefore reasonable to infer that the Court of Criminal Appeals considered the issue to be waived or without merit.  Petitioner's failure to comply with established state procedural rules for preserving claims for appellate review results in the procedural default of this claim, which should be dismissed.

### C.  Comments of Juror Seaton during voir dire

Again petitioner raised no claim concerning this instance of juror misconduct in his own pleadings, and the trial court made no specific factual findings as to this claim as to either petitioner or his codefendant.  On appeal from the post-conviction hearing

petitioner filed his own brief in the Court of Criminal Appeals, and this brief raises no challenge to the trial court's denial of relief as to this instance of juror misconduct. The Court of Criminal Appeals made no holding as to this issue other than to affirm the denial of relief. It is therefore reasonable to infer that the Court of Criminal Appeals considered the issue to be waived or without merit. Petitioner's failure to comply with established state procedural rules for preserving claims for appellate review results in the procedural default of this claim, which should be dismissed. This issue was likewise not raised on direct appeal. The claim is thus defaulted.

### D. Sequestration and jury family night.

Petitioner failed to raise this claim on direct appeal or in his own post-conviction pleadings. The claim is thus defaulted. Notwithstanding this default, the Court of Criminal Appeals considered the issue as it related to both co-defendants, and held that the record lacked clear and convincing evidence to substantiate the claim.

> At the time of Petitioners' trial, "[i]n all criminal prosecutions except those in which a death sentence may be rendered, the judge of the criminal court may, in his discretion, with the consent of the defendant, and with the consent of the district attorney general, permit the jurors to separate at times when they are not engaged upon the actual trial or deliberation of the case." T.C.A. § 40-18-116 (1992). "[T]he test of keeping a jury 'together' is not a literal one, requiring each juror to be at all times in the presence of all others." *State v. Bondurant*, 4 S.W.3d 662, 671 (Tenn. 1999). Rather, "[t]he real test is whether a juror passes from the attendance and control of the court officer." *Id*. "Once a defendant shows that a [sequestered] jury has been separated, the burden shifts to the State to show that such separation did not result in prejudice to the defendant." *State v. Jackson*, 173 S.W.3d 401, 410 (Tenn. 2005) (citing *Gonzales v. State*, 593 S.W.2d 288, 291 (Tenn. 1980)). "If the State fails to meet the

40

burden of showing that the separation did not result in prejudice, a new trial is required." *Bondurant*, 4 S.W.3d at 672.

After considering the testimonial record, the Court of Criminal Appeals found that the claim was not supported by the necessary clear and convincing proof showing that the jurors were out of the court officer's control.

> Based upon our review of the record, we conclude that Petitioners have failed to present clear and unequivocal evidence that the jurors were outside the presence of the court officers during the family gathering. *See, e.g., Bondurant*, 4 S.W.3d at 673 (concluding that court officer's affidavit unequivocally stating that he had no control over the jury members as they individually traveled between the motel and the courthouse presented more than the possibility of a separation). Both jurors testified that the gathering was confined to one large room, and there is no evidence that any jurors left the conference room to visit with their family members without supervision. Although the jurors could not remember where the court officers were stationed during the gathering, Mr. Ballinger observed that the officers "were always there assisting us." Petitioners are not entitled to relief on this issue.

(Add. 20, pp. 26-27)

Petitioner fails to show that this determination is an "objectively unreasonable" determination of fact. *Williams*, 529 U.S. at 409. Relief should be denied

> 7. THE STATE COURT REASONABLY AND CORRECTLY DETERMINED THAT PROOF OF OTHER SUSPECTS DOES NOT UNDERMINE CONFIDENCE IN THE VERDICT. (Doc.3, pp. 46-48)

In this claim, petitioner seeks federal review of the post-conviction court's denial of relief on petitioner's *Brady* claim. The Court of Criminal Appeals properly applied *Brady* and determined that the evidence presented was not exculpatory.

41

Petitioners argue that the State violated the requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to disclose Detective Gourley's memorandum concerning his telephone conversation with Agent Gregory about Lester Johnson and the correspondence from Mr. Turner and Mr. Floyd. Petitioners contend that the undisclosed information contained in the documents would have provided evidence that other individuals had the motive and opportunity to kill Mr. Griffin and Ms. Branum. The State argues that there is no evidence that the Sevier County authorities were in possession of Detective Gourley's memorandum. In any event, the State contends that the letters from Mr. Turner and Mr. Floyd did not contain any exculpatory evidence, and neither source of information was material to Petitioners' case.

In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. 373 U.S. at 87, 83 S. Ct. at 1196-97. "Evidence 'favorable to the accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citations omitted).

In order to establish a *Brady* violation, the defendant must show the following four elements:

> 1)     that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2)     that the State suppressed the information;
>
> 3)     that the information was favorable to the accused; and
>
> 4)     that the information was material.

*Id*. at 56 (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998)).

Both Petitioners made general *Brady* requests prior to trial. The post-

42

conviction court found that Petitioners had also satisfied the second element.  The letters from Mr. Taylor and Mr. Floyd were addressed to investigating officers in the Sevier County Sheriff's Department.  As for Detective Gourley's memorandum, Petitioners' counsel stated at the evidentiary hearing that he retrieved the document from the files of the Blount County Sheriff's Department.  Because of the close interrelationship between the investigations conducted by the Sevier County and Blount County authorities, the post-conviction court found that "that information contained in the investigative offices of the Blount County Sheriff's Department, who investigated in [the Sevier County] case and who testified in this case, would be information that would have to be, under *Brady*, certainly disclosed."  The post-conviction court, however, found that the information in the proffered documents, by itself, was not exculpatory, and there was no evidence that either Mr. Floyd or Mr. Johnson were connected with the case.

We agree with the post-conviction court's finding that Mr. Floyd's general promises of information about the Griffins is not, in itself, exculpatory.  Moreover, the letter by itself does not provide any "information that would have enabled defense counsel to conduct further and possibly fruitful investigation regarding the fact that someone other than [Petitioners] killed the victim."  *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).  Although counsel may not have seen Mr. Floyd's letter, Counsel Daniel explored at trial the connection between Mr. Floyd and Mr. Griffin based on information provided by Petitioner Dellinger.  That is, that Mr. Griffin had previously bought drugs from Mr. Floyd, and that when Mr. Floyd was arrested for dealing in drugs, there were rumors that Mr. Griffin provided the officers with the information needed to make the arrest.  Detective Widener acknowledged at trial that he was aware of this information.

Nor do we find the information in Detective Gourley's memorandum to be exculpatory.  Agent Gregory acknowledges that Mr. Johnson and Petitioners were "close associates."  He states that Tommy Griffin and Connie Branum were scheduled to testify for the State, in a manner favorable to the victim at Mr. Johnson's trial for attempted first degree sexual assault offense.  Agent Gregory stated, "Griffin did not show up for the trial.  It is unknown at this time if Branam [sic] did.  Several places were shot up in Sevier Co. with a shotgun prior to the trial.  Threats were made to most of the State's witnesses, judge and prosecutor."  Mr. Johnson

43

was found not guilty and released from custody in Jackson County, North Carolina, sometime around 6:00 p.m. on February 21, 1992. While it is possible for Mr. Johnson to have traveled from the courthouse in Sylva, North Carolina, to Sevier County, Tennessee, before midnight, there is nothing in the record to indicate that he did so, nor is there any indication that he was in Sevier County when Ms. Branum was killed.

Even if we conclude, however, that some of the information contained in this evidence was exculpatory, it does not satisfy the *Brady* materiality requirement. In *State v. Edgin*, 902 S.W.2d 387 (Tenn. 1995), our Supreme Court adopted the standard of "materiality" set forth in *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), that is, that the

> "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"

*Edgin*, 902 S.W.2d at 390 (quoting *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566) (citations omitted)).

Neither the letters nor Detective Gourley's memorandum leads us to conclude that there is a "reasonable probability" that the result would have been different had the information been disclosed. Petitioners' counsel, according to the trial transcript, were aware of and explored Mr. Floyd's connection with Mr. Griffin. As for Mr. Johnson's possible role in the offenses, there is no evidence that he was in Sevier County at the time of the offenses to elevate the connection, as the post-conviction court found, beyond a "mere conjecture or possibility." Regardless of Mr. Johnson's whereabouts on February 21, 1992, the testimony at Petitioners' trial for Ms. Branum's murder clearly placed Ms. Branum in Petitioners' company shortly before the fire from her car was spotted by the Gordons. Based upon our review of the record, we conclude that the evidence does not preponderate against the post-conviction court's finding that the State's failure to disclose this evidence does not undermine confidence in the

outcome of the trial.  Petitioners are not entitled to relief on this issue. (Add. 20, pp.28-30).

Petitioner cannot show that the denial of relief is "contrary to" or "an unreasonable application of" Supreme Court precedent. 28 U.S.C. § 2254(d)(2).  *See Williams v. Taylor*, 529 U.S. at 407.  Relief should be denied.  Nevertheless, petitioner alleges that this evidence constitutes an excuse for other defaulted claims.  In order to satisfy the *Schlup* gateway, petitioner's burden is not to show that reasonable doubt exists, but that no reasonable juror would convict given the entire record including the purported new evidence.  *Schlup,* 513 U.S. 329. Petitioner cannot make this showing on the current record.

8. SUTTON IS NOT ENTITLED TO AN EVIDENTIARY HEARING UNDER *TOWNSEND V. SAIN,* 372 U.S. 293, 312-18.  (Doc. 3 pp. 48-49)

As stated in section *V. B., supra,* 28 U.S.C. 2254(d) controls the question of petitioner's entitlement to an evidentiary hearing.  *See Williams v. Coyle* 260 F.3d 684, 698 (2001).  For the reasons cited in Sections V.C. 1-7, petitioner has not established entitlement to an evidentiary hearing under the AEDPA.  Relief should be denied; petitioner's failure to comply with established state procedural rules for preserving claims for appellate review results in the procedural default of this claim, which should be dismissed.

45

9. PETITIONER HAS FAILED TO SHOW THAT HE IS ENTITLED TO REVIEW OF HIS PROCEDURALLY DEFAULTED CLAIMS. (Doc. 3, pp. 49-53)

Petitioner argues that expert proof obtained after his trial and post-conviction proceeding entitles him to an evidentiary hearing under *House v. Bell,* 126 S.Ct. 2064(2006). The "new" evidence which petitioner offers is itself procedurally barred from consideration in this Court. As respondent has argued, petitioner must overcome this default by showing that this case falls into the narrow "fundamental miscarriage of justice" exception. *See McCleskey, supra.* The claim is defaulted. Relief should be denied.

## CONCLUSION

For the reasons stated, the petition for writ of habeas corpus should be denied.

Respectfully submitted,

ROBERT E. COOPER, JR.
Tennessee Attorney General & Reporter


/s/ Clarence E. Lutz
Assistant Attorney General
Criminal Justice Division
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3486
B.P.R. No. 17460

46

## CERTIFICATE OF SERVICE

A copy of the foregoing was served on Stephen Kissinger, Federal Defender Services, 530 Gay Street, Suite 900, Knoxville, Tennessee 37902 users through the Electronic Filing System on this the 20th day of August, 2007.

/s/ Clarence E. Lutz
Assistant Attorney General

47