UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

GARY WAYNE SUTTON,                  )
                                    )
              Petitioner,           )
                                    )
v.                                  )         No.:  3:07-cv-30
                                    )               (VARLAN/SHIRLEY)
RICKY BELL, WARDEN,                 )
                                    )
              Respondent.           )

## MEMORANDUM OPINION

Gary Wayne Sutton ("Sutton" or "Petitioner"), a death-sentenced inmate at the

Riverbend Maximum Security Institution in Nashville, Tennessee, brings this petition for

writ of habeas corpus against the Warden, Ricky Bell ("Respondent"), pursuant to 28 U.S.C.

§ 2254, challenging the legality of his confinement for his 1993 convictions and sentences

for first-degree murder and setting fire to personal property [Doc. 3].[1]  Respondent filed an

answer to the habeas corpus petition, which conforms with Rule 5, but also contains an

argument that the petition must be dismissed based upon procedural default and the

deferential review standards set forth in § 2254(d) and *Williams v. Taylor*, 529 U.S. 362, 405

(2000) [Doc. 17].  Sutton filed a reply to Respondent's answer [Doc. 27].  Thus, the case is

ripe for review.  *See* Rule 8 of the Rules Governing Section 2254 Cases in the United States

District Court.

--------

[1]Sutton was sentenced to life for this first degree murder conviction and two years for the
setting fire to personal property conviction.  Sutton was subsequently sentenced to death in his
related case for the murder of Tommy Griffin, the brother of the victim in this case.  *See Sutton v.
Bell*, 683 F. Supp. 2d 640, 646–47 (E.D. Tenn. 2010).

After carefully considering the complete record before it and the applicable law, for the reasons explained below, the Court will **DISMISS** Sutton's habeas petition [Doc. 3].

## I. PROCEDURAL BACKGROUND

On February 24, 1993, Sutton and his co-defendant and uncle, James Dellinger ("Dellinger"), were convicted by a jury in Sevier County, Tennessee of the 1992 premeditated first-degree murder of Connie Branam ("Branam")[2] and felonious burning of personal property [Addendum No. 1, Vol. III, pp. 486–87; 496]. The jury sentenced Sutton to life imprisonment for the murder [Addendum No. 1, Vol. III, p. 496]. The court further adjudged Sutton guilty of felonious burning of personal property based on the jury's guilty verdict on that charge and sentenced him to a two-year sentence to run consecutive to his life sentence [Addendum No. 1, Vol. III, p. 497].

Sutton's conviction and sentence were affirmed on direct appeal. *State v. Sutton* and *Dellinger*, (hereinafter "*State v. Sutton*" or "*Sutton*"), No. 03C01-9403-CR-0090, 1995 406953 (Tenn. Crim. App. July 11, 1995), *perm. to app. denied*, (Jan. 22, 1996) [Addendum No. 22]. On direct appeal to the Tennessee Criminal Court of Appeals, Sutton raised six issues: five trial issues and one sentencing issue. *Id.* at *1.

Sutton filed his original petition for post-conviction relief on January 21, 1997, in the Criminal Court for Sevier County, Tennessee in Sevierville. Sutton alleged several instances

---

[2] Connie Branam's name is spelled two ways throughout the record: "Branam" and "Branum." For the sake of consistency, the Court will uses "Branam" unless quoting material wherein the name is spelled "Branum."

of ineffective assistance of trial counsel and one instance of ineffective assistance of appellate counsel [Addendum No. 12, pp. 1–5]. Sutton filed amended petitions on July 10, 1998, and June 22, 2003 [Addendum No. 12, pp. 27–30; 37–38]. After an evidentiary hearing on June 30, 2003 and February 25, 2004, the trial court denied relief [Addendum No. 34, pp. 6611–22].

Sutton appealed to the Tennessee Court of Criminal Appeals, raising approximately seven claims. The Court of Criminal Appeals affirmed the denial of post-conviction relief. *Dellinger* and *Sutton v. State*, (hereinafter "*Sutton v. State*" or "*Sutton*") No. E2004-01068-CCA-R3-PC, 2006 WL 1679595 (Tenn. Crim. App. June 19, 2006). Sutton's application for permission to appeal was denied by the Tennessee Supreme Court on October 30, 2006.

Sutton initiated the instant habeas proceedings on or about January 11, 2007, and filed his initial habeas petition on January 31, 2007 [Doc. 3]. Respondent filed an answer [Doc. 17], to which Sutton replied [Doc. 27].

## II. FACTUAL BACKGROUND

### A. Trial Proof

#### 1. Evidence Presented by the State

##### a. Crime

According to the evidence presented at Sutton's Sevier County trial by the State of Tennessee (the "State"), during the Christmas season of 1991, Sutton was involved in a fight with Bill Griffin in the presence of Tommy Griffin ("Griffin") and Sutton's uncle and co-

defendant, Dellinger.[3]  Sutton repeatedly stomped on Bill Griffin's head and injured him. Branam's daughter shoved Sutton off Bill Griffin, who was then taken to the hospital [Addendum No. 3, Vol. 1, pp. 1063–65].

On February 15, 1992, Officer John Brown answered a complaint involving Dellinger [Addendum No. 2, Vol. 9, p. 897].  Upon arriving at the scene, Dellinger showed the officer a storage building adjacent to his trailer.  Someone had fired several shots into the trailer and Dellinger told the officer he thought the shooter was one of the Griffins [Addendum No. 2, Vol. 9, p. 897].  Dellinger told the officer "they had done this before, and that if he had to, he would . . . wipe the entire hill of Griffins out" [Addendum No. 2, Vol. 9, p. 898].

On February 21, 1992, Jamie Marie Forsythe ("Forsythe") was working at Howie's Hideaway Lounge ("Howie's") from 10:00 a.m. until 5:00 p.m.  During the last two hours of her shift, she served beer to Sutton, Dellinger, and Griffin who had arrived at Howie's in a dark-blue Firebird, Camaro, or Trans Am [Addendum No. 3, Vol. 3, pp. 1226–28]. Forsythe left when her shift ended and was replaced by Terri Lilly ("Lilly").  Lilly served the men two or three drinks, and at about 7:00 p.m., the three men left the bar [Addendum No. 2, Vol. 10, pp. 917–21].

At approximately 7:00 p.m., Cynthia Walker ("Walker") and her husband, who were driving on Alcoa Highway, observed a dark-colored Camaro parked on the side of the road with the passenger-side door open and only one headlight on [Addendum No. 2, Vol. 10, pp.

_____

[3]Bill and Tommy Griffin are Branam's brothers.

4

928–31, 945]. Walker saw a fight occurring on the passenger side of the vehicle. Walker's husband called the Blount County police station to report the fight [Addendum No. 2, Vol. 10, pp. 933].

Also around 7:00 p.m., Sharon Davis ("Davis") and her family were driving on Alcoa Highway when she saw a lone shirtless man stumbling along the side of the road. They returned later and the man was no longer in that area. However, a short way beyond, past Hunt Road, Davis observed two men outside an older dark-colored Camaro who appeared to be looking for something [Addendum No. 2, Vol. 10, pp. 949–52].

At 7:11 p.m., Blount County 911 dispatcher, Sandra Leone Hicks, received a call and sent an officer to the Hunt Road area looking for a black or dark-colored Camaro [Addendum No. 2, Vol. 10, p. 977]. Soon thereafter, a City of Alcoa police officer responded; initially he did not see anything, but then observed a vehicle crossing over the grass median and made a traffic stop. As he was making the traffic stop, he noticed a vehicle "radically" flashing its lights at him [Addendum No. 2, Vol. 10, pp. 959–61]. He directed his back-up, Officer Drew Roberts ("Officer Roberts"), to investigate the vehicle flashing its lights. Officer Roberts approached that vehicle, a small, Ford Ranger pickup truck, and observed two white males standing outside the vehicle and one shirtless, white male, whom he determined was Griffin, sitting in the bed of the truck. Officer Roberts observed that Griffin "had some scrapes and scratches on his upper body, and a cut behind his left ear" [Addendum No. 2, Vol. 10, pp. 966–68]. The officer described Griffin as being scared and on the verge of tears, while explaining that he had an argument with some friends, who were not really his friends, who

5

had put him out of the car. Griffin informed the officer he just could not tell the officer what happened [Addendum No. 2, Vol. 10, p. 968].

Griffin was charged with public intoxication and transported to the Blount County Jail, arriving at 7:35 p.m. [Addendum No. 2, Vol. 10, p. 970]. Dellinger and Sutton subsequently came to the jail between 8:25 p.m. and 8:40 p.m. and asked to post bail for Griffin, but they were told to come back between 10:30 p.m. and 11:00 p.m. [Addendum No. 3, Vol. 2, pp. 1145–49].

About 9:00 p.m., Griffin's and Dellinger's neighbor in Bluff Heights, Alvin Lee Henry ("Henry"), was watching television when his dog began barking. Henry looked out his window and saw Dellinger's truck about 100 feet above Griffin's trailer and saw someone entering the passenger side of Dellinger's truck, which then proceeded up the driveway to Dellinger's trailer. Henry glanced back toward the road and saw that Griffin's trailer was on fire. His wife called 911 [Addendum No. 2, Vol. 10, pp. 980–86].

About 9:00 p.m., Jennifer Branam, Griffin's thirteen-year old niece,[4] was awakened by her sister and advised that Griffin's trailer was on fire. Jennifer Branam went to Dellinger's trailer and asked for Dellinger, but his wife said he was not there. Immediately afterwards, Jennifer Branam saw Dellinger and Sutton breathlessly walking down the hall wearing jackets and pants wet up to the knees, though it was not raining, snowing, or sleeting. She asked them if her uncle was in his trailer, and Sutton responded that he was in

---

[4]She was thirteen years old at the time she testified.

Blount County with a girl. Dellinger declined Jennifer Branam's request to go down to her uncle's trailer explaining they couldn't go down there "[b]ecause they were in enough trouble as it is" [Addendum No. 3, Vol. 1, pp. 1035–39].

Jennifer Branam returned home. Soon thereafter, she observed Dellinger remove a sheet-wrapped object out of his truck, two and a half to three feet in length, and place it in his wife's car. Then she observed Dellinger and Sutton drive off in the car [Addendum No. 3, Vol. 1, pp. 1043–44].

Herman Lewis ("Lewis"), who was in the vicinity, saw two people leave Dellinger's trailer and also saw one of them get something, which "had a coat or something around it[,]" out of the truck and place it in the backseat of the car. Two people then got in the car and just sat there until Mr. Lewis left [Addendum No. 3, Vol. 2, pp. 1121–24].

At approximately 11:25 p.m., Dellinger and Sutton returned to the jail and were seen by two law enforcement officers. One of the officers saw either Dellinger or Sutton carrying a blue flannel-type shirt and heard one of them tell Griffin (who was shirtless when he was arrested), "'[w]e got to go out this way. We're parked up here.' And the comment was made something about, '[w]e've got to get back to Sevierville - - get you back to Sevierville.'" [Addendum No. 3, Vol. 2, p. 1165–66].

At 11:55 p.m., Jason McDonald, who lived about 500 yards from the Blue Hole on the Little River, was writing in his journal when he heard two or three gunshots coming from the bottom of the hill [Addendum No. 3, Vol. 2, pp. 1169–72]. His mother also heard the shots [Addendum No. 3, Vol. 2, p. 1175].

7

The next morning, Saturday, February 22, 1992, Jennifer Branam saw Dellinger and Sutton, one of whom retrieved the same item she had seen placed in the vehicle [Addendum No. 3, Vol. 1, pp. 1044–45]. Later that day, around 2:30 p.m. or so, Branam, who was concerned about Griffin's unexplained absence, asked Georgia Elaine Mayes ("Mayes"), the wife of a Sergeant with the Sevier County Sheriff's Department, to watch her children so she could go to the Blount County Sheriff's Department and show them a picture of Griffin to see if they had arrested him the night before, and she informed her that she would be home as quick as possible. Mayes observed Branam stop and talk to Dellinger's wife and Angel Gray, at which time Mayes went back into her house [Addendum No.3, Vol. 2, pp. 1176–94]. Around 2:00 p.m., Branam arrived at Jerry Sullivan's ("Sullivan") grocery store carrying a picture of her brother. Sullivan agreed to let Branam leave her car in his parking lot. Later, he observed her talking to two men in a white Dodge truck [Addendum No. 3, Vol. 3, pp. 1218–21].

On that date, Forsythe was again working the day shift at Howie's when Dellinger and Sutton entered the bar with a woman who was crying. The woman introduced herself as Connie and said she was there looking for her brother. As they discussed the previous day's events, Carr described the third person with Dellinger and Sutton as having "a real bad limp," whom Branam identified as her brother. During that conversation, Dellinger interrupted Forsythe several times asking if she remembered them and then asking if she was sure she remembered them. She acknowledged that she was sure she remembered them. Then Dellinger explained that "[t]he last time we seen him was up the road a piece, and he was

with a short, fat, dark haired girl, and she was real ugly.  Have you seen her in here?"
Forsythe had never seen anyone who fit that description in Howie's.  Dellinger then
explained, "we figured that he'd come back here because yesterday we picked him up from
jail and come here and had a drink, and he doesn't know the area, so we thought he'd come
back here" [Addendum No. 3, Vol. 3, pp. 1226–30].  Forsythe informed him she had not seen
Griffin on Saturday, and, at that point, Dellinger and Sutton looked at each other and went
to the restroom [Addendum No. 3, Vol. 3, pp. 1230–31].

Forsythe served Dellinger, Sutton, and Branam several beers, and the trio remained
at Howie's when Forsythe left around 5:00 p.m.  Forsythe thought Branam was drinking the
most [Addendum No. 3, Vol. 3, p. 1242].  Lilly replaced Forsythe at the bar and continued
to serve them beer.  Branam asked her with whom Griffin had left the day before, and Lilly
"got a little confused, and when I started to answer, the other gentlemen - - the same
gentlemen [sic], the older guy with the hat on had asked me to get their beer, and so I just
walked off from the table, and went and got them a beer" [Addendum No. 3, Vol. 3, pp.
1261–63].  Lilly was concerned that Branam was not in any condition to drive, but the men
assured her they were going to take care of her.  The three individuals left the bar with
Branam walking between Sutton and Dellinger [Addendum No. 3, Vol. 3, pp. 1264–65].

About 8:00 p.m., James R. Gordon ("Gordon") and his wife heard a high-pitched
whistle coming from the woods.  They could not identify the noise but saw a fire through the
trees.  The friends they were meeting for dinner suggested it was probably campers and
nothing to worry about [Addendum No. 3, Vol. 3, pp. 1275–80; Addendum No. 3, Vol. 5,

9

pp. 1401–02]. About a week later, Gordon and his foster son drove over a large area of the woods looking for the source of the flames. He saw no evidence of a fire until he stumbled upon a burned automobile in which a body was found inside (later identified as Branam). He concluded that this was the location of the fire he had seen on Saturday and called the police [Addendum No. 3, Vol. 5, pp. 1402–04].

On February 24, 1992, after the Gordons observed the fire but before Branam's body and car were discovered, the lead investigator, Detective Widener, received a call about 4:30 p.m. and responded to Manning Lane near the Blue Hole where the body of Griffin was discovered. Detective Widener observed the victim's body lying face down on the ground angled downward toward the river. Two spent shotgun shells were found nearby [Addendum No. 3, Vol. 4, pp. 1303–08]. Two Budweiser beer cans also were collected at the scene. Although law enforcement attempted to obtain prints off both the shotgun shells and the beer cans, no identifiable prints were able to be lifted [Addendum No. 3, Vol. 4, pp. 1389–90].

### b. Investigation

Gordon contacted law enforcement when he discovered the burned automobile. Dr. William Bass ("Dr. Bass"), a professor and director of the Forensic Anthropology Center at the University of Tennessee in Knoxville, traveled to the fire scene, at the request of the Sevier County Sheriff's Department, where he saw an extensively-burned Dodge Dart automobile with remains inside. Dr. Bass examined the burn pattern in the car and the degree of destruction of the body and concluded that an accelerant had been poured in the

10

car. Dr. Bass's assistant found a 303 shell in the front floorboard of the car [Addendum No. 3, Vols. 5 & 6, pp.1500–1501, 1518].[5]

From dental records, Dr. Bass positively identified the body as that of Branam [Addendum No. 3, Vol. 5, pp. 1478–82]. The body was burned so extensively that the lab was not able to extract any liquid from the body as the soft tissue was burned off and the top of the skull was "literally cremated" [Addendum No. 3, Vol. 5, pp. 1485, 1487]. The liver also was tested, but the crime lab was unable to do a toxicology test because "the tissue was cooked too much" [Addendum No. 3, Vol. 5, pp. 1485–88]. Although the lab detected dioxipan from the mouth area it was unable to detect carbon monoxide, which would have indicated whether Branam was alive when the fire started.[6] Dr. Bass was unable to make a determination as to the time or cause of death because "to be able to determine a cause of death you had to have something on the skeletal remains that would indicate what that force was, and this body is so badly burned that does not exist any longer" [Addendum No. 3, Vol. 5, p. 1490–91, 1496].[7]

---

[5]A 303 rifle was confiscated from Dellinger's residence [Addendum No. 3, Vol. 6, p. 1535].

[6]Dr. Bass explained that he wanted to test Branam's blood to determine whether it contained carbon monoxide because, if her blood contained carbon monoxide, then she would have been alive and breathing in the gases when the fire started. Because there was no blood left in Branam's body, as it was too badly burned, he was unable to determine whether she was dead before the fire was started [Addendum No. 3, Vols. 5 & 6, p. 1487].

[7]An x-ray of the body through the body bag reflected opaque material in Branam's left shoulder, so initially Dr. Bass thought she had been shot. Dr. Bass subsequently concluded, however, that the lab test analysis did not support that conclusion [Addendum No. 3, Vol. 5, pp. 1494–95].

11

The State arson investigator, Gary Clabo ("Clabo"), concluded someone placed an accelerant in the vehicle and ignited it, thereby setting the vehicle on fire [Addendum No. 3, Vol. 5 , pp. 1416–1418].  Similarly, Clabo concluded Griffin's mobile home fire was an incendiary fire in which an accelerant was used to start the fire [Addendum No. 3, Vol. 5, pp. 1411–12].  Although the lab reports did not reveal an accelerant, Clabo explained that even when they know a fire has involved an incendiary liquid accelerant, there are times the lab does not detect any evidence of the accelerant because "the fire consumed whatever was there, or . . . it evaporated before the sample was taken" [Addendum No. 3, Vol. 5, p. 1463].

TBI Agent Donald I. Carmen, a forensic scientist who preformed drug analysis and forensic firearms identification, testified the 303 cartridge coming from the passenger side of Branam's vehicle was fired from the rifle that came from Dellinger's residence [Addendum No. 3, Vol. 6, pp. 1594–95].

### 2. Testimony Presented on Behalf of Sutton

Jimmy Sutton, Petitioner's brother, testified that on February 21, 1992, Sutton and Dellinger arrived at his residence around 7:30 p.m. in Sutton's Camaro.  Sutton complained that his water pump was leaking, so he left the vehicle with Jimmy Sutton to repair, and he and Dellinger, along with Carolyn Weaver, who had been at Jimmy Sutton's, left about 7:45 in Jimmy Sutton's small Dodge Ram truck [Addendum No. 3, Vol. 9, pp. 1813–27].  Sutton and Dellinger returned the truck to Jimmy Sutton Sunday night and they took the Camero [Addendum No. 3, Vol. 9, pp. 1829].

12

Jimmy Sutton testified that the night Sutton was arrested, an unidentified "they" took the Camero to his uncle's garage and that, five or six months later, an unidentified "they" took it to another uncle's garage [Addendum No. 3, Vol. 9, pp. 1813–15]. According to Jimmy Sutton, on February 21, 1992, when the Camero pulled into his driveway, all the headlights were working and he had made no change to the vehicle. The car was driven to the courthouse and the headlights were introduced as evidence to support his testimony [Addendum No. 3, Vol. 9, pp. 1816–22].[8]

Jimmy Sutton described Sutton's vehicle as a 1984, Z-28 with a decal of a bra painted on the front of it. Jimmy Sutton stated that as far as he knew the bra was painted on it prior to February 21, 1992 [Addendum No. 3, Vol. 9, p. 1813–15]. He further explained that there were "spots of paint [on the headlights] – mists of paint where he had painted that bra on there" [Addendum No. 3, Vol. 9, p. 1817]. Upon inquiry about the appearance of one of the headlights, Jimmy Sutton explained that it had paint on it [Addendum No. 3, Vol. 9, p. 1820].

---

[8]Subsequent to the introduction of the headlight and Sutton's testimony, one of the jurors discovered the manufacturer's date on the headlight [Addendum 3, Vol. 10, p. 1994; Addendum 3, Vol. 11, pp. 2011–16]. Thereafter, the State presented rebuttal witness, Detective Mark Turner, who testified he observed the vehicle at Jimmy Sutton's residence on March 2, 1992, and he subsequently saw it while he was parked at the Buckskin Trading Post on Chapman Highway and it had the headlights on but one of the headlights was not working [Addendum No. 3, Vol. 11, pp. 2024–25]. In addition, William Martin Barnes, Jr., the manager of manufacturing at the Wagner Lighting Plant in Sevierville, testified that one of the headlights introduced by the defense as being on the car on February 21, 1992, reflected that it was manufactured on February 13, 1993. However, the prosecutor asked him if it was manufactured on February 13, 1992, and he responded in the affirmative [Addendum No. 3, Vol. 11, pp. 2046–47]. It is important to note that, regardless of which date is correct, the headlight was manufactured after the time Sutton testified he replaced the light (when he bought the car six or seven months prior to these crimes).

The headlights were introduced into evidence and marked as exhibits but not passed to the jury at that time [Addendum No. 3, Vol. 9, pp. 1820–21].

Sutton testified that he bought the Camaro about six or seven months prior to the commission of these crimes, and that when he first bought the car it had a headlight out and he put a new one in. According to Sutton, all the headlights were working on February 21, 1992. Sutton further explained the car also had a bra already painted on it but he "re-spray[ed] it . . . three or four times . . . touched it up where [he'd] skinned it . . . and stuff in that nature . . ." [Addendum No. 3, Vol. 10, pp. 1906–07].

Sutton had known Griffin for about three years, and he claimed Griffin was his best friend. Sutton testified Griffin was involved in narcotics and, at times, would transport cocaine in his fake leg. According to Sutton, all of the people with whom Griffin engaged in drug activity, including a guy named Bobby Floyd, recently had been arrested on narcotic charges, and they thought Griffin was responsible for their arrests [Addendum No. 3, Vol. 10, pp. 1915–17].

Providing a detailed accounting of his whereabouts during the weekend of the murders, Sutton testified that after they left Howie's Friday evening, he and Dellinger went in a convenience store and got beer and Griffin stayed outside talking to a short, "dark headed[]" lady who wore glasses. When they came out the lady wanted to know if they "had any smoke or anything . . . and [Petitioner] told her right off that [he] didn't fool with drugs . . . Tommy had a bottle of Xanex . . . probably 110 Xanex . . . on him in his leg, and he give [sic] three or four of them and he ended up leaving with the unidentified woman"

14

[Addendum No. 3, Vol. 10, pp. 1907–15, 1920]. Sutton denied being in the Alcoa Highway area that evening but admitted to going with Dellinger to bail Griffin out of jail. Sutton testified Dellinger took off his own shirt and gave it to Griffin, who left with the girl he had met earlier [Addendum No. 3, Vol. 10, pp. 1932–33].

Sutton stayed at Dellinger's that night, and the next day they drove to his residence to see if a check had been delivered. They started riding around and drinking beer and rode to Wears Valley and Townsend to look for Griffin when they ran into his sister, Branam. She wanted them to go to Howie's to see if Griffin was there, so she drove them over to the bar but told them not to tell anybody she had been there or her husband would have her committed to a mental institution again. Sutton drank three or four beers at Howie's before leaving around 6:00 or 6:30 p.m. Sutton said that, although all three were fairly intoxicated, he drove them all back to Branam's car. When Branam got out of the vehicle, she said she was going to one more place to look for her brother. They proceeded to Dellinger's house, arriving there about 8:00 p.m. and staying all night.

The next morning Sutton and Carolyn Weaver left about 10:00 or 10:30 that morning in Linda Dellinger's ("Linda Dellinger") car and went to his residence. Soon thereafter they went grocery shopping for breakfast food which they brought back for Linda Dellinger to cook.

Sutton denied he killed either Griffin or Branam [Addendum No. 3, Vol. 10, pp. 1937–56].

### 3. Verdict

After hearing all the evidence and considering all the exhibits, the jury returned a verdict, in just under three hours, finding Sutton guilty of first-degree murder as to Branam and burning her personal property [Addendum No. 3, Vol. 12, p. 2119].

### B. Sentencing Proof

During the penalty phase of the trial, the State relied upon the aggravating factor that "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest and prosecution of the defendants" [Addendum No. 3, Vol. 12, p. 2124].

Several family members and friends presented "good character" evidence about Sutton, testifying as to his kindness, generosity, reliability, dependability, and work ethic. His mother testified that when she and Sutton's father divorced "it hurt Gary a lot" [Addendum No. 3, Vol. 12, pp. 2139–55]. In addition, evidence of Sutton's good jail conduct was introduced, i.e., he only had one discipline report for failure to report as scheduled to his job site.

In less than one hour, the jury determined that life in prison was the appropriate punishment for the murder of Branam. The court sentenced him to a consecutive two-year sentence on the burning of personal property, for a total sentence of life plus two years [Addendum No. 3, Vol. 12, pp. 2178–79].

## C. Post-Conviction Proof

Filing a petition for post-conviction relief on January 21, 1997, Attorney H. Randolph Fallin initiated post-conviction proceedings in state court on Sutton's behalf. Although Sutton and Dellinger filed separate petitions for post-conviction relief, a combined evidentiary hearing was conducted on June 30, 2003 and February 25, 2004 [Addendum 13, Vols. 1–3].

Sutton's first witness was one of his two his trial attorneys, David Webb ("Webb"), who was involved in the case prior to his arrest. Webb testified he filed several pretrial motions and went to both scenes where the murder victims were discovered. He explained that it was the defense's idea to present the headlights as evidence because they were told by the client and his family that all headlights were in operation at the time of Griffin's murder. He explained that a headlight debacle occurred when a juror removed an evidence sticker revealing the manufacture date of the headlight, which was devastating to the defense because it was later than the date Sutton testified that he replaced the headlight [Addendum No. 13, Vol. 1, pp. 18–27].

Sutton hired Zane Daniel ("Daniel") to assist Webb shortly before trial. Webb or Daniel attempted to talk to every witness Sutton or his family members identified. Webb explained the theory of the defense as two-fold: (1) the cause of death was accidental or suicide, and (2) the murder was committed by someone else [Addendum No. 13, Vol. 1, pp. 34–36].

17

Daniel also testified that the theory of defense was that neither Sutton nor Dellinger committed the crimes. Once the ballistic evidence was tied to Dellinger, Daniel contacted the ballistics expert in Knoxville, Brian Sturgill. Daniel also contacted Brian Stuart, an arson expert, regarding the issue of how the victim died, i.e., whether it was an accidental death or a homicide [Addendum No. 13, Vol. 1, pp. 40–51].

As his third and final witness during his state post-conviction proceedings, Sutton called one of Dellinger's trial attorneys, Susanna Thomas Webb ("Thomas Webb") [Addendum No. 13, Vol. 2, pp. 13–30]. Thomas Webb explained the headlight evidence introduction as follows:

> The headlight was introduced into evidence and was passed to the jury. And, of course, this was during Mr. Sutton's defense, and I was representing Mr. Dellinger, so I wasn't really active in anything that was going on.
>
> And I saw the members of the jury pass it from this corner down the row. And when it got to the two gentlemen on the end of the front row here, one of the gentlemen was looking at it. They had just been handing it from one to another. The gentlemen at the end there looked at it, and then he turned it over. And I saw him then lean back to the man who had handed it to him and point to something on the back of the headlight. And they spent a few minutes looking at that, and then they handed it back down where it came from, with everybody pointing to what the man on the end had seen and, you know, whispering as it went along.
>
> And it immediately became obvious that something had really caught their attention and that they considered it something that they had a duty to point out to the people that had already looked at it, because they sent it back down that way, and then it came back and - down the row. And each time it was passed, you know, it was pointed and indicated, whatever it was that the juror had seen.
>
> . . . .

18

> At the - by the time the headlight had been passed through the jury, I think everybody at the counsel table realized that there was a serious problem with whatever had happened.

[Addendum No. 13, Vol. 2, pp. 15–19].  Thomas Webb further explained that Sutton's trial counsel were extremely concerned about the damage done to their client's case by this piece of evidence and whether there was an ethical problem because they introduced, what appeared to have been, perjured testimony by a witness that they had called to provide the foundation for the evidence.  Sutton's counsel contacted Lance Bracey with the Board of Professional Responsibility that night for direction on what corrective actions they could take [Addendum No. 13, Vol. 2, p. 19].

## III.     STANDARDS OF REVIEW

### A.     Habeas Claims Cognizable Under 28 U.S.C. § 2254

A federal district court has jurisdiction to grant a writ of habeas corpus pursuant to § 2254 of Title 28 to the United States Code.  Section 2254(a) limits the court's jurisdiction to those cases in which a petitioner "in custody pursuant to the judgment of a state court" alleges "he is in custody in violation of the Constitution or laws or treaties of the United States."  The initial question in a habeas petition is, therefore, whether the petitioner raises claims cognizable under § 2254(a).

### B.     Review of Habeas Claims on the Merits

Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), limits a federal district court's jurisdiction to review habeas claims on the merits.  In particular, a court considering a habeas claim must defer to any decision by

19

a state court concerning that claim unless the state-court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). The Supreme Court interpreted the language of § 2254 in *Williams v. Taylor*, 529 U.S. 362, 402 (2000) (O'Connor, J., delivering the opinion of the Court as to Part II and concurring as to Parts I and III–V); *see also Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000)*, cert. denied*, 532 U.S. 947 (2001) (construing *Williams*).

According to the *Williams* Court, the phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "holdings, as opposed to dicta, of [the Supreme Court's] decisions as of the time of the relevant State-court decision." 529 U.S. at 412. Hence, a federal district court hearing a habeas corpus petition may not look to lower federal court decisions to determine whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established law." *See id.*; *Harris*, 212 F.3d at 943–44.

The phrase "contrary to . . . clearly established precedent" means "substantially different from the relevant precedent of [the Supreme Court]." *Williams*, 529 U.S. at 405. A state-court decision is "contrary to . . . clearly established precedent" if the state court applied a rule contradicting the governing law set forth in Supreme Court cases or the state court confronted a set of facts materially indistinguishable from a Supreme Court decision

and arrived at a different result. *Id.* at 405–08. But a state-court decision applying valid Supreme Court precedent does not fall within the "contrary to" language and cannot be reviewed by a federal court under § 2254(d)(1), even if the federal court would have reached a different result in applying the rule, unless the result is unreasonable. *Id.* at 407.

The phrase "an unreasonable application of . . . clearly established precedent" means an "application of clearly established law [that] was objectively unreasonable." *Id.* at 409. It does not mean "an incorrect application of federal law." *Id.* at 410 (emphasis original). Hence, if a federal court concludes in its independent judgment that the state-court decision applied clearly established federal law erroneously or incorrectly, it can grant habeas relief under § 2254(d)(1) only if the application was also unreasonable. *Id.* at 410–13.

### C.    Factual Bases for Habeas Claims

In reviewing a state court's adjudication of a habeas claim, the federal district court must presume the state court's factual determinations were correct. 28 U.S.C. 2254(e)(1). The petitioner may rebut this presumption of correctness by clear and convincing evidence. *Id.* If the petitioner failed to develop the factual basis for his habeas claim in the state-court proceedings, however, he generally is not entitled to an evidentiary hearing unless (1) the legal or factual basis of the habeas claim did not exist at the time of the state-court proceedings, and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." *Id.* at § 2254(e)(2).

21

A petitioner "fail[s] to develop the factual basis" for his habeas claim in the state-court proceedings through a lack of diligence or some greater fault attributable to him or his counsel. *Williams*, 529 U.S. at 431–35. Congress intended that "prisoners who are at fault for the deficiency in the state-court record must satisfy a heightened standard to obtain an evidentiary hearing." *Id*. Hence, whether a petitioner must satisfy the heightened standard imposed by § 2254(e)(2) depends on whether the petitioner was diligent in his efforts to develop a factual basis for his claim, not on whether the facts could have been discovered or whether those efforts would have been successful. *Id*. at 433–37.

Lack of diligence will not bar an evidentiary hearing if efforts to discover the facts would have been in vain because there is no relationship between the petitioner's fault and the impossibility of discovery. 28 U.S.C. § 2254(e)(2)(A)(I). Similarly, a petitioner's lack of diligence or fault will not bar a hearing if there is clear and convincing evidence a reasonable trier of fact would not have found the petitioner guilty of the underlying offense but for constitutional error, *id*. at § 2254 (e)(2)(B), or if a new rule of constitutional law not available at the time of the earlier proceedings is made retroactive to cases on collateral review by the Supreme Court. *Id*. at § 2254(e)(2)(A)(i). Thus, a petitioner who failed to develop the factual basis of a claim in state-court proceedings through lack of diligence or fault has an opportunity to obtain an evidentiary hearing if the legal or factual basis of the claim did not exist at the time of state-court proceedings. *Williams*, 529 U.S. at 435–37.

In summary, a prisoner must be diligent in developing the record and, if possible, in presenting all claims of constitutional error so the state court will have its rightful

opportunity to adjudicate federal rights. If the prisoner contributes to the absence of a full and fair adjudication in state court and fails to diligently develop the record, then an evidentiary hearing is prohibited in federal court pursuant to § 2254(e)(2) unless the statute's stringent requirements are met. *Id.* at 437. If a prisoner made insufficient effort to pursue a claim in state court, then he will be prohibited from pursuing the claim in federal court. However, if a prisoner failed to develop the factual basis of a claim because he was unable to develop his claim in state court despite diligent effort, then an evidentiary hearing will not be barred by § 2254(e)(2). *See Williams*, 529 U.S. at 437.

**D.    Procedural Default**

Section 2254(b) limits a federal court's jurisdiction to hear a habeas claim to those cases in which a petitioner has exhausted all available state-court remedies:

> (1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that—
>
>> (A)    the applicant has exhausted the remedies available in the courts of the State; or
>>
>> (B)    (i)    there is an absence of available State corrective processes; or
>>
>>> (ii)    circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> (2)    An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

23

28 U.S.C. § 2254(b); *see also Granberry v. Greer*, 481 U.S. 129, 133–34 (1987); *Rose v. Lundy*, 455 U.S. 509, 519 (1982); Rule 4 of the Rules Governing § 2254 Cases in the United States District Court.

A petitioner fails to exhaust his available state-court remedies if he still has the opportunity to raise his claim by any available state-court procedure. *Gray v. Netherland*, 518 U.S. 152, 161 (1996), *Preiser v. Rodriguez*, 411 U.S. 475, 477, 489–90 (1973); *Gall v. Parker*, 231 F.3d 265, 283–84 (6th Cir. 2000), *superseded by statute on other grounds*. To exhaust these state remedies, the petitioner must have presented to the state courts both the legal and factual basis of the claim for which he seeks habeas relief. *Gray*, 518 U.S. at 162–63 (stating that the exhaustion requirement is not satisfied "by presenting the state courts only with the facts necessary to state a claim for relief"); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). The factual allegations made in federal court must be the same factual allegations made in state court, and the substance of a federal habeas claim presented to the federal court must first be presented to the state court. *Picard*, 404 U.S. at 276.

When a petitioner raises different factual issues under the same legal theory, he is required to present each factual claim to the highest state court in order to exhaust his state remedies. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999). A petitioner has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. *Pillette v. Foltz*, 824 F.2d 494, 497–98 (6th Cir. 1987). Moreover, each factual claim must be presented to the state courts as a matter of

24

specific federal law.  *Gray*, 518 U.S. at 163 ("It is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court."); *Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."); *see also Anderson v. Harless*, 459 U.S. 4, 6 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar State-law claim was made.").

Conversely, if a petitioner presented the substance of his habeas claim to the state courts, an elaboration of the facts or legal theories will not result in a new claim.  *Jones v. Washington*, 15 F.3d 671, 674–75 (7th Cir.), *cert. denied*, 512 U.S. 1241 (1994).  The standard for determining whether the petitioner has exhausted the factual basis of his claim is whether the additional facts "fundamentally alter the legal claim already considered by the state courts."  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).  The supplementation and clarification of the state-court factual record does not necessarily change a claim so dramatically as to require that the state courts be given a new opportunity to hear the issues.  *Id*. at 258–60.  The "failure to make every factual argument to support [a] claim does not constitute a failure to exhaust."  *Patterson v. Cuyler*, 729 F.2d 925, 929 (3rd Cir. 1984), *overruled on other ground recognized in Carter v. Rafferty*, 826 F.2d 1299 (3d Cir. 1987); *see also Picard*, 404 U.S. at 277–78 (discussing how a claim may be fairly presented to the state court without citing chapter and verse of the Constitution).

25

At bottom, a claim sought to be vindicated in a federal habeas proceeding must have been raised in the state courts so that the state courts have the first opportunity to hear the claim. The state court to which the petitioner presented the issue of federal law must address the merits of those claims. *Coleman v. Thompson*, 501 U.S. 722, 734–35 (1991). If the state court decides those claims on an adequate and independent state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner is barred by this procedural default from seeking federal habeas review, unless he can show cause and prejudice for that default. *Edwards v. Carpenter*, 529 U.S. 446 (2000); *Teague v. Lane*, 489 U.S. 288, 297-99 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 87–88 (1977). Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. *Coleman*, 501 U.S. at 752–53; *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

E.      **Miscarriage of Justice: Actual Innocence**

A petitioner may avoid the procedural bar and the necessity of showing cause and prejudice by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (quoting *Carrier*, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.*; *see also Sawyer v. Whitley*, 505 U.S. 333, 339 n.5 (1992) (holding that a petitioner must

26

"show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt") (citations omitted).

When raising a gateway claim of actual innocence, a habeas petitioner must demonstrate "an independent constitutional violation occurring in the underlying State criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Thus, as a gateway claim, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id*. at 404. The Supreme Court has explicitly tied the fundamental miscarriage of justice exception to the petitioner's innocence to ensure the exception would remain rare and only be applied in the extraordinary case, while also ensuring relief would be extended to those who are truly deserving. *See Schlup*, 513 U.S. at 299.

A "freestanding claim" of actual innocence is a petitioner's attempt to prove his innocence outright. *See House v. Bell*, 547 U.S. 518, 554–55 (2006). Although the United States Supreme Court has never explicitly recognized a freestanding claim of actual innocence, it recognized the possibility of such a claim, at least in capital cases, and the "extraordinarily high" burden a petitioner would have to meet in *Herrera v. Collins*:

> We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of

actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high. The showing made by petitioner in this case falls far short of any such threshold.

506 U.S. 390, 417 (1993).

Although the issue of a freestanding innocence claim was before the Supreme Court in *House v. Bell*, and the Court observed that "House urges the Court to answer the question left open in *Herrera* and hold not only that freestanding innocence claims are possible but also that he has established one[,]" the Court declined to resolve the issue. *House*, 547 U.S. at 554–55. Instead, the Court concluded:

> We conclude here, much as in *Herrera*, that whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it. To be sure, House has cast considerable doubt on his guilt-doubt sufficient to satisfy *Schlup's* gateway standard for obtaining federal review despite a state procedural default. In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as "extraordinarily high." 506 U.S., at 417. The sequence of the Court's decisions in *Herrera* and *Schlup*-first leaving unresolved the status of freestanding claims and then establishing the gateway standard-implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*. It follows, given the closeness of the *Schlup* question here, that House's showing falls short of the threshold implied in *Herrera*.

*Id*. at 555.

In summary, whether raising a gateway innocence claim or a freestanding innocence claim, it appears that a petitioner is required to present new reliable evidence that was not presented at trial. Once armed with the new evidence, a petitioner asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely

28

than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt, *Schlup*, 513 U.S. at 328, and a petitioner asserting a freestanding innocence claim must meet an "extraordinarily high" standard which the Supreme Court has not yet defined. *House*, 547 U.S. at 555. Finally, the miscarriage of justice exception is concerned with actual—not legal—innocence. *See Smith v. Murray*, 477 U.S. 527, 537 (1986).

### F. Rule 8(a) Evidentiary Hearing Determination, Rules Governing Section 2254 Cases in the United States District Court (hereinafter "Habeas Rules")

If a respondent is ordered to answer a § 2254 petition, the petitioner may submit a reply to the respondent's answer or other pleading within a time fixed by the judge. Habeas Rule 5. Upon submission of those filings a judge may, for good cause, authorize discovery, *see* Habeas Rule 6, and the court may, direct the parties to expand the record, *see* Habeas Rule 7.

Pursuant to Habeas Rule 8, the court must review the petition, the answer, the reply, "any transcripts and records of state-court proceedings, and any material submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Habeas Rule 8(a). "If the judge decides that an evidentiary hearing is neither required nor desirable, he shall make such a disposition of the petition 'as justice shall require.'" Habeas Rule 8, Advisory Committee Notes.

## IV. ANALYSIS[9]

### A. Sufficiency of the Evidence (Claim I)

Sutton maintains "[t]he state court unreasonably found sufficiency of the evidence based on its novel legal theory that 'sticking with your story' establishes all elements of an offense, in violation of *Jackson v. Virginia*, 443 U.S. 307 (1979)" [Doc. 3 (internal punctuation omitted)]. Sutton therefore argues that the evidence is insufficient to allow a jury to conclude beyond a reasonable doubt that he is guilty of first-degree murder. Sutton claims the State's proof has shown nothing more than his possible mere presence and that taken in the best light, the State only demonstrated that:

> Sutton and Dellinger were with Branam on the day she disappeared; Sutton gave a statement that he was with Dellinger that same weekend; Sutton gave a statement that he did not see Dellinger kill Branam; and there were minute inconsistencies between Dellinger and Sutton's statements to law enforcement. None of this evidence shows premeditation, intention, or deliberation.

[Doc. 3]. Respondent asserts that the appellate court decision was not contrary to or an unreasonable application of Supreme Court precedent.

### 1. Applicable Law

A state shall not obtain a conviction without proving each and every element of an offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 323. Sufficient evidence supports a conviction if, after viewing the evidence and the inferences to be drawn therefrom in light

---

[9]The Court addresses Petitioner's numerous claims in his petition for writ of habeas corpus in the order in which he raised them in his petition [*See* Doc. 3]. The Court, however, parenthetically numbers the claims as numbered in the petition.

most favorable to the prosecution, the Court can conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 324; *Pinchon v. Myers*, 615 F.3d 631, 643 (6th Cir. 2010), *petition for cert. filed* (Dec. 17, 2010) (No. 8077); *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir.), *cert. denied*, 516 U.S. 975 (1995). This standard of review does not permit the federal habeas court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Herrera*, 506 U.S. at 401–02. This due process guarantee of sufficiency of the evidence extends only to facts needed to establish the elements of the crime.

In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the prisoner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*, 443 U.S. 713, 714 (1979). The petitioner is entitled to habeas relief, however, only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson*, 443 U.S. at 324; *see also Brofford v. Marshall*, 751 F.2d 845, 856 (6th Cir.), *cert. denied*, 474 U.S. 872 (1985).

"Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal punctuation and citations

omitted); *see also Jackson*, 443 U.S. at 326 (declining to adopt the theory "that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt"); *Holland v. United States*, 348 U.S. 121, 140 (1954) (same in a tax evasion case). The elements of premeditated first-degree murder may be inferred from circumstantial evidence. *See, e.g., Delisle v. Rivers*, 161 F.3d 370, 389 (6th Cir. 1998), *cert. denied*, 526 U.S. 1975 (1999) (premeditation and intent to kill may be inferred from circumstantial evidence).

Witness credibility is an issue to be left solely within the province of the jury, *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact, *United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir.), *cert. denied*, 469 U.S. 1076 (1984). In addition, credibility findings made by state courts are entitled to the presumption of correctness. *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004); *Smith v. Jago*, 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). The Sixth Circuit has previously found that the appellant "bears a heavy burden" when insufficiency of the evidence is claimed, *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.), *cert. denied*, 476 U.S. 1123 (1986), and "[i]t is for the jury, not [a reviewing] court, to assess the credibility of the witnesses presented at trial." *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992). Thus, it is clear that a court should not attempt to substitute its opinion for that of the jury. *See York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988), *cert. denied*, 490 U.S. 1049 (1989).

## 2.    Discussion

Sutton challenged the sufficiency of the evidence on direct appeal, and the state appellate court, applying the controlling standard in *Jackson v. Virginia*, concluded the evidence was sufficient to support a finding of guilt beyond a reasonable doubt and the challenge was therefore without merit. Specifically, the state appellate court concluded the proof was sufficient to establish Sutton had the requisite intent, premeditation, and deliberation in killing Branam. *State v. Sutton*, 1995 WL 406953, at *6.

Sutton specifically argues that the Court of Criminal Appeals's conclusion that he possessed the requisite intent for a first-degree murder conviction because he "had the opportunity to reveal Dellinger's crimes and exonerate himself, but he did not[, and instead h]e 'stuck to his story.' . . . [thus t]he only reasonable hypothesis is that the appellants acted in concert and with a common intent," *id*. at *4, was unreasonable and that the evidence does not establish intent, premeditation, or deliberation. Sutton specifically attacks the following state-court findings: that he was present at the time of Branam's death; that her death was a murder; that the evidence was sufficient to establish he intended to kill Branam or shared in Dellinger's intent to kill her; and that the evidence was sufficient to demonstrate premeditation, and deliberation.

The task before the Court is to determine whether it was objectively unreasonable for the state appellate court to conclude a rational trier of fact, after viewing the evidence in the light most favorable to the State, "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. If the Court concludes the evidence

33

itself was sufficient to convict under *Jackson*, the inquiry ends. If the Court concludes the evidence was insufficient to convict, it then must then apply AEDPA deference and determine whether the state court was "objectively unreasonable in concluding to the contrary." *Pinchon*, 615 F.3d at 644.

### a. Presence at Murder

First, Sutton argues "[t]he State has shown nothing more than [his] possible mere presence [at the murder]" [Doc. 3, p. 7]. The Court disagrees as there was sufficient evidence from which a jury could infer that Sutton was present when Branam was murdered. The trial testimony demonstrated Sutton knew Branam was attempting to determine what happened to Griffin, that Sutton was drinking with her prior to her death, and that he was seen leaving Howie's with her less than two hours before witnesses sighted the fire where she was later discovered dead and burned in her vehicle. Furthermore, the last time Branam was seen alive was in the company of Sutton and Dellinger. In addition, there was testimony from a witness that, the morning after she observed the fire, she observed a truck meeting the description of Dellinger's truck, with two people inside, leave the area where the car had burned. Sutton gave a statement to authorities that he was with Dellinger the whole weekend; he failed to mention, however, that he was with Branam at Howie's on the evening of her death and he concealed from Branam that he had been with her brother at Howie's on the day he disappeared. The state court concluded these actions could have led a reasonable jury to conclude Sutton shared Dellinger's motive to prevent Branam from discovering and revealing they killed her brother, and this circumstantial evidence was sufficient to establish

34

Sutton was present at the time of Branam's death and participated in causing her death.

Contrary to Sutton's claim, viewing the evidence and the inferences to be drawn from the record in the light most favorable to the prosecution, any rational trier of fact could have found that Sutton was present when Branam was murdered. Accordingly, the Court concludes the state court's conclusion that the substantial circumstantial evidence in this case demonstrates, beyond a reasonable doubt, that Sutton was present when Branam was murder was not unreasonable.

### b.     Proof that Branam's Death was Murder

Sutton also argues his conviction rests on mere conjecture as there is no proof as to how Branam's death occurred. Sutton is mistaken because the exact method or cause of Branam's death is not an element of the crime of first degree murder; his conviction does not rest on conjecture, but on the fact that she was murdered. Although Branam's remains were so completely burned that it was impossible to determine whether she was shot or burned to death, the circumstantial evidence was sufficient for a trier of fact to conclude, beyond a reasonable doubt, that she was murdered. As the state appellate court explained:

> At trial, the state introduced uncontradicted testimony that some type of liquid accelerant was applied to the body and to the interior of the car. The fire was not started by a cigarette or other smoldering initiator. Accidental death is therefore not a reasonable possibility. Furthermore, while Connie Branum had previously attempted suicide, it is unreasonable to suppose that she abandoned her search for her missing brother, drove to a remote location, doused herself and the interior of her car with an accelerant, somehow disposed of the container that she used to transport the accelerant, and then immolated herself. This is particularly true in light of other evidence presented at trial. A witness saw Dellinger's truck leaving the area the next morning with two people inside. Both Sutton and Dellinger initially gave statements to the police in

35

which neither admitted to having been with Connie Branum at Howie's Hideaway that evening. They later claimed that they had not mentioned going to the Hideaway with Branum because she had asked them not to tell anyone and they did not think that it was important anyway.

*Sutton v. State,* 1995 WL 406953, at *5.

Although the exact cause of death is unknown, there is substantial circumstantial evidence from which the jury could infer that Branam was murdered beyond a reasonable doubt. In addition, there is no evidence in the record contradicting the circumstantial evidence that she was murdered by Sutton and Dellinger.

### c.    Intent

Sutton contends the state court's holding that his failure to inculpate his uncle, thus "sticking to his story," demonstrated he shared Dellinger's intent to kill Branam or that he knew of Dellinger's plans in advance, is contrary to, or an unreasonable application of federal law [Doc. 3]. It is necessary to put the state court's statement about Sutton "sticking to his story" into context. The court explained:

> Sutton also contends that the evidence is insufficient to establish that he intended to kill Connie Branum or shared Dellinger's intent to kill her. He proposes an alternate scenario in which Dellinger forced him at gunpoint to assist in concealing both murders. This theory is simply not reasonable. Sutton had the opportunity to reveal Dellinger's crimes and exonerate himself, but did not. He 'stuck to his story.' Based on the evidence introduced at trial, the only reasonable hypothesis is that the appellants acted in concert and with a common intent.

*Sutton v. State*, 1995 WL 406953, at *4.

36

The state court's conclusion that the evidence establishes the element of intent is not unreasonable as there is no evidence that demonstrates, or from which the Court can infer, that Sutton's alternate scenario occurred. There is, however, sufficient evidence from which to infer that Sutton and Dellinger planned and intended to murder Branam. Consequently, there is sufficient circumstantial evidence from which a rational trier of fact could have found Sutton possessed the necessary intent.

### d.    Premeditation and Deliberation

Finally, Sutton challenges the state court's finding that the evidence was sufficient to demonstrate the elements of premeditation and deliberation to support his conviction for first-degree murder beyond a reasonable doubt. The state appellate court rested its decision, in part, on the following:

> [T]he evidence indicates appellants killed Connie Branum to prevent her from discovering that they were responsible for the murder of her brother, Tommy Griffin. The appellants 'ran into' Branum while she was searching for her brother. They did not tell her that they had left the Hideaway with Griffin the night before. Witnesses established that the fire which consumed Branum's body and her car started a short period of time after the three left the bar. Branum's car was concealed in a remote location. Finally the appellants voluntarily gave statements during the investigation of the Griffin murder in which they neglected to mention that they had been with Connie Branum the day after Griffin's disappearance. The existence and execution of a plan to kill Connie Branum establishes the required intent, premeditation, and deliberation. This issue is without merit. The evidence adduced at trial is sufficient to support the appellants' convictions for first degree murder.

*Id.* at *6.

The testimony of the independent prosecution witnesses who, by happenstance, were present at locations where Sutton was seen during the time of the double homicide,

corroborated each other's testimony and the jury obviously believed the witnesses and accredited their testimony, as is their prerogative. Although arguably, none of the pieces of evidence alone demonstrates Sutton's guilt, all of the circumstantial evidence considered together, along with the inferred motive, is sufficient to meet Tennessee's requirement that for circumstantial evidence of premeditation and deliberation to support a jury verdict "[a] web of guilt must be woven around the defendant from which he cannot escape and from which fact and circumstances the jury could draw no other reasonable inference save the guilt of the [Petitioner] beyond a reasonable doubt" [Doc. 3, p. 8 (quoting *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971)].

Having independently assessed the evidence in this case, the Court concludes it sufficient under *Jackson*'s standard to support Sutton's conviction for first-degree premeditated murder. The evidence supports a rational inference that, once Sutton and Dellinger learned Branam was looking for Griffin, they formed, through premeditation and deliberation, the specific intent to kill her because she was retracing Griffin's steps and was on the trail to discovering he was last seen with Sutton and Dellinger. The evidence presented in this case, even though circumstantial, is undoubtedly sufficient to support the conviction under *Jackson*. Thus, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of first-degree premeditated murder beyond a reasonable doubt.

The jury clearly accepted the State's proof and Sutton has not identified, and the Court has not found, any serious flaw in the State's evidence. The jury's determination

properly conforms with the *Jackson* standard—when the evidence is viewed in the light most favorable to the prosecution, a rational trier of fact could find the necessary elements, here premeditation, deliberation, and intent, beyond a reasonable doubt. Consequently, the jury's finding of guilt will not be disturbed.

Accordingly, because Sutton has not demonstrated that the state-court decision was based on an unreasonable determination of the facts or that it was contrary to, or an unreasonable application of clearly established federal law, no habeas relief is warranted and Sutton's sufficiency of the evidence claim will be **DISMISSED**.

### B. Ineffective Assistance of Counsel Claims (Claim II)

The criteria for analyzing a claim of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a defendant to demonstrate two essential elements: (1) counsel's performance was deficient (i.e., counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment), and (2) counsel's deficient performance prejudiced the defense (i.e., deprived the defendant of a fair trial rendering the outcome of the trial unreliable). *Id*. at 687–88.

In order to demonstrate deficient performance, it must be shown that counsel's representation fell "below an objective standard of reasonableness" in light of the "prevailing professional norms." *Id*. In *Bobby v. Van Hook*, the Supreme Court reiterated that an objective standard of reasonableness is a general standard:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

> Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.

*Bobby v. Van Hook*, ___ U.S. ___, 130 S. Ct. 13, 16 (2009) (quoting *Stickland*, 466 U.S. at 688–89) (citations omitted).

When applying these standards, the Court is cognizant of the fact that there is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. "Reviewing courts focus on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997) (citing *Strickland*, 466 U.S. at 687; *United States v. Cronic*, 466 U.S. 648, 658, (1984); *McQueen*, 99 F.3d at 1310–11). A reviewing court cannot indulge in hindsight but must instead evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland,* 466 U.S. at 690; *McQueen*, 99 F.3d at 1311. Trial counsel's tactical decisions are particularly difficult to attack. *McQueen*, 99 F.3d at 1311; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *McQueen*, 99 F.3d at 1311; *O'Hara*, 24 F.3d at 828. "[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998) (quoting *Strickland*, 466 U.S. at 690). A court must make an independent judicial evaluation of counsel's performance and determine whether counsel

acted reasonably under all the circumstances. *McQueen*, 99 F.3d at 1311; *O'Hara*, 24 F.3d at 828; *Ward v. United States*, 995 F.2d 1317, 1321–22 (6th Cir. 1993); *Sims v. Livesay*, 970 F.2d 1575, 1580–81 (6th Cir. 1992).

To establish the prejudice prong, a petitioner must show that, absent his attorney's errors, the result of his trial would have been different. *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *West v. Seabold*, 73 F.3d 81, 84 (6th Cir.) (quoting *Strickland*, 466 U.S. at 691 (further citation omitted)), *cert. denied*, 518 U.S. 1027 (1996).

The Supreme Court reiterated the standard of prejudice in *Wiggins v. Smith*:

> [T]o establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

539 U.S. 510, 534 (2003) (quoting *Strickland*, 466 U.S. at 694).

The Court notes that, in evaluating Sutton's ineffective assistance of counsel claim, not only must the Court follow the guidelines for evaluating claims of ineffective assistance of counsel as outlined above, but its review of the state court's decision that Sutton failed to establish ineffective assistance of counsel is circumscribed by § 2254(d)'s deferential review standards. Therefore, Sutton will meet his burden of establishing ineffective assistance of counsel only if he demonstrates the state court's finding of no ineffective assistance is

contrary to, or an unreasonable application of Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

### 1. Failure to Investigate Griffin's Death

Sutton contends his trial counsel "failed to investigate the circumstances surrounding Griffin's death, even though the State's prosecution of the Branam death was inextricably bound with proof that Dellinger and Sutton killed Griffin" [Doc. 3, p. 9].[10] The trial court allowed the State to prove Griffin's death as part of its case in chief in the Branam trial to prove the identity of Branam's murderers [Addendum No. 2, Vols. 9 & 10; Addendum No. 3, Vols. 1–6]. Sutton contends that, under these circumstances, trial counsel should have investigated and presented available evidence challenging Griffin's death.

Respondent contends the only challenge to the investigation into Griffin's murder in state court was one by Dellinger. Thus, argues Respondent, this claim is defaulted and Sutton's attempt to present a different factual basis is barred by 28 U.S.C. § 2254(e)(2). Respondent alternatively argues, should the Court find the claim is not barred, denial of relief to Dellinger on his claim was not contrary to, or an unreasonable application of well-settled Supreme Court precedent. As explained below, the determination of whether this claim is procedurally barred is somewhat complex as Sutton merely adopted Dellinger's claim.

---

[10]Petitioner complains that counsel agreed to the admission of Dr. Eric Ellington's autopsy report reflecting Griffin died of a shotgun wound to the head by stipulation. There is no evidence in the record contradicting the cause of Griffin's death.

42

### a.    Procedural Bar

Although Respondent does not explain his reason for making this alternative argument regarding the adjudication of this claim which was raised by Dellinger, after an exhaustive review of the record pertaining to this issue, it is apparent he does so because, even though Sutton did not raise this claim in his state post-conviction petition or any of his amendments [Addendum No. 12, pp. 1–22, 27–30, 37–38],[11] present any proof to support such a claim during his state post-conviction hearing [Addendum 13, Vol. 1, Vol. 2, pp. 13–30], or specifically raise it in his appellate court brief [Addendum No. 18], the post-conviction appellate court, arguably, granted Sutton's request and permitted Sutton to adopt Dellinger's claim that his trial attorneys failed to investigate Griffin's murder.[12]

A review of the record reveals that Sutton's state post-conviction appellate brief (in the "Statement of the Case" section) included a paragraph referencing the consolidation of his appeal with Dellinger's and stating that he was adopting "any additional arguments that

---

[11]Nothing in the record reflects Sutton personally raised this claim or provided any specific evidence to support such a claim as to his trial attorneys. At the beginning of the state post-conviction hearing Sutton's counsel informed the Court he would be presenting evidence on issues relating to change of venue, voir dire, and "the headlight situation" [Addendum No. 13 pp. 7, 11]. Sutton's state post-conviction counsel later requested to adopt amendments made by Dellinger as to any *Brady* violations and discovery violations, and the State did not oppose these. Sutton's post-conviction counsel was permitted to adopt and amend his petition to include "the extensive amendments that were filed for Mr. Dellinger," at the end of Dellinger's post-conviction case. The Court, however, is unable to locate the referenced amendments [Addendum No. 3, Vol. 3, p. 256]. In his appellate brief, Sutton requested to adopt any additional arguments that Dellinger made on appeal of this case. Tenn. R. App. P. 27(j) ("In cases . . . consolidated for purposes of appeal, . . . any party may adopt by reference any part of the brief of another party") [Addendum No. 18, p. 4].

[12]The Court was unable locate Dellinger's post-conviction appellate brief in any of the addenda.

Dellinger makes on the appeal in this case" [Addendum No. 18, p. 4]. In its introduction addressing this failure to investigate Griffin's death claim, the appellate court stated: "On appeal, Petitioners argue that their respective trial and appellate counsel rendered ineffective assistance of counsel because they . . . (2) failed to adequately investigate the death of Tommy Griffin in Blount County." *Sutton v. State,* 2006 WL 1679595, at *1. Thus, the court indicated that it was permitting Sutton's request to adopt Dellinger's claim.

Confusing this matter further, however, when the appellate court addressed the claim, it stated, "Petitioner Dellinger argues that his counsel were ineffective because they failed to conduct any investigation into the facts and circumstances surrounding Mr. Griffin's murder in Blount County, particularly the timing of the death." *Id.* at *16. The appellate court reviewed the evidence submitted by Dellinger during his post-conviction hearing to support the claim. Nevertheless, the appellate court indicated it was adjudicating the claim as to both Sutton and Dellinger by its use of the plural "Petitioners":

> Even assuming that *Petitioners'* Sevier County counsel should have investigated Mr. Griffin's murder in Blount County more thoroughly (as was purportedly done by *Petitioners'* counsel at the Blount County trial), *Petitioners* have failed to establish that there is a reasonable probability that such investigation would have led to any different result in *Petitioners'* Sevier County trial. The evidence does not preponderate against the trial court's finding that *Petitioners* failed to establish that they were prejudiced by their counsel's conduct in this regard. *Petitioners* are not entitled to relief on this issue.

*Id.* at *18 (emphasis added).[13]

Therefore, in ruling on the merits of Dellinger's claim, the state appellate court, at the same time appears to have ruled on the merits of Sutton's claim, despite the fact that Sutton did not specifically raise the issue at the post-conviction trial level, did not present any evidence to support the claim, and did not raise the issue in his direct appeal. Being cognizant of the Supreme Court's instruction that the failure of a habeas petitioner to abide by a state procedural rule does not, in and of itself, prevent a federal court from reaching the claim unless the state court actually relied on the procedural bar as an independent basis for its disposition of the case, *Harris v. Reed*, 489 U.S. 255, 262 (1989), the Court assumes, for purposes of this discussion, the doctrine of procedural default does not bar this Court from reaching the claim's merits.

### b.    New Expert Affidavits

In his habeas petition, Sutton claims trial counsel were deficient for failing to present to the jury scientific evidence demonstrating that Griffin did not die at 11:55 p.m. on the

---

[13]The appellate court consolidated Sutton's appeal and Dellinger's appeal of the dismissal of their state post-conviction petitions. A review of the state appellate court's decision reflects, "Petitioner Dellinger argues that his counsel were ineffective because they failed to conduct any investigation of the facts and circumstances surrounding Mr. Grffnin's murder in Blount County, particularly the time of his death." *Dellinger and Sutton v. State*, 2006 1679595, at *16 (Tenn. Crim. App. 2006), *perm. app. denied*, (Tenn. Oct. 30, 2006). The Court observes that the appellate court specified when both petitioners raised a claim, e.g. Failure to Investigate the Sevier County Murder and Introduction of the Headlights as an Exhibit at trial, *id.* at 10–12, and specified that certain claims were raised by Dellinger, e.g. Failure to Investigate Mr. Griffin's Murder; Petitioner Dellinger's Right to Testify; and Ineffective Assistance of Appellate Counsel for failing to appeal the Motion to Suppress. *Id.* at 16–20. Nevertheless, because of the manner in which the appellate court addressed the claim that trial counsel failed to investigate Griffin's murder, it is difficult to discern the exact procedural posture of this claim.

night of Friday, February 21, 1992, but, instead, must have died much closer to the time the body was discovered. Sutton has attached the affidavits of two experts, both of whom he alleges have concluded, based on their review of the evidence and records, that it is "scientifically impossible that Griffin died at this critical time" [Doc. 3, p. 10].[14]

These affidavits were not first presented to the state court, and, therefore, this Court must first determine whether this new evidence should even be considered in this habeas review.[15] A habeas petitioner is normally limited to the factual record developed in state-court proceedings and § 2254(e)(2) limits a petitioner's ability to present evidence in a federal habeas proceeding that was not offered to the state court. 28 U.S.C. § 2254(e)(2) (providing that a petitioner may not present evidence in a federal habeas proceeding that was not considered by the state court if he "failed to develop the factual basis of a claim in State court proceedings").

A petitioner who has sought to develop a factual basis in state court, but was denied the opportunity to do so, will not be deemed to have failed to develop the facts supporting a claim. *See Williams,* 529 U.S. at 436–37; *McAdoo v. Elo*, 365 F.3d 487, 500 (6th Cir. 2004). A petitioner who did not take or seek the opportunity to develop evidence in his state post-conviction proceeding, will be deemed to have failed to develop the factual basis of the claim in state court. 28 U.S.C. § 2254(e)(2). The latter situation will preclude the habeas

---

[14]No expert testimony was introduced during the Branam murder trial regarding Griffin's time of death. Only circumstantial evidence of the time of his death was introduced during this trial.

[15]Notably, Sutton has not sought to expand the record with these affidavits. Rule 7 of the Rules Governing Section 2254 Cases in the United States District Court.

court from considering new facts presented for the first time in federal habeas proceedings or granting an evidentiary hearing to consider the new facts. Clearly, § 2254(e)(2) is designed to restrict the development of facts in federal habeas proceedings that were not known to or considered by a state court. Therefore, the decision of whether to consider Sutton's attempt to introduce the new evidence hinges on whether he properly attempted to introduce the same evidence in his state-court proceedings.

Sutton did not seek to introduce these affidavits in his state post-conviction proceedings in 2004. Sutton, however, claims this issue was presented to the state court and rejected because of a failure to present any medical testimony. Sutton argues that this opinion is unreasonable because the state post-conviction court denied him funding for expert testimony in an order dated September 15, 2003, based on Tennessee Supreme Court Rule 13 § 5(a)(2) ("In non-capital post-conviction proceedings, funding for investigative, expert, or other similar services shall not be authorized or approved"), a denial which the Court of Criminal Appeals declined to overrule.[16] There is nothing in the record indicating Sutton

---

[16]Sutton did not raise the issue of trial counsel failing to investigate Griffin's death in his state post-conviction petition or any of his amended petitions [Addendum No. 12, pp. 1–22; 27–30; 37–38]. Although Sutton and Dellinger each filed separate state post-conviction motions, the hearing was consolidated. A review of the record reflects the state post-conviction court granted permission for an interlocutory appeal of its denial to consolidate the state post-conviction proceedings in the Blount County murder with the post-conviction proceedings in the Sevier County murder, and his claim that the state post-conviction procedures unconstitutionally denied him access to services. The state appellate court stated it was "unable to agree that immediate appellate review is warranted" [Addendum No. 17]. The appellate court explained that Sutton could raise these issues on appeal. Nevertheless, the appellate court explained why the post-conviction courts decision was correct and denied the interlocutory appeal. Notably, nowhere in these records is there any indication that Sutton requested the funds for the purpose of hiring experts to determine Griffin's time of death, nor did he appeal the denial of the funds for services in his post-conviction appellate brief.

sought to develop this specific evidence during state post-conviction proceedings. There is evidence, however, that he and Dellinger sought funds to pay for some type of services to investigate his post-conviction claims.

Therefore, it appears that even if he had properly requested services of these experts, such a request would have been denied pursuant to Tennessee Supreme Court Rule 13 § 5(a)(2), which bars authorization of expert and investigative services in non-capital post-conviction cases. Hence, because the Court is treating this claim as exhausted and because it appears that Sutton did attempt to obtain funds to pay for some type of services to investigate his post-conviction claims and that such a request was denied, for purposes of this discussion, the Court will consider the affidavits.

One other matter needs to be addressed before the Court analyzes this claim. This Court previously conducted a habeas evidentiary hearing in Sutton's related death penalty habeas case and considered, among other claims, the accuracy of the State's time-of-death evidence in the Griffin murder case. *See Sutton v. Bell*, Civil Case Number 3:06-cv-388. Several experts, including the authors of the affidavits submitted in this case, Dr. Stanton C. Kessler and Neal H. Haskell, Ph.D. DABFE, testified during the habeas evidentiary hearing as to their opinions of Griffin's time of death. Accordingly, the Court takes judicial notice of its own records and files in Sutton's related habeas petition, *Sutton v. Bell*, Civil Case Number 3:06-cv-388, including but not limited to the transcripts and exhibits from the habeas evidentiary hearing, identified as document numbers 136 to 139. *See* Fed. R. Evid. 201(b)(2) (a court may take judicial notice of facts that are "capable of accurate and ready

48

determination by resort to sources whose accuracy cannot be reasonably questioned," such as the records of court proceedings).

For purposes of this analysis, the Court will first summarize pertinent parts of the testimony presented during the evidentiary hearing in Sutton's death penalty habeas case, which Sutton introduced in an effort to demonstrate Griffin did not die at 11:55 p.m. on Friday, February 21, 1992, beginning with the two experts who submitted affidavits in the instant case. Then the State's proof pertinent to the time-of-death determination will be summarized. Finally, the Court will analyze the evidence and law.

### (1)     Dr. Neal Haskell

Petitioner presented Dr. Neal Haskell, a board certified forensic entomologist, as an expert in his death penalty habeas proceeding. Dr. Haskell explained how insect activity assists in determining a person's time of death [Civil Case No. 3:06-cv-388, Doc. 137, pp. 23–24].[17] Relying upon his observation of the crime scene years after the crime was committed, as well as reports by the first responders, investigators, and medical examiners; crime investigation and autopsy pictures; climatological data from the McGhee Tyson Airport in Knoxville, Tennessee and the Gatlinburg weather station in Sevier County; and the lack of any evidence of insect activity, Dr. Haskell testified that, based upon a reasonable degree of medical certainty, the body was not there any longer than 24 to 48 hours prior to

---

[17]All documents referred to in this section discussing the expert testimony are located in the underlying death penalty habeas case, 3:06-cv-388. Hereinafter, a document will not be referenced by the case number; it will only be referenced by its document number.

49

when the body was found. He further testified within a reasonable degree of medical certainty that Griffin was not killed on Friday, February 21, 1992 [Doc. 137, pp. 53–54].

### (2)    Dr. Stanton Coleman Kessler

Dr. Stanton Coleman Kessler, a forensic pathologist and medical examiner, disagreed with the State's trial expert's time-of-death opinion and most of his other testimony. For example, Dr. Kessler stated that he does not believe that time of death can be determined by looking at slides of organs, because organs decompose at different rates; has never heard of anyone determining time of death by looking at slides of organs; and discounts the slide method of determining a time of death and believes it lacks a scientific basis [Doc. 137, p. 114–115].

Though it is customary for forensic pathologists to look at weather data to reach a time-of-death opinion, Dr. Kessler could not give an exact time of death, but testified that in his opinion, the body was 12 to 24 hours old, but not 64 hours old [Doc. 137, p. 129]. Dr. Kessler explained that without knowing the actual temperature at the site where the body was found,[18] he could not be one-hundred percent accurate and could not give an exact time of death, but did give his "best guesstimate"[19] based on temperature charts from the Knoxville

---

[18]None of these experts had the temperatures at the location where the body was discovered. Therefore, they looked at temperature charts from the Knoxville Airport and/or Gatlinburg in reaching their opinions.

[19]A "guesstimate" is defined as "an estimate which is based on both guesswork and reasoning." Oxford English Online Dictionary, *available at* http://english.oxforddictionaries.com/view/entry/m_en_us1252687#m_en_us1252687 (last visited July 18, 2011).

Airport, even though he also looked at the Gatlinburg temperature charts [Doc. 139, p. 10].

He added that "unless you actually do temperature recordings at the scene for several weeks, you can't be 100 percent accurate. Because even moving 300 feet in an area that has to be shaded, or has water near it running there, or whatever, can change things tremendously" [Doc. 139, p. 10].

Dr. Kessler explained that a more accurate time-of-death opinion could have been provided had certain tests been performed, i.e., vitreous from the eye fluid, body temperature, and serum testing for potassium level, and, within two or three hours as the body is sitting there, measuring rectal temperatures and looking at nomograms[20] [Doc. 139, pp. 14, 20–22, 25]. Even though he previously testified during the state post-conviction proceedings of Sutton's co-defendant that more testing was desirable, when asked during the habeas evidentiary hearing if he agreed that the information available would not permit a "100 percent . . . perfectly-clear picture of when the death" occurred, he answered that, while more testing was preferable, he knew 100 percent "that the body was fresh . . . within about 24 hours" [Doc. 139, pp. 21–22].

---

[20]A "nomogram" is defined as "[a] diagram representing a relationship between three or more variables by means of a number of straight or curved scales, so arranged that the value of one variable corresponding to given values of the others can be found by a simple geometrical construction." Oxford English Online Dictionary, *available at* http://english.oxforddictionaries.com/definition/nomogram?region=us (last visited July 18, 2011).

### (3)     Dr. Darinka Mileusnic-Polchan

Petitioner also presented Dr. Darinka Mileusnic-Polchan, Chief Medical Examiner for Knox and Anderson Counties and a pathology professor. She reviewed the first responder reports, crime scene photographs, Dr. Harlan's trial testimony, and the slides of the organs of the victim's body in making her time-of-death determination [Doc. 139, pp. 40–41; 43–45]. She testified that, "[d]epending on the circumstances where the body was found she was comfortable with the victim being dead for a day or perhaps two or three days" [Doc. 139, p. 48].

Contrary to Dr. Harlan's testimony, Dr. Mileusnic-Polchan testified she saw no decomposition on the slides. Although she initially testified an estimate of death based on the examination of microscopic slides is not recognized science, Dr. Mileusnic-Polchan subsequently testified it was proper for her to draw conclusions from the slides as to the time of death, but improper for Dr. Harlan to do so, because Dr. Harlan "looked at actual hours[,]" stating that the tissue on the slide indicated the victim had been dead for 72 hours or longer, whereas, one "cannot put an hour to it" [Doc. 139, p. 49].

Dr. Mileusnic-Polchan noted that determining time of an unwitnessed death is "a very complex topic, and we still don't have answers. We have to rely on a lot of data. . . . [I]t would be impossible to put the time - - an exact time to his death" [Doc. 139, p. 60]. Nevertheless, somewhat contrary to her prior testimony that she was "comfortable" with the victim being dead between one and three days, she then testified that she was "comfortable with this body being dead 24 hours. I can maybe even push it to a day and a half. But

52

beyond that, I'm very uncomfortable. And I don't - - I would never really support the time of death - - the time being more than 48 hours" [Doc. 139, p. 60].

Dr. Mileusnic-Polchan also testified that "a lot of things can impede . . . anybody's ability to give the time of death. . . . Because under no circumstances can anybody really give you the exact time of death" and that none of the techniques used to determine time of death "can give you a with full certainty answer to the time of death[,]" and "any self-respecting pathologist cannot really put the exact time of death" [Doc. 139, p. 63–65]. Finally, on cross-examination, acknowledging that no one knows the temperature at the location of where the body was found, Dr. Mileusnic-Polchan testified that weather temperatures play a role in the rate of decomposition of a body and the colder it is the less decomposition you would see in the body [Doc. 139, pp. 69–70].

### (4) Dr. Bruce Phillip Levy

At the conclusion of Sutton's proof, the State presented the Chief Medical Examiner for the State of Tennessee as its expert witness, Dr. Bruce Phillip Levy, who testified as to his opinion of Mr. Griffin's time of death.[21] Dr. Levy, Chief Medical Examiner for the State of Tennessee and the County Medical Examiner for Davidson County, explained that when making a time-of-death determination, a forensic pathologist establishes a "window of death[,]" which begins with the time the person is last seen alive. Dr. Levy reviewed

---

[21]The month after the evidentiary hearing, Dr. Levy was suspended as medical examiner for Davidson County and the Tennessee Department of Health began action to terminate his contract as state medical examiner after he was arrested on felony drug charges. *See* "State Medical Examiner to Lose Job After Drug Bust" NewsChannel5.com, March 17, 2010, http://www.newschannel5.com/global/story.asp?s=12155327.

53

materials relative to the time of death of Griffin, including the first responders report, the ambulance report, the autopsy report, and the official Gatlinburg climatology readings, before concluding Griffin could have died 12 to 64 hours prior to being found [Doc. 138, pp. 4–18].

Dr. Levy testified the official temperature readings will vary across regions and, contrary to Dr. Haskell's opinion, wooded areas tend to be a little cooler than the surrounding open areas [Doc. 138 p. 15]. Dr. Levy agreed with the other experts' opinions regarding the standard length of time it takes a body to go through rigor mortis, but clarified that these general standards are based on bodies being maintained at temperatures between 70 to 72 degrees [Doc. 138, p. 16]. Therefore, based on the material he reviewed, his experience and training, and due to the body being exposed to cooler conditions than 70 and 72 degrees, Dr. Levy concluded the victim could have died at any point from the time he was last seen to approximately six hours before he was found [Doc. 138, p. 25–26].

### c.    Analysis

Because both the performance prong and the prejudice prong must be satisfied to establish a claim of ineffective assistance, if a petitioner cannot satisfy one prong, the other need not be examined. *Strickland*, 466 U.S. at 697. Therefore, for purposes of this discussion, the Court will assume, without finding, that trial counsel were deficient for failing to investigate the time of Griffin's death. Thus, Sutton must demonstrate prejudice to demonstrate he received ineffective assistance of counsel. As previously stated, to establish prejudice Sutton must show that there is a reasonable probability that, but for counsel's

54

failure to investigate the time of Griffin's death, the result of the proceeding would have been different, thus undermining the Court's confidence in the outcome. *Id.* at 694.

Considering the expert witnesses' testimony presented at the habeas death penalty evidentiary hearing and during the trial of Griffin's murder, along with the circumstantial evidence of Griffin's time of death, the Court cannot conclude that Sutton suffered any prejudice as a result of the failure of his trial counsel to investigate Griffin's murder. This is so because the new expert testimony does not weaken, in any way whatsoever, the circumstantial evidence pointing to Petitioner's guilt; all it does is contradict the State's time-of-death testimony and support the defense's expert's time-of-death testimony—both of which the jury heard during the Griffin murder trial when it found Sutton and Dellinger guilty of his murder. Although it is true that, at the time of trial, the credentials of the State's trial expert outweighed the credentials of the defense's trial expert, and although the State's trial expert was subsequently stripped of his medical license, the fact of the matter is, all the circumstantial evidence support's the State's theory of Griffin's time of death and none of the circumstantial evidence supports the defense's theory. Moreover, this new expert testimony does not demonstrate that the time-of-death opinion of the State's trial expert was incorrect.[22]

---

[22]At trial, the State's expert, Dr. Harlan, testified that he considered the reports from the first responders; the autopsy report, the photographs, the tissues on the microscopic slides, and the fact the victim was last seen alive around 11:30 p.m. on Friday, February 21, 1992, before estimating Griffin died between 11:30 p.m. on Friday, February 21 and 8:00 a.m. on Saturday, February 22, 1992.

The expert testimony does not demonstrate that Sutton was prejudiced by his counsel's failure to investigate the facts surrounding the Griffin murder. Rather, the testimony of the new experts establishes that time-of-death determinations are not an exact science; involve the exercise of individual judgment within the framework of evaluating certain data; and are based on a fairly subjective evaluation of data. Moreover, the testimony of these new experts demonstrate that the exact time of death of this unwitnessed murder cannot be determined by these experts based upon the data provided to them.

As an example of the subjective interpretation of data by these experts, one only need look at the issue regarding the use and interpretation of the microscopic slides. The expert conducting the autopsy concluded that certain organs evidenced decomposition and autolysis—a conclusion with which Dr. Harlan agreed but with which Dr. Mileusnic-Polchan disagreed. In addition, Dr. Kessler testified neither time of death nor change of decomposition could be determined microscopically [Doc. 137, p. 114]. Similarly, Dr. Mileusnic-Polchan testified an estimate of time-of-death could not be based upon the examination of such slides and was outside the realm of "recognized science," only to subsequently testify that she considered the slides in reaching her time-of-death opinion, but explained the reason it was not proper for Dr. Harlan to do so was because "[h]e was stating that whatever he was seeing in the tissue is telling him that this individual had been dead 72 hours or longer [and] [y]ou cannot put an hour to it" [Doc. 139, p. 48–49].

The evidence Sutton contends demonstrates he is actually innocent constitutes nothing more than conflicting conclusions between experts and, rather than demonstrating his actual innocence, it merely reveals that a time-of-death determination is not an exact science, but a fairly subjective opinion. For example, Sutton's new experts testified as to the importance of knowing the temperature to which the body was exposed when making time-of death determinations, yet all of these new experts used temperatures in locations other than where the victim's body was found to reach their time-of-death opinions [Docs. 137, 139].

Similarly, although all of Sutton's new experts supported the opinion of Dr. Ellington, a trial witness, that more scientific tests should have been conducted to ensure a more accurate time of death, they were all comfortable, even without the tests, providing a fairly narrow window in which the murder could have occurred. Finally, although the difference between the latest time of death according to the State's trial expert Dr. Harlan (i.e., early morning hours of February 22, 1992) and Dr. Haskell's earliest estimated time of death (i.e., late afternoon hours of February 22, 1992), which was substantially based on temperatures and the lack of insect activity, amounted to a difference of approximately 15 hours, Dr. Haskell refused to consider that it was possible the death could have occurred earlier than late afternoon on February 22, 1992, even though the temperature was below fifty degrees—the lowest temperature at which he would expect to see fly activity—for the first eleven and a half hours of the day and the last five hours of the day [Doc. 137, pp. 66–68, Defendant's Exhibit No. 1 (Knoxville McGhee Tyson temperatures)].

It is also important to note that Sutton's habeas experts differed, to some extent, on their time of death opinions. In Dr. Haskell's opinion, the body was most likely 24 to 36 hours old but "to be conservative and to cover variability" he conceded it's possible it was 48 hours old [Doc. 137, pp. 53–54]. Dr. Kessler believed the body was 12 to 24 hours old, and Dr. Mileusnic-Polchan was initially comfortable with the body being dead 24 to 72 hours but also testified she was comfortable with the body being dead 24 hours, maybe even a day and a half but she was very uncomfortable and "would never really support the time of death - - the time being more than 48 hours" [Doc. 139, pp. 6, 48, 60].

Finally, Sutton's three new experts disagreed with the opinion of the three State experts (Dr. Harlan, and Dr. Levy, and the proposed testimony of Dr. Blake). As the weight of the experts' testimony is basically equal and as the other evidence implicating Sutton in the crime has not been weakened, the Court's confidence in the outcome of the trial is not undermined. The affidavits, therefore, do not help Sutton as they do not demonstrate he suffered any prejudice as the result of this alleged shortcoming, and they do not undermine the Court's confidence in the outcome of Sutton's trial. Consequently, the prejudice prong of *Strickland* is not satisfied.

Not only has Sutton failed to demonstrate he was prejudiced by counsel's alleged failure to investigate Griffin's murder, to the extent he alleges any procedural default of this claim should be excused based on his actual innocence, he has failed to meet the *Schlup*

standard of actual innocence.[23]   Accordingly, because Sutton has not demonstrated actual

innocence or that he is entitled to habeas relief on his claim that trial counsel failed to

investigate Griffin's murder and time of death, this claim will be **DISMISSED**.

## 2.     Failure to Investigate All Suspects

Sutton contends trial counsel were ineffective for failing to investigate all suspects and

failing to call certain witnesses.  Sutton also claims that this evidence is sufficient to raise a

viable *Schlup* actual innocence claim which should excuse any procedural default of any of

these claims.  The Court will address each suspect/witness claim individually and then

explain why Sutton's assertion of actual innocence lacks merit.

---

[23]Sutton argues that his actual innocence excuses any alleged procedural default of any of his habeas claims.  A claim of actual innocence may be a procedural gateway to allow consideration of a constitutional claim otherwise procedurally barred from federal review.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  In the context of *Schlup*, a petitioner must establish his factual innocence of the crime, and not mere legal insufficiency.  *See Bousley v. United States*, 523 U.S. 614, 623 (1998).  The *Schlup* exception is limited to "certain exceptional cases involving a compelling claim of actual innocence."  *House*, 547 U.S. at 522; *see Schlup*, 513 U.S. at 324 (noting that "experience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare").

The proffered evidence of actual innocence is opinion evidence, in the form of live testimony from these experts expressing their opinions as to the victim's time of death.  This is not the kind of compelling evidence contemplated by the Supreme Court of the United States in *House*, as it does not demonstrate that "more likely than note that no single juror, acting reasonably, would vote to convict[.]" *House*, 547 U.S. at 571 (internal punctuation and citations omitted)  For the reasons explained above, and in the following paragraphs, those opinions, neither individually nor cumulatively lead the Court to conclude that, in light of all the evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327–28.

### a.    Eddie Blair

Sutton argues counsel were ineffective for failing to investigate Eddie Blair ("Blair").

Sutton maintains that Blair's wife would have testified that shortly after Griffin's death, law

enforcement came to their house, searched Blair's car and the grounds, and took away 12

gauge shotgun shells that they picked up from the ground.  She would have further testified

that Blair always carried a shotgun in his car; the shotgun was not there when law

enforcement searched his car; during the time of the deaths, Blair returned home late one

night and threw his clothes in the trash; the next morning he took out the trash and put it in

the car; and in the twenty years she lived with him, he never took out the trash.

Respondent correctly points out that this claim was never presented in state court and

is therefore procedurally defaulted.  Respondent contends Sutton's default should not be

excused because he has not met the *Schlup* standard of showing innocence as this is not

"exculpatory scientific evidence, trustworthy eyewitness account, or critical physical

evidence" showing innocence.  *Schlup*, 513 U.S. at 324.

A state prisoner must exhaust all constitutional claims, by fully and fairly presenting

them in state court, before a federal court can consider them in a habeas proceeding.  28

U.S.C. § 2254(b)(1)(A), (c).  Sutton's failure to present his ineffective assistance of counsel

claim for failing to investigate Blair to the Tennessee courts in a timely fashion has resulted

in a procedural default of the claim.  *See Coleman*, 501 U.S. at 731–32.

This allegation is unsupported, is not exculpatory, and does not demonstrate his actual

innocence.  Hence, as explained more fully *infra*, this allegation does not meet the stringent

standard of credible, reliable evidence of actual innocence required to present a viable *Schlup* actual innocence claim. Accordingly, Sutton's claim that counsel were ineffective for failing to investigate Blair will be **DISMISSED** as procedurally barred from habeas review.

### b. Danny Sutton

Sutton claims counsel were ineffective for failing to call Danny Sutton to bolster the defense theory that Bill Cogdill ("Cogdill") was responsible for the deaths of Branam and Griffin. Sutton faults counsel for not calling Danny Sutton to testify that on March 2, 1992, when he and Cogdill were driving to Cogdill's house, they saw it was on fire and the fire was determined to be arson. Sutton also faults counsel for failing to investigate whether Cogdill had been in a fight with Griffin at his trailer the night before his disappearance.

Sutton failed to raise his ineffective assistance of counsel claim for failing to call Danny Sutton to bolster his defense in any state-court proceeding. Sutton's failure to present this claim to the Tennessee courts in a timely fashion has resulted in a procedural default of the claim. *See Coleman*, 501 U.S. at 731–32.

This evidence does not demonstrate Sutton's actual innocence and thus it does not excuse his procedural default. Accordingly, because this claim was never raised in state court and because Sutton's has not raise a viable *Schlup* claim, it is therefore barred from habeas review and will be **DISMISSED**.

### c. Johnny Wade McCarter

Sutton claims counsel were ineffective for failing to present testimony of Johnny Wade McCarter ("McCarter") because he would have testified that Barbara Gordon's

testimony that she saw a white truck the morning after seeing the fire in the woods, was influenced by law enforcement and inconsistent with the terrain of the area.

McCarter, James and Barbara Gordon's foster-son, a twelve-year-old child at the time these murders occurred, testified at the state post-conviction evidentiary hearing. After McCarter and Mr. Gordon "drove up on the car with Connie Branum's body in it[,]" they drove back out to the road and McCarter waited at the end of the road while Mr. Gordon called 911. [Addendum No. 13, Vol. 3, p. 214]. McCarter heard a conversation with Mr. and Mrs. Gordon and law enforcement officers at that time.

> The thing that stuck with me forever since it first happened, when Barbara - when Jim called the police, he also called his wife, which [sic] just lived on the other side of a little cove which is close to that road. And she showed up there and - while we were being questioned. And then she told them that they had seen the fire, and then the next day that she had saw a white Blazer or a Bronco with mudder tires on it coming down by the house.
>
> . . .
>
> Big tires. Big mud tires. I mean, she knows what they are. She helped - Jim had a Chevrolet - a Chevrolet pickup, a '68, '67 that he mounted on a jeep frame. And he put mudders on it. I mean, they were just big mudder tires.
>
> . . .
>
> And when she was explaining to them that she had saw that vehicle, one of the - one of the officers or one of the investigators, detective, whatever he was, he said, "Now, wait just a minute." He said, "Are you sure that you didn't see . . ."
>
> Because she - what she was telling them was she had saw a Chevrolet Blazer or a Ford Bronco. It was something that had a topper on it with the mudder tires. And he said, "Are you sure, now? Wait just a minute. Are you sure you didn't see a white Dodge truck without a camper on it?"

[Addendum No. 13, Vol. 3, pp. 215–216]. McCarter proceed to explain that Mrs. Gordon responded:

> "Oh, yes, it was a Dodge." And then I guess the next morning, or it might even have been that night they brought her down here and showed her the truck that was over here in the parking lot.

[Addendum No. 13, Vol. 3, p. 216].

On cross-examination, McCarter explained that Mr. and Mrs. Gordon were divorced and he does not see or hear from Mrs. Gordon "very much at all" [Addendum No. 13, Vol. 3. p. 223]. Although McCarter was adamant about what he heard, he testified that he considers Mrs. Gordon to be a very genuine, honest person, and when asked whether he would believe her under oath in a court of law he answered in the affirmative.

The state courts noted that Mrs. Gordon did not deny at trial that she first described the vehicle as a Bronco or Blazer, and that she later said she saw a white truck with a tool box in the back. She testified the truck was white with mud tires that were solid [Addendum No. 3, Vol. 3, p. 1278]. During trial she explained the inconsistency, stating:

> I was pretty shaken up that night. I was pretty tore up when he found that body in the car and stuff, but after I calmed down and really thought about what I had seen coming out - you know, then when I though about it, I remembered what I had seen.
>
> . . . Well, when I thought about it, I thought it couldn't have been a Bronco or a Blazer because I could see the back of their heads at the back of the truck - - you know, when I was - - I was trying to see who it was because there wasn't nobody supposed to be back there, and we were house sitting for these people. All I could see was the back of their heads in the truck, and I realized that wasn't what I had seen.

63

[Addendum No. 3, Vol. 3, pp. 1279–80]. Mrs. Gordon was throughly cross examined by Sutton's defense counsel about her conflicting statements concerning the type of vehicle she had seen leaving the area the day after they had seen the fire. In addition, she was asked whether law enforcement asked her if she had seen a white truck and she testified they did not ask her that question [Addendum No. 3, Vol. 3, pp. 1285–1294]. Furthermore, contrary to McCarter's testimony, Mrs. Gordon testified she did not know what make or model the truck was but all she knew was "it was a white, boxy shaped truck with black tires on it and no stripes or nothing" [Addendum No. 3, Vol. 3, p. 1291].

As to Sutton's claim that McCarter testified the unpaved logging road on which Mrs. Gordon claimed to have seen the white truck traveling was impassable, he is mistaken as to Mrs. Gordon's testimony. Mrs. Gordon did not testify she saw the truck travel on the unpaved logging road. Indeed, she testified the road that ran past the house where she and here husband were house sitting ended at the house but "there's an old road that goes on back off in the woods there[,]" which was back in the direction they saw the fire [Addendum No. 3, Vol. 3, pp. 1276–77]. She testified the white truck came from that area the morning after they saw the fire. She testified it was coming from the direction of the woods, "past the house going out" [Addendum No. 3, Vol., 3, p. 1277]. She also testified she could not describe the area or the logging roads because she did not go back there and had not walked back there in years [Addendum No. 3, Vol. 3, pp. 1284–85].

The post-conviction court implicitly found that even if Sutton's counsel should have interviewed or called McCarter to testify, Sutton failed to show prejudice by such omission.

64

The state post-conviction court concluded the issue was moot because Mrs. Gordon's testimony was "hotly contested," her credibility was contested, and the jury believed Mrs. Gordon. The appellate court concluded the evidence did not preponderate against the post-conviction court's finding that Sutton did not establish he was prejudiced by counsel's failure to call McCarter as a witness at trial.

To obtain relief, Sutton must demonstrate the decision of the Tennessee Court of Criminal Appeals was either contrary to or an unreasonable application of Supreme Court precedent. Sutton does not make such an argument. Instead, he claims the state-court decision overlooked the fact that trial counsel failed to investigate this aspect of the case and that the State's case against Sutton was very weak. Regardless of what the state opinion overlooked, Sutton has not demonstrated that it is contrary to or an unreasonable application of Supreme Court precedent.

McCarter's testimony does not demonstrate Sutton was prejudiced by counsel's failure to interview him and present him as a witness. Mrs. Gordon's testimony is not contradicted by McCarter's testimony except to the extent she denied law enforcement asked her if she saw a white truck and McCarter testified the officer asked her if she was sure she did not see a white Dodge truck without a camper. The evidence upon which Sutton relies does not show prejudice because it does not undermine the reliability of the jury's decision. Considering that Mrs. Gordon's credibility was contested at trial and she was thoroughly cross examined; McCarter was a twelve-year-old child at the time of the crime; and his testimony that Mrs. Gordon changed her testimony to say she saw a white Dodge truck is

65

somewhat contradicted by the transcript (Mrs. Gordon testified she changed her description to a white truck but was unable to identify the make or model of the truck she saw), the Court is unable to conclude the state-court decision was contrary to or an unreasonable application of *Strickland*.

Accordingly, because counsel were not deficient in failing to call this witness and this evidence is insufficient to demonstrate a reasonable probability that, but for counsel's failure to present this evidence, the result of the proceeding would have been different, habeas relief is not warranted on Sutton's claim that counsel were ineffective for failing to interview and present McCarter's testimony. This claim will be **DISMISSED**.

### d. *Schlup* **Actual Innocence Claim**

It appears Sutton claims that the alleged testimony of Martha Blair and Danny Sutton that could have been offered, along with McCarter's testimony, demonstrates his actual innocence of these offenses. Sutton did not submit the affidavits of either Ms. Blair or Danny Sutton nor does he purport that either of these two witnesses would testify he was actually innocent of these murders. Nevertheless, even if Sutton had submitted affidavits of their purported testimony, the outcome would be the same.

A petitioner may overcome a procedural default by presenting a credible claim of actual innocence. *Schlup*, 513 U.S. at 324. To meet this standard a petitioner must "support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial[,]" *id.* and that demonstrates "that it is more likely than not that no

66

reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. To demonstrate actual innocence under *Schlup*, a petitioner must show "factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623 (1998).

This claim of actual innocence hinges upon Sutton's unsupported allegations of what he claims Ms. Blair's and Danny Sutton's testimony would be, and upon Mr. McCarter's post-conviction testimony. McCarter's testimony does not establish Sutton's actual innocence. In addition, the purported testimony of Ms. Blair and Danny Sutton does not fundamentally call into question the reliability of Sutton's conviction as there is nothing in these allegations showing Sutton's actual innocence or weakening the substantial circumstantial evidence presented at trial against him. It simply does not rise to the level of evidence that has been found by courts in the past to satisfy the *Schlup* standard as it does not show that "it is more likely than not that no reasonable juror would have found [Sutton] guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 327.

In sum, Sutton has failed to present any new reliable evidence, evidence that he is actually innocent, or any evidence indicating that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. Accordingly, looking at this evidence individually and cumulatively, Sutton's *Schlup* actual innocence claim fails and does not excuse the procedural default of any of his claims.

### 3. Failure to Investigate and Examine Car Headlights

Petitioner claims counsel rendered ineffective assistance when they failed to investigate and examine the headlights from his Camaro before admitting them into evidence

and tendering them to the jury. Petitioner contends counsel's failure to investigate the headlight was the result of "inattention" and, consequently, devastating evidence that one of the headlights was manufactured approximately six months after Sutton said he had replaced the headlight was introduced to the jury.

During the trial of this matter, there was testimony from the State's witnesses that the Camaro seen along side Alcoa Highway in Blount County where three men were engaged in some type of altercation and where Griffin was arrested had a headlight that was not working.[24] At trial, the State contended the Camaro belonged to Sutton and that Branam was murdered to prevent her from discovering what happened to her brother, Griffin. Sutton's strategy of undermining the State's alleged motive for Branam's murder rested, in part, on showing the Camaro observed at the scene of Griffin's arrest was not Sutton's Camaro. The defense presented several witnesses, including Sutton, who testified the Camaro's headlights were working on or near February 21, 1992, and none of the headlights had been changed since that date. Sutton testified he bought the Camaro six or seven months prior to Griffin's murder and at that time one of the headlights was not working and he replaced it with a new headlight. Some of Sutton's relatives also testified the vehicle had been in their possession since he was arrested and none of the headlights had been changed.

---

[24]TBI Agent David Davenport met with Sutton on March 9, 1992 at the Sevier County Sheriff's Department after Sutton, who was incarcerated at the Sevier County Jail, contacted Sheriff Ogle and requested to talk to the officers. Although Sutton denied any involvement in the murders, Agent Davenport testified he did admit that early Friday evening he, Dellinger, and Griffin had been in his Camaro and that it had a headlight out [Addendum No. 3, Vol. 6, p. 1535–40].

Defense counsel subsequently admitted into evidence the headlights from Sutton's Camaro after Sutton's brother took a court officer to test the headlights in the courthouse parking lot to confirm they were all working prior to being brought into the courtroom and introduced to the jury [Addendum No. 3, Vol. 9, p. 1820]. Sutton's brother testified the headlights were flecked with paint prior to Griffin's murder, and he identified at trial the paint spots on at least one of the headlights he had removed from Sutton's Camaro. After the headlights were passed to the jury, a juror noticed a code on one of the headlights revealing it was manufactured, at the earliest, a week before the weekend in question, undermining the defense theory.[25]

During post-conviction proceedings, Sutton's post-conviction counsel made a cursory inquiry of Webb, one of Sutton's trial counsel, about the facts surrounding the headlight. Webb explained that the decision to introduce the headlights was based on Sutton's and his family's representations that all the headlights were working on February 21, 1992, and that no one had replaced any of the headlights. Webb testified Sutton and members of his family had insisted to him that all the headlights on the Camaro worked [Addendum 13, Vol. 1, pp. 26–28, 30–31].

Daniel, Sutton's other trial counsel, testified it was his idea to introduce the headlights into evidence to show all the headlights on Sutton's Camaro were working and to

---

[25]The State's rebuttal witness initially testified the headlight was manufactured on February 13, 1993, but when the prosecutor asked, "February the 13th of 1992?" the witness responded, "[y]es, sir" [Addendum No. 3, Vol. 11, p. 2047].

demonstrate Sutton was not at the altercation on Alcoa Highway. Daniel looked at the headlights when they were brought into the court house but did not notice the manufacturer's date until the jury brought it to everyone's attention [Addendum No. 13, Vol. 1, pp. 47–50]. Daniel said he did not check the manufacturer's date because Sutton, his family members, and other defense witnesses had told him the headlights were working on the weekend in question. Daniel went to the car and had the headlights turned on to confirm they were working before introducing them into evidence [Addendum No. 13, Vol. 1, pp. 51–56].

The state appellate court concluded trial counsel's actions did not fall below the objective standard of reasonableness demanded of defense attorneys because Sutton did not demonstrate counsel's reliance on the credibility of his and his family's assurances that the headlights were all working on the day in question and had not been changed was an error that was so serious that they were not functioning as counsel guaranteed him by the Sixth Amendment. First, based on the representations made by Sutton, his family members, and other witnesses, that counsel's decision to introduce the lights that he was led to believe were the lights in the Camaro on the night in question, was sound trial strategy to demonstrate Sutton was not involved in the altercation with Griffin, and thus had no motive to murder Branam. The fact that Sutton and his relatives apparently chose to deceive counsel does not render counsel's performance deficient.

When concluding that counsel's performance did not fall below the objective standard of reasonableness demanded of defense attorneys, the Tennessee Court of Criminal Appeals also explained:

Nor is it clear from the record, as Petitioner Sutton contends, that "even a brief examination of the headlight by counsel would have revealed the problem." Petitioner Sutton did not introduce the Camaro's headlights as an exhibit at the post-conviction hearing. At the hearing, Counsel Daniel testified that he examined the headlights when they were brought into the courtroom, but he did not notice a manufacturer's stamp. Counsel Miller stated that although a manufacturer's stamp was visible on the headlight, without specialized knowledge, a lay person probably would not have known what the numbers meant. The headlights were passed to several jurors before one of the panel noticed the stamp. The State called a rebuttal witness to explain the significance of the manufacturer's coding on the headlight.

Petitioner Sutton submits that it was not necessary to introduce the headlights as an exhibit at trial, and counsel's conduct in this regard was "careless and not the result of trial strategy." Despite his assertion that there was no reason to physically introduce the headlights, the decision to do so reflected sound trial strategy based on Petitioner Sutton's and Jimmy Sutton's testimony at trial concerning the unique paint markings on the headlights of Petitioner Sutton's Camaro. Clearly, from Petitioner Sutton's viewpoint, it would have been prudent to stop with the testimony of the defense witnesses. However, as the trial court found, "for [Petitioner Sutton] to say that [counsel] failed to protect him from his own misguided attempts to undermine the judicial system through fraud is disingenuous." Based on all of the foregoing, we conclude that the evidence does not preponderate against the post-conviction court's finding that Counsel Daniel's actions in this regard did not fall below the objective standard of reasonableness demanded of defense attorneys.

*Sutton v. State,* 2006 1679595, *15–16.

Counsel has a duty to make reasonable investigations or to make a reasonable decision not to investigate particular matters. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). Counsel's investigation into Sutton's claim that all the headlights on his Camaro were working on February 21, 1992 reflected reasonable professional judgment. In addition to Sutton and other witnesses telling counsel the headlights were working, six witnesses—Sutton, his girlfriend at the time, Carolyn Weaver, his brother and sister-in-law,

Jimmy and Diane Sutton, Sutton's uncle, Reese Ray Sutton, Sutton's brother, LeRoy Sutton—testified under oath that the headlights were working on or near the date in question [Addendum No. 3, Vol. 8, pp. 1774–75; Addendum No. 3, Vol. 9, pp. 1816, 1848, 1860, 1862].

The United States Supreme Court has instructed that,

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]

*Strickland*, 466 U.S. at 689. The Court also addressed counsel's duty to investigate, explaining that,

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that

pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id.* at 690–91.

Applying the teachings of *Strickland's* rules for investigative decisions, trial counsel's introduction of the headlights without inspecting them to determine whether there was a manufacturer's date on them was not deficient performance because *Strickland* permits counsel to rely on the information provided by his client, thus diminishing or eliminating the need for further investigation. *Id.* at 691. Sutton now argues that trial counsel should have inspected the headlights rather than relying upon his and his family's representations. Sutton is incorrect as "defense counsel may properly rely on information supplied by the defendant in determining the nature and scope of the needed pretrial investigation." *Lewis v. Mazurkiewicz*, 915 F.2d 106, 111 (3rd Cir. 1990).

The test for deficient performance of counsel is not whether counsel could have done more; perfection is not required. Instead, the test is whether what counsel did was within the wide range of reasonable professional assistance. *See United States v. Munoz,* 605 F.3d 359, 381 (6th Cir. 2010) ("The Sixth Amendment guarantees reasonable competence, not perfect litigation." (internal punctuation and citations omitted)), *petition for cert. filed*, 79 USLW 3344 (Nov. 23, 2010) (No. 10-702); *Nichols v. United States*, 563 F.3d 240, 248 (6th Cir.) (perfect advocacy is not required), *cert. denied*, 130 S. Ct. 277 (2009); *Smith v. Mitchell*, 348

F.3d 177, 206 (6th Cir. 2003) (same), *cert. denied*, 543 U.S. 841 (2004). *Strickland* instructs that, because counsel's action not to investigate and examine the headlights further was based both on his client's representations and his client's family's representations that the headlights had been working on the night in question and that they had not been replaced subsequent to that night, counsel's performance was not deficient. Trial counsel's reliance on Sutton's representations regarding the headlight presents a situation that the *Strickland* Court instructs may "considerably diminish[] or eliminate[] [further investigation] altogether." *Id.* Thus, based on these circumstances and applying a heavy measure of deference to counsel's judgment, the Court is unable to conclude that counsel's decision not to inspect the headlight further was unreasonable.

The state court's rejection of Sutton's claim that counsel were ineffective for failing to investigate the truthfulness of Sutton's and his family's representations by inspecting the headlights was consistent with *Strickland*. Accordingly, the rejection of this claim by the state courts was not based on an unreasonable determination of the facts or an unreasonable application of *Strickland*. Habeas relief will be **DENIED** on this claim.

### 4.    Failure to Appeal

Sutton claims counsel failed to protect his right to a trial by an impartial jury by failing to appeal the denial of a change of venue, failing to object to the manner in which the *venires* were selected, and failing to appeal the denial of individual *voir dire*. In addition, Sutton claims counsel failed to appeal "when a juror investigated and discovered that the manufacture date on one of the headlights undermined this theory and then educated the

74

other jurors about it" [Doc. 3, p. 24]; the presence of the Bible in the jury room and prayer for guidance; the suppression issue; and the reasonable doubt instruction.

### a.    Denial of Change of Venue

Sutton contends trial counsel were ineffective on his direct appeal for failing to protect his right to a trial by an impartial jury when they failed to appeal the denial of a change of venue. Sutton contends Sevierville was inundated with media coverage of the two deaths and there were no less than 27 newspaper articles about the deaths. Specifically, Sutton contends certain jurors obtained information that Sutton had previously committed unrelated criminal behavior when a prospective juror stated, "I've formed an opinion. I even know stuff that the boys done before they even committed the crime. Not being innocent, I don't believe" [Addendum No. 2, Vol 1, p. 76–77]. Sutton, however, has not directed the Court's attention to the location of any evidence supporting his claim that the jury was biased, and the Court's review of the *voir dire* has revealed none. Respondent contends the state appellate court's decision finding no ineffective assistance is not contrary to or an unreasonable application of Supreme Court precedent.

The state appellate court began its analysis of the merits of this claim by noting the trial court excused several prospective jurors who expressed they had formed an opinion as to the case and would not be able to change that opinion based on the evidence presented at trial; the grant or denial of a motion for change of venue is left to the sound discretion of the trial court; exposure of jurors to pretrial publicity does not automatically warrant a change of venue; and prejudice will not be presumed on a mere showing of extensive publicity. The

75

state appellate court concluded Dellinger failed to show he was prejudice by counsel's failure to raise this issue on appeal. Once again the state appellate court stated both Sutton and Dellinger raised this issue, but it only mentioned Dellinger when analyzing the claim. Nevertheless, the Court will treat this claim as exhausted for purposes of this discussion.

Initially, the Court notes that post-conviction counsel did not inquire of trial counsel as to their reasons for not appealing the denial of the change of venue [Addendum No. 13, Vol. 1]. However, Webb testified that they appealed every issue on which they thought the appellate court would grant relief [Addendum No. 13, Vol. 1, p. 33].

The Sixth Amendment guarantees a defendant the right to a trial by an impartial jury. U.S. Const. amend. VI. This fair-trial right is effectuated by impaneling a jury of impartial, "indifferent" jurors who render a verdict based on evidence adduced at the trial. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "[A] biased juror is one who cannot 'conscientiously apply the law and find the facts.'" *Franklin v. Anderson*, 434 F.3d 412, 422 (6th Cir. 2006) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985)), *cert. denied*, 549 U.S. 1156 (2007). A juror's "exposure to information about a state defendant's prior convictions or news accounts of the crime with which he is charged [does not] alone presumptively deprive the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). Indeed, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Skilling v. United States*, 130 S. Ct. 2896, 2916 (2010) (internal quotations and citation omitted). Thus, "[i]t is not required . . . that the jurors be totally ignorant of the facts and issues involved." *Irvin*, 366 U.S. at 722. "It is sufficient if the juror can lay aside his

76

impression or opinion and render a verdict based on the evidence presented in court." *Id*. at 723 (citations omitted). A jury should be composed of jurors who "will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Adams v. Texas*, 448 U.S. 38, 45 (1980).

Although Sutton contends certain jurors obtained information that Sutton had previously committed unrelated criminal behavior when another prospective juror made his statements, Sutton has not shown that either such jurors were biased against him or that the verdict was based on this information. Sutton must demonstrate a juror who rendered his verdict was actually biased against him in order to prove counsel's failure to strike a juror prejudiced him. *Miller v. Webb*, 385 F.3d 666, 679 (6th Cir. 2004). Sutton has not done so.

Sutton has not pointed to any evidence in the seven volumes of *voir dire* transcripts indicating any juror who sat on his jury was biased against him. When Juror Gaps was questioned by the trial court, he testified he had not formed an opinion as to guilt or innocence based on what he read or heard [Addendum No. 2, Vol. 1, p. 72]. Moreover, the Court's review of the *voir dire* transcripts did not reveal any bias by any of the jurors who sat on Sutton's case [Addendum No. 2, Vols. 1–7].

In sum, Sutton has presented no evidence to support his claim that his jury was not impartial and/or that any jurors possessed actual bias. Therefore, he has failed to show that his counsel's failure to appeal the denial of a change of venue was prejudicial. Consequently, the state appellate court's decision rejecting this claim did not rest on an

unreasonable determination of the facts or on an unreasonable application of Supreme Court

precedent. Accordingly, this claim will be **DISMISSED.**

> **b.** **Failure to Object to Method of *Venire* Selection; Appeal the Denial of Individual *Voir Dire***

Sutton contends these issues were intertwined with the venue issue and thus

exhausted. Respondent maintains these issues are procedurally barred. Sutton counters that

review on the merits is proper pursuant to *Schlup's* gateway innocence standards.

An examination of the claim Sutton raised on appeal in his post-conviction case belies

Sutton's claim that these issues were intertwined with the venue issue. Sutton claimed that

counsel were ineffective for failing to preserve the change of venue issues was raised on

appeal as follows:

> A criminal defendant is entitled to effective assistance of counsel on a first appeal as of right. It is clear from the testimony in the post-conviction hearings that there was a considerable amount of pretrial publicity and hard feelings against the defendants. In fact, one of the jurors stated that he had known of criminal acts committed by the defendants before they committed the murders they were on trial for. A number of the jurors, as reflected in the transcript of the voir dire proceedings, expressed knowledge and opinions regarding the case. However, all peremptory challenges were not exercised and this issue was not appealed.

[Addendum No. 16, pp. 18–19] (internal record and case citations omitted)].

Clearly, the claims Sutton raises in this habeas proceeding regarding the selection of

the *venires* and individual *voir dire* were never presented in state court and are therefore

procedurally defaulted. As previously stated, a state prisoner must exhaust all constitutional

claims by fully and fairly presenting them in state court, before a federal court can consider

them in a habeas proceeding. 28 U.S.C. § 2254(b)(1)(A), (c). Exhaustion requires a state prisoner to give the state courts a "*fair* opportunity to act" on each of the claims before he presents those claims in a federal habeas petition; something Sutton has failed to do. *O'Sullivan*, 526 U.S. at 844 (emphasis in original).

In addition, because Sutton has not raised a viable *Schlup* claim, as neither the "other suspects" nor the "expert affidavit" evidence, individually or cumulatively, establishes that he is factually innocent of the murders (as discussed *infra* Sections B.2. and B.3. and *supra* Sections G. and I.), these claims are barred from habeas review and will be **DISMISSED**.

### c. Juror's Discovery of Manufacturer's Date of Headlight

Sutton challenges trial counsel's failure to "object and appeal when a juror investigated and discovered that the manufacture date on one of the headlights undermined [the defense] theory and then educated the other jurors about it." Testimony at the post-conviction hearing revealed that a juror, while examining the headlight once it was passed to the jury, discovered the date the headlight was manufactured, and while in the jury box, pointed the date out to other jurors.

This claim is barred from habeas review, however, because it was never raised in the state courts. Sutton has provided no cause and prejudice to excuse his procedural default or a sufficient claim of actual innocence. Accordingly, Sutton's claim that counsel failed to object and appeal when a juror discovered and revealed the manufacture date on one of the headlights is procedurally barred from habeas review and will be **DISMISSED**.

79

### d. Failure to Appeal Presence of Bible During Deliberations

Petitioner complains that counsel did not interview jurors post-trial to learn that jurors consulted a Bible during the deliberation process. Petitioner explains this issue was presented to the state court as a violation of the right to have an impartial jury but, should the Court conclude the claim raised in state court is insufficient to include this ineffective assistance claim, then the claim must be reviewed on the merits pursuant to *Schlup*. This ineffective assistance of counsel claim was not raised in state court and is therefore procedurally defaulted. Because the Court has concluded Sutton has failed to establish a valid claim of actual innocence, a merits review pursuant to *Schlup* will not be conducted. Accordingly, this claim is barred from habeas review and will be **DISMISSED**.

### e. Failure to Appeal the Denial of the Suppression Motion

Sutton contends his trial counsel were ineffective for failing to appeal the suppression issue. According to Sutton, the specific issue he raised in during his post-conviction appeal, which the appellate court failed to address, "is whether counsel were ineffective for failing to timely file the motion seeking to suppress items seized before consent and failing to appeal the ruling on whether evidence obtained prior to consent being given is admissible. Because the state court failed to review this issue, this court may review it *de novo*" [Doc. 3, p. 27]. Sutton does not, however, cite the portion of his state post-conviction appellate brief where he raised the specific issue relating to the suppression of evidence seized prior to consent and the Court is unable to locate such an issue. The only issue pertaining to the suppression

80

motion in Sutton's appellate brief is the following vague issue, which lacks any citation to the record or to applicable authorities:

> During the post-conviction proceedings, there was a stipulation entered regarding the fact that James Dellinger's wife, Linda Dellinger, had not consented to a search of their property. It appears beyond dispute that the officer who obtained the search warrant swore to lies in the search warrant affidavit. Much of the damaging evidence, in the form of shotgun casings and a rifle, were admitted by the state as exhibits at trial as a result of the search. Sutton had standing to contest the search. However, proper motions were not filed and the issue was not properly argued and appealed.

[Addendum No. 18, pp. 13, 18–19].

Although the appellate court acknowledged that both Sutton and Dellinger argued that their appellate counsel were ineffective because they failed to appeal the trial court's denial of their motion to suppress the evidence found as a result of the search of Dellinger's residence, the court affirmed the denial of relief as to Dellinger, but made no specific ruling as to Sutton. *Sutton v. State*, 2006 1679595, *19–21. Thus, once again this Court is presented with an issue in a somewhat convoluted procedural posture. It is important to note that Tenn. R. App. P. 27(a)(7) requires briefs on appeal to contain an argument, citations to authorities, and appropriate references to the record. Failure to comply with these basic rules will ordinarily constitute a waiver of the issue and under such circumstances the appeals court is not obligated to review the issue. *State v. Keller*, 813 S.W. 2d 146, 150 (Tenn. Crim. App. 1991) ("Bald assertions unaccompanied by legal argument or citations to authorities are waived.").

81

Respondent argues, without citing to any authority, that "[i]n petitioner's application for permission to appeal from the judgment of the Court of Criminal Appeals, he makes no argument concerning this issue. . . . [Thus, he did not] properly preserve this claim of ineffective assistance on appeal" [Doc. 17, p. 30]. According to Respondent, this alleged failure to comply with established state procedural rules for preserving claims for appellate review results in the procedural default of this claim, and the Court should dismiss it. The Court disagrees with this contention because Tennessee Supreme Court Rule 39 provides that a claim is exhausted if litigated in the lower appellate court. Respondent has not cited to any case or rule, and the Court is not aware of one, which provides that once a claim is exhausted in the Court of Appeals, it become unexhausted by the failure to include it in an application for permission to appeal.

Although the Court is cognizant of the fact that exhaustion is complete, even if the state court does not address "a federal constitutional claim *squarely* raised in" a petitioner's state court brief, *Smith v. Digmon*, 434 U.S. 332, 333 (1978) (per curiam) (emphasis added), a petitioner is required to fairly present the claim to the state courts to satisfy the exhaustion requirement. *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Rose*, 455 U.S. at 518. A petitioner must present his claims to the state courts such that they are permitted the "opportunity to apply controlling legal principles to the facts bearing upon (his) constitutional claim." *Picard*, 404 U.S. at 277 (alteration in original). "Thus, the prohibition against raising nonexhausted claims in federal habeas proceedings extends . . . to the specific assertions of fact that might support relief." *Kelley v. Secretary for Dept. of Corrections*, 377

82

F.3d 1317, 1344 (11th Cir. 2004), *cert. denied*, 545 U.S. 1149 (2005). Therefore, habeas petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state courts. *Id.*

"To preserve an allegation of ineffective assistance for federal habeas review, a petitioner must present that specific allegation to a state court." *Maynard v. Lockhart*, 981 F.2d 981, 984–85 & n.1 (8th Cir. 1992) (citations omitted). Habeas petitioners are required to "present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation." *Kelley,* 377 F.3d at 1344–45. In other words:

> [T]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined. Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick.

*Id.* (quoting *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir.1988)). Reading Sutton's state post-conviction petition and amendments, the state post-conviction transcript, and Sutton's appellate brief, there are no facts or testimony explaining the grounds on which Sutton is attacking counsel's performance in relation to the suppression-of-the-evidence motion. Instead, Sutton "scatter[ed] some makeshift needles in the haystack of the state court record," *id,* but failed to present a coherent argument.

In his state post-conviction petition, Sutton claimed:

> [C]ounsel on appeal failed to raise the question as to whether or not the Trial Court was correct in concluding that the evidence seized as a result of the search of the primary residence of James Dellinger and part-time residence of

83

Gary Wayne Sutton was admissible by consent of Dellinger's wife when the Search Warrant itself was clearly insufficient and illegal. The record clearly indicates that Dellinger's wife merely acquiesced to the Officer's clearly stated intention of searching the premises under the authority of the Warrant he showed her. Certainly, the testimony in Pre-Trial Motions to Suppress clearly show the Officer searched under the authority of the defective Warrant rather than the alleged consent of Mrs. Dellinger.

[Addendum No. 12, Vol. 1, pp. 4–5]. In his final amended state post-conviction petition, Sutton claimed, "[c]ounsel were ineffective in failing to properly appeal the motions to suppress pursuant to the Fourth Amendment to the United States Constitution and the corresponding provisions of the Tennessee Constitution" [Addendum No. 12, Vol. 1, p. 38].

During his state post-conviction hearing, Sutton's post-conviction counsel asked some general questions regarding the suppression issue, but a review of the record reflects there were no specific questions to trial counsel inquiring about their failure to timely file the motion seeking to suppress items seized before consent and their failure to appeal the issue [Addendum No. 13, Vol. 1, pp. 22–23, 51–52]. One of Sutton's trial counsel, Webb, testified that counsel appealed the issues counsel thought Sutton had a chance to win on appeal [Addendum No. 13, Vol. 1, pp. 32–33]. The parties do not direct the Court's attention to, nor has the Court located, any evidence that inquiry was made of Sutton's trial counsel as to the reason for failing to timely file the motion seeking to suppress items seized before consent or the reason for failing to pursue the issue on appeal.

The state post-conviction trial court made the following ruling as to the suppression issue:

> [E]ither by collateral estoppel or by judicial estoppel, the issues pertaining to the search of the Dellinger residence have already been passed upon and ruled upon, and the search warrant and the search upheld by the Tennessee Court of Criminal Appeals in the case out of Blount County, and therefore hold that any issue pertaining to the search of the residence is hereby moot.

[Addendum No. 12, Vol. 3, p. 4].

It is unquestionable that Sutton failed to present the factual predicate he submits in this Court to the state courts. The claim he submitted to the state appellate court was insufficient and met the waiver criteria of Tenn. R. App. P. 27(a)(7) as it did not include references to the record, cites to authority, and argument. Furthermore, it appears the state court actually applied the state procedural bar to the issue by not addressing it even though the state court did not explicitly state that it was doing so.

The present situation is somewhat difficult to discern because Sutton did not present a fact predicated in the state court. Although the Court is aware that new facts relied upon by a petitioner in federal court that do not fundamentally alter his claim but rather supplement and clarify the record is permissible, *see Richey v. Bradshaw*, 498 F.3d 344, 353–54 (6th Cir. 2007), that rule has been applied when the petitioner presented the same legal claim to the state courts and supported such claim with pertinent factual support, *see Morris v. Dretke*, 413 F.3d 484, 495 (5th Cir. 2005) (finding the new IQ evidence, which was not available during state proceedings, only supplemented evidence of low intellectual functioning and adaptive deficits from childhood on that was presented in state court).

85

Unlike *Morris*, the factual predicate Sutton now raises was available to him in state court. Nevertheless, assuming this claim is exhausted and reviewing it *de novo*, Sutton is not entitled to relief because he has not demonstrated trial counsel were ineffective. The only evidence in the record supporting this claim is Webb's testimony that counsel appealed the issues counsel thought Sutton had a chance to win on appeal [Addendum No. 13, Vol. 1, pp. 32–33]. There is no evidence before this Court from which it could even infer counsel's strategic decision fell below an objective standard of reasonableness. There is no evidence before this Court that indicates the suppression issue was clearly a strong issue that should have been raised and could have been won on appeal. Consequently, Sutton has not overcome the presumption that counsel's decision not to pursue the suppression issue was sound trial strategy. *See Strickland*, 466 U.S. at 687–88.

Even assuming for the sake of discussion that counsel's failure to pursue the suppression issue was deficient, which the Court does not find, Sutton's factually unsupported claim that, "[i]f counsel had timely filed the suppression motion and appealed this issue, the court would have barred admission of items obtained before Ms. Dellinger purportedly gave consent[,]" is insufficient to demonstrate counsel's performance resulted in any prejudice to Sutton. Accordingly, Sutton's claim that counsel was ineffective for failing to timely raise and appeal the suppression issue is without merit and will be **DISMISSED**.

### f. Failure to Appeal Reasonable Doubt Jury Instruction

Sutton contends trial counsel were ineffective for failing to appeal jury instructions that "diluted the beyond a reasonable doubt standard" [Doc. 3, p. 28]. Respondent maintains these claims are procedurally defaulted because Sutton never raised them in state court.

Sutton has claimed for the first time in his habeas petition that counsel were ineffective for failing to challenge the reasonable doubt jury instruction. The substance of a federal habeas corpus claim must first be presented to the state courts and Sutton's failure to do so renders this claim procedurally defaulted. Sutton contends the Court should reach the merits of this claim based on his actual innocence. Sutton has not presented a viable actual innocence claim as he has failed to meet the *Schlup* standard and show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.

Consequently, Sutton's alleged constitutional violation was never presented to a state court and he has committed a procedural default for which no cause and prejudice, or a fundamental miscarriage of justice, i.e., actual innocence, has been shown. Accordingly, this claim will be **DISMISSED** as procedurally barred.

### g. Failure to Present Lay Witnesses and Expert Testimony to Rebut State's Theory on Griffin's Time of Death

Sutton argues counsel were ineffective for failing to present lay and expert witnesses to rebut the State's theory on the time of Griffin's death, which prejudiced him. Respondent maintains this claim is procedurally defaulted as it was never raised in state court. To the

extent this claim is different than Sutton's claim that counsel failed to investigate Griffin's death, the claim is procedurally barred from habeas review as Sutton never raised this claim during his state post-conviction proceedings, and it will be **DISMISSED**.

With this claim, Sutton intertwines claims that counsel failed to present witnesses to rebut proof that a white truck was seen the next day near the area of the car fire; establish other possible suspects; inspect the headlights and investigate and present relevant evidence; and object and raise on appeal critical issues. To the extent these issues are not previously addressed in this memorandum opinion, they are insufficient to state a claim as Sutton has not provided "the facts supporting each ground[,]" in violation of Rule 2(c)(2) of the Rules Governing Section 2254 Cases in the United States District Court. Accordingly, these claims will be **DISMISSED**.

### C. Denial of Fair Trial and Due Process Rights (Claim III)

Although the critical question the jury was to resolve was whether he was guilty of the first degree murder of Branam, Sutton contends that the trial court admitted several other instances of alleged criminal behavior by both Sutton and Dellinger, rendering his trial unfair and denying him due process. Specifically, Sutton challenges the introduction of the evidence of a 1991 altercation between Sutton and Bill Griffin; an early 1992 incident wherein Sutton shot out a street light; a threat by Dellinger that he would "wipe out the whole hill of Griffins"; an altercation between Griffin, Dellinger, and Sutton on Alcoa Highway on the night Griffin disappeared and the burning of Griffin's trailer the same night; and the alleged murder of Griffin.

88

Sutton seemingly argues the state court's conclusion that the evidence was relevant and properly admitted pursuant to Rule 404(b) of the Tennessee Rules of Evidence was an erroneous application of state law, thus rising to the level of depriving Sutton of due process and a fundamentally fair trial. Sutton argues "[t]he sheer volume of irrelevant prejudicial evidence 'infected the trial with unfairness as to make the resulting conviction a denial of due process'" [Doc. 3, p. 39 (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974))].

Respondent maintains this claim is procedurally defaulted because, when Sutton argued the evidence of these other acts was inadmissible before the state trial court, he relied upon the Tennessee Rules of Evidence and Tennessee state cases and made no constitutional argument [Addendum No. 6, pp. 72–80]. Respondent contends that, because Sutton did not present this as a constitutional claim in state court, he is procedurally barred from doing so here.

Although habeas relief cannot be granted simply "on the basis of a perceived error of state law," *Pulley v. Harris*, 465 U.S. 37, 41 (1984), habeas relief can be granted if the state law error rises to the level of depriving the defendant of fundamental fairness in the trial process, *Estelle v. McGuire*, 502 U.S. 62 (1991). The Supreme Court, however, has "made clear that 28 U.S.C. § 2254 requires a federal habeas petitioner to provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claims. It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made. . . . [T]he habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal

89

habeas corpus claim." *Anderson*, 459 U.S. at 6 (internal and end citations omitted). "[A] state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). "If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." *Duncan*, 513 U.S. at 366.

A review of Sutton's direct-appeal brief reflects that he did not argue the evidentiary ruling denied him a fair trial and due process in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution; rather, he argued the trial court erred in admitting the evidence in violation of Rule 404(b) of the Tennessee Rules of Evidence [Addendum No. 6, pp. 72–80]. Notably, Sutton does not deny he failed to raise this claim in state court on federal grounds.

Sutton's appellate brief reveals that he did not indicate any federal law basis for his claim as he did not cite in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds. Rather, he cited to Tennessee case law, none of which decided such a claim on federal grounds; one federal Fourth Circuit case and one Second Circuit case, neither of which addressed denial of a fair trial or due process in violation of the Sixth, Eighth, and Fourteenth Amendments of the United State

90

Constitution;[26] and the Tennessee Rules of Evidence. In this instance, Sutton failed to apprise the state court of his claim that the evidentiary rulings of which he complained were not only a violation of state law, but also denied him a fundamentally fair trial and the due process of federal law. Because Sutton never raised this claim as a constitutional claim in state court, the state appellate courts did not address the claim on constitutional grounds.

Accordingly, the claim is procedurally barred from habeas review and will be **DISMISSED**.

### D. Application of *Bruton v. United States*, 391 U.S. 123 (1968) (Claim IV)

Sutton argues that his rights under the Confrontation Clause were violated when the trial court admitted out-of-court statements given by his nontestifying co-defendant, Dellinger. Sutton contends the admission of his uncle's statement that "If I have to, I'll wipe out the entire hill of Griffins[,]" violated his confrontation rights because Dellinger did not testify. In addition, Sutton claims the State's proof of the inconsistencies between his statement and Dellinger's statement denied him the right to confront Dellinger about the inconsistencies.

Respondent counters that the state court's denial of relief on this claim was neither "contrary to" nor "an unreasonable application of" well-settled Supreme Court precedent.

---

[26]In his state brief, Petitioner cited *United States v. Woods,* 484 F.2d 127, 1234 (4th Cir. 1973), *cert. denied,* 415 U.S. 979 (1974), for the proposition that evidence of other offenses is not admissible to demonstrate propensity or disposition on the part of a defendant to commit a crime for which he is on trial. Petitioner cited *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 928 (2nd Cir. 1977), for the proposition that, without a record, an issue cannot be resolved by the reviewing court.

Sutton raised this claim on direct appeal and the state appellate court concluded there was no *Bruton* issue "because the statement in question does not implicate Sutton in any way. Sutton was implicated by his own statements that he was with Dellinger continuously during the relevant time periods." *State v. Sutton*, 1995 WL 406953, at *7.

## 1. Applicable Law

"Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). In *Bruton*, however, the Supreme Court "recognized a narrow exception to this principle: We held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Id*. at 207. A defendant has a Confrontation Clause right to cross-examine a codefendant who incriminates him. *See Bruton,* 391 U.S. at 126, 135–36. Thus, "a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's *confession* naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson*, 481 U.S. at 201–02 (emphasis added). Habeas relief for a *Bruton* violation will be granted "only if the trial error 'had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners . . . are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Stanford v. Parker,* 266 F.3d

442, 456 (6th Cir. 2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)), *cert. denied*, 537 U.S. 831 (2002).

### 2. Discussion

During trial, Detective Widener testified that Dellinger said he and Sutton wanted to talk to law enforcement to give them some information about Griffin on February 25, 1992, the day after Griffin's body was found. Dellinger provided the following: that he, Sutton, and Griffin had gone out drinking and shooting pool on February 21, 1992, at Pugsey's on Chapman Highway and drove back through Blount County and stopped at a Citgo station on Walnut Highway; that the last time they saw Griffin was when he left there with a girl he had just met; that they were not aware Griffin's trailer was on fire until Branam called him; and that Branam called him a second time and told him Griffin was in jail and asked Dellinger to get him out. During that session, both Dellinger and Sutton denied seeing Branam on Saturday. Detective Widener called Sutton and Dellinger in for questioning on February 28, 1992, during which time they both gave statements. Detective Widener testified that, after *Mirandizing* them, "[t]hey both, according to them, told me right up front that they had been with Connie on Saturday but did not tell him initially because she had asked them not to tell anyone [Addendum No.3, Vol. 4, pp. 1309–1323]. Although there were minor discrepancies in Sutton's and Dellinger's statements, neither statement was a confession, as both of them denied any involvement in the murders of Griffin and Branam, and neither party accused the other of any criminal activity.

93

Unlike the statement at issue in *Bruton,* Dellinger's statement did not "expressly implicate" Sutton as his accomplice in crime because Dellinger did not confess to engaging in any criminal conduct. *Bruton*, 391 U.S. at 124 n.1. In contrast to the statement involved in *Bruton*, Dellinger's statement was not a confession or incriminating on its face. As reiterated by the Supreme Court in *Richardson*, the *Bruton* rule only applies in cases "when the *facially incriminating confession* of a nontestifying codefendant is introduced at their joint trial." 481 U.S. at 207 (emphasis added). The statement at issue here is not a confession and is not incriminating on its face. At most, it arguably became so only when linked with evidence introduced later at trial, including Sutton's own testimony. Therefore, *Bruton* is not applicable because Dellinger's statement is not a confession and did not facially incriminate Sutton.

Sutton has not cited, nor did the Court's research uncover, a Supreme Court case extending the *Bruton* rule to a voluntary statement given to law enforcement wherein the codefendant denies any involvement in the crime and does not shift blame onto the defendant. Therefore, Sutton has not demonstrated that the state-court decision finding that this sort of evidence does not violate *Bruton* is "contrary to" or "an unreasonable application of" well-settled Supreme Court precedent. 28 U.S.C. § 2254(d)(2).

Nevertheless, even assuming a *Bruton* violation occurred, Sutton would not be entitled to relief because any error was harmless. *See Schneble v. Florida*, 405 U.S. 427, 430 (1972) (applying harmless error review to alleged *Bruton* violations). The *Schneble* Court acknowledged that "[i]n some cases the properly admitted evidence of guilt is so

94

overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Id.*

The Court has carefully reviewed the entire transcript of Sutton's trial and has determined, assuming the statement could be considered a confession, that its admission was harmless error. Sutton was tried for the murder of Branam with Dellinger, and Sutton's statement to authorities and his testimony at trial was very similar to the statement given by Dellinger. Although the evidence introduced at trial was circumstantial, it was fairly overwhelming. Indeed, the trial court, during the post-conviction proceedings, described the circumstantial evidence as follows: "[The circumstantial evidence] compiled in this case and presented and approved by this jury was much more compelling than any eyewitness case that I have ever seen. It fit like a glove" [Addendum No. 13, Vol. 3 p. 266].

In sum, with a few minor exceptions, Sutton's statement was consistent with Dellinger's statement. This is not a case where either one of them pointed the finger at the other—they both adamantly denied any involvement in the murder. This is a situation where Sutton was convicted based upon the independent circumstantial evidence of guilt, and the allegedly inadmissible statements of Dellinger, at most, tended to corroborate certain details of Sutton's statement that he and Dellinger were together during the times in question and the circumstantial evidence. The State's case would not have been less persuasive had Dellinger's statement been excluded. Thus, the admission of Dellinger's statement into evidence was harmless error.

95

In sum, habeas relief is not warranted on Sutton's *Bruton* claim because there was no *Bruton* error. Thus, the state appellate court's resolution of the claim on that basis was not unreasonable. In the alternative, any *Bruton* violation was harmless. Accordingly, habeas relief is not warranted on Sutton's *Bruton* claim and it will be **DISMISSED**.

### E.    Prejudicial Joinder (Claim V)

Sutton contends the trial court's joinder of his trial with Dellinger's prejudiced him in two ways: (1) "his confrontation rights were violated when he was convicted in large part based on his nontestifying codefendant's statements," and (2) "his rights to due process and fundamental fairness were violated when evidence properly admitted only against Dellinger was unfairly imputed to him" [Doc. 3, pp. 39–40].

The confrontation rights claim (*Bruton* claim) was addressed above, *see supra* Section IV.D., and found to be without merit. The Court therefore turns to Sutton's challenge that key pieces of evidence were admitted at the joint trial, which allegedly were relevant only to Dellinger. The evidence to which Sutton refers are statements made by Dellinger: (1) that he'd wipe out the "entire hill of Griffins[,]" if he had to; (2) that Griffin was last seen with a short, fat girl; and (3) they went to Howie's after bailing Griffin out of jail. Sutton claims without joinder his case would have never made it to trial. It is Sutton's position that the trial court's joinder of his and Dellinger's trial was constitutional error because it deprived him of a fair trial.

When the issue was raised on appeal, the state appellate court specifically found "the trial court gave cautionary instructions throughout the trial and provided a comprehensive

final instruction as to how the jury should consider the evidence relating to each defendant."

*State v. Sutton*, 1995 WL 406953, at *7.  The state appellate court, observing that Sutton

failed to show, and nothing in the record suggested, that the jury disregarded the trial court's

limiting instruction, concluded that there was no prejudice and that this issue was without

merit. *Id.*

The decision to join defendants for trial is governed by Rule 8 of the Tennessee Rules

of Criminal Procedure, and the decision is within the sound discretion of the trial court.  *Id.*

at *6.  As the state appellate court explained:

> The Tennessee Rules of Criminal Procedure allow for the joinder of
> defendants if "each of the defendants is charged with accountability for each
> offense included."  Tenn. R. Crim. P. 8(c)(3)(i).  The Rules also provide for
> severance of the defendants if "it is deemed appropriate to promote a fair
> determination of the guilt or innocence of one or more defendants."  Tenn. R.
> Crim. P. 14(c)(2)(i), (ii).  The decision of whether to grant a motion for
> severance is addressed to the sound discretion of the trial judge.  His or her
> exercise of this discretion will not be reversed unless it appears that the
> appellant was prejudiced by such a denial.  *State v. Coleman*, 619 S.W.2d 112
> (Tenn. 1981); *State v. Lunait*, 665 S.W.2d 739 (Tenn. Crim. App. 1983).

*Id.*

In considering Sutton's complaint against joinder, the Tennessee courts applied state

law.  The Court must accept as binding the state court's interpretation of the state rules and

law on severance of criminal trials.  *Estelle*, 502 U.S. at 67–68 (re-emphasizing "that it is not

the province of a federal habeas court to reexamine state-court determinations on state-law

questions").

To obtain habeas relief on a claim involving state law, the burden is on Sutton to demonstrate the state court's joinder of his and Dellinger's trial resulted in prejudice so great that he was denied his right to a fair trial. *Id.* In other words, a state trial court's alleged abuse of discretion, without more, is not a constitutional violation and does not entitle Sutton to habeas relief. *Stanford*, 266 F.3d at 459. Disparity in the amount of evidence presented against a codefendant does not justify severance in the absence of a showing of prejudice. *United States v. Hogan*, 763 F.2d 697, 705 (5th Cir.), *opinion withdrawn in part by* 771 F.2d 82 (5th Cir. 1985). Indeed, joint trials of codefendants are generally favored and "[a] petitioner seeking habeas relief on the basis of a trial court's failure to sever his trial from his co-defendant's bears a very heavy burden." *Id.*

The Sixth Circuit has held, "in a Sixth Amendment habeas challenge, that a defendant must show both (1) an abuse of discretion on the part of the trial court and (2) compelling and specific prejudice in order to successfully challenge the joinder of his trial with that of a codefendant." *Clark v. O'Dea*, 257 F.3d 498, 504 (6th Cir. 2001) (citation omitted), *cert. denied*, 535 U.S. 938 (2002). The Court's analysis is guided by *Clark*. Similar to Sutton's case, in *Clark* there was evidence introduced that pertained only to Clark's codefendant. For example, there was evidence of Satanism elicited by the prosecution, i.e., testimony about a sketch book of sacrilegious drawings, a handwritten book of spells, and a Satanic poem, all of which only pertained to Clark's codefendant. *Id.* In addition, there was testimony about a threat that the codefendant made that related only to the codefendant.

98

And, similar to Sutton's case, Clark and his codefendant presented essentially the same alibi defense to the jury—that they were with each other at another location on the evening of the murder.  Finding the testimony about Clark's codefendant's Satanism and threats only implicated Clark by association, the court concluded that "the fact there is substantial difference in the amount of evidence adduced against each defendant . . . is not grounds to overturn denial of severance unless there is a substantial risk that the jury could not compartmentalize or distinguish between the evidence against each defendant." *Id.*  The court concluded the jury was able to separate the testimony against Clark's codefendant from the testimony against Clark, because the testimony about his codefendant's threats and Satanic paraphernalia was not particularly complex, and the state court had ample reasons to try Clark and his codefendant together because both were charged with committing the same crime.  *Id.* (citing *Buchanan v. Kentucky*, 483 U.S. 402, 418 (1987) (recognizing that the state has an interest in proceeding with joint trials where "all of the crimes charged against the joined defendants arise out of one chain of events, where there is a single victim, and where, in fact, the defendants are indicated on several of the same counts")).  Thus, The Sixth Circuit found Clark did not demonstrate any compelling and specific prejudice to his case.

Guided by the *Clark* and *Buchanan* decisions, the Court concludes Sutton is not entitled to habeas relief.  Both Sutton and Dellinger were indicted for the first-degree murder of Branam and setting her car on fire.  They did not present mutually antagonistic defenses.  Instead, they both presented the same alibi defense to the jury—that they dropped off the

99

victim, they left together, and were with each other at another location on the evening of the murder. The jury undoubtedly was able to separate the testimony against Dellinger from the testimony against Sutton because, although the case was lengthy and consisted of numerous witnesses testifying about numerous pieces of circumstantial evidence, the testimony of Dellinger's statements and actions was uncomplicated and not complex.

Moreover, the challenged evidence did not directly implicate Sutton in Dellinger's action and any implication comes indirectly through Sutton's association with Dellinger, Sutton's statement to law enforcement, and testimony of Sutton's actions by other witnesses. The circumstantial evidence connected Dellinger and Sutton to the crime, and the items of evidence against Dellinger were pieces of the circumstantial evidence. In addition to Sutton admitting that he spent most of the weekend in question with Dellinger and that he was with Dellinger at the time of the trailer fire, when Griffin was bailed out of jail, and when Branam left the Townsend Shopping Center in Dellinger's truck, there was proof that established that Dellinger and Sutton were the last individuals with each victim when that victim was last seen alive. Thus, Sutton's claim that there is no similar evidence against him is incorrect, as he admitted to being with Dellinger during the times identified above. As the Supreme Court has stated: "[D]efendants are not entitled to severance merely because they may have a better change of acquittal in separate trials." *Zafiro v. United States,* 506 U.S. 534, 540 (1993).

Furthermore, the trial court gave cautionary instructions throughout the trial. For example, when the testimony was presented that Dellinger said "if he had to, . . . he'd wipe the entire hill of Griffins out[,]" the court instructed the jury that it could only consider this

100

statement as it relates to Dellinger and they were not permitted to consider it against Sutton [Addendum No. 2, Vol. 9, pp. 897–98]. In addition, the trial court instructed the jury it was trying two separate cases and it gave a comprehensive final instruction as to how the jury should consider the evidence relating to each defendant, specifically instructing that any evidence that was limited to one defendant should not considered by them as to the other defendant [Addendum No. 3, Vol. 12, pp. 2102–2112]. *See Zafiro*, 506 U.S. at 540–41 (finding that jury instructions instructing jury to give separate consideration to each individual defendant and each charge against him were sufficient to cure any possibility of prejudice).

Consequently, Sutton has not demonstrated the joinder was improper or that he suffered any prejudice as a result of the joinder of his trial with Dellinger's; thus, he has not demonstrated that the challenged joinder resulted in prejudice so great as to deny him his constitutional right to a fair trial. *See United States v. Lane*, 474 U.S. 438, 446 n.8 (1986) (finding improper joinder of defendants does not, in itself, violate the Constitution because the demonstration of prejudice must be so great as to deny the Fifth Amendment right to fair trial in order to rise to level of constitutional violation). 28 U.S.C. § 2254(d).

Accordingly, because Sutton has failed to demonstrate that the state court's resolution of this claim was contrary to or an unreasonable application of Supreme Court precedent, no habeas relief is warranted and this claim will be **DISMISSED**.

### F. Denial of Impartial Jury Trial (Claim VI)

Sutton contends he was denied an impartial jury for several reasons: (1) two jurors consulted a Bible and prayed during the guilt phase deliberations; (2) a juror examining the headlights detected a date of manufacture and there was a discussion among the jurors about that date during the trial; (3) a prospective juror, who was subsequently excused, made derogatory statements about Sutton and Dellinger during *voir dire*; and (4) the jury participated in an unmonitored "family night"while sequestered.

### 1. Bible and Prayer

Sutton claims at least two jurors consulted a Bible and prayed during jury deliberations. Sutton contends that, because the Bible was open and two of the jurors prayed together, the state court's conclusion that "there is no evidence that any juror was improperly exposed to extraneous information during the deliberation process[,]" *Sutton*, 2006 WL 1679595, at *22, is unreasonable because it makes the unsubstantiated factual conclusion that there was no extraneous information introduced into the deliberation process. Sutton, citing *Turner v. Louisiana*, 379 U.S. 466 (1965), argues that the presence of the Bible in jury room and prayer for guidance in the judgment process violated the Sixth Amendment's guarantee of a trial by jury which requires the verdict to be based on the evidence produced at trial. Sutton, however, does not cite any case law regarding the presence of a Bible in the jury room to support his contention. Respondent claims Sutton did not raise this claim on direct

appeal as required by state statute[27] and, without citing any case law regarding the presence of a Bible in the jury room, that the state-court determination was reasonable.

The Court of Criminal Appeals of Tennessee concluded Sutton failed to meet his burden of making an initial showing that the jury was exposed to extraneous prejudicial information because the proof did not demonstrate that any juror read from the Bible or discussed scriptures during deliberations; thus, there was no proof any juror was improperly exposed to extraneous information during the deliberation process.

Although the Court's research revealed case law from lower federal courts regarding the presence of a Bible in the jury room, no such Supreme Court precedent was located. Nevertheless, as explained herein, there was no constitutional violation to Sutton's right to be tried by an impartial jury because there is no showing the Bible had any influence on the jury's verdict—i.e., Sutton has not proven any prejudice by its alleged use.

The Supreme Court has stated:

> In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.

*Turner*, 379 U.S. at 472–73 (also observing that "[e]xercise of calm and informed judgment by its members is essential to proper enforcement of law" (citation omitted)).   Sutton

---

[27]The State argued waiver on appeal from the post-conviction evidentiary hearing, but the Court of Criminal Appeals found the waiver argument was waived under state law and decided the issue on the merits.

contends the presence of the Bible in the jury room and the prayer for guidance in the judgment process violated this rule.

The testimony revealed that some of the jurors had a difficult time sitting in judgment on this case and six to eight of them "were in tears over the process" [Addendum No. 13, Vol. 2, p. 102]. One of the jurors had a Bible in the deliberation room and walked off to be by himself praying. The testifying juror walked over to that particular juror and although they did not read the Bible, the two jurors did "pray[ ] together for him and us and the whole process . . . . It was very difficult. . . . And . . . he wanted to do the right thing, as we all did. . . ." [Addendum No. 13, Vol. 2, pp. 102–03].

There is no proof that any juror relied upon the Bible as a source of law rather than the Tennessee law as instructed by the judge; thus, it does not appear the Bible was used by any juror as a deliberative aide. Instead, it appears it was used for personal strength and support, i.e., to help jurors "[e]xercise . . . calm and informed judgment[.]" *Turner*, 379 U.S. at 472–73. This is not a case where the jury was reading and debating the biblical text as the basis for a life and death decision; rather, it appears the Bible was used to give some of the jurors the strength and support to make a judgment and to make the right judgment. There is no evidence that the Bible had any evidentiary relevance to the jury's determination. *See Robinson v. Polk*, 438 F.3d 350 (4th Cir.) (finding that the Bible was not an external influence and denying relief where it was alleged a juror read an "eye for an eye" passage from the Bible in an attempt to convince fellow jurors to vote for death penalty), *cert. denied*, 549 U.S. 1003 (2006); *Fields v. Brown*, 503 F.3d 775, 780–81 (9th Cir. 2007) (without

104

deciding if the Bible was internal or external influence, concluded there was no prejudicial constitutional error where foreperson of jury brought notes "for" and "against" imposition of the death penalty based on his review of the Bible and other reference texts), *cert. denied*, 552 U.S. 1314 (2008); *United States v. Rodriguez,* 667 F. Supp. 2d 218, 221 (2009) ("There is no proscription on jurors reading the Bible before or after deliberations, or having a personal Bible in their possession"); *but cf. McNair v. Campbell*, 416 F.3d 1291, 1308–09 (11th Cir. 2005) (finding the Bible to be extraneous material but concluding the State carried their burden of rebutting the presumption of prejudice), *cert. denied*, 547 U.S. 1073 (2006); *Oliver v. Quarterman*, 541 F.3d 329, 339–40 (5th Cir. 2008) (finding the Bible found to be extraneous where juror pointed out specific passages in Bible that described the very facts at issue in the case but Oliver failed to rebut state court's factual finding that the Bible did not prejudice the jury's decision), *cert. denied*, 129 S. Ct. 1985 (2009). Further, there is no proof in the record from which the Court could even infer that either the Bible or prayer during jury deliberations resulted in any prejudice. Indeed, there is no evidence that any juror made his or her decision on anything other than the evidence presented in court and the law as given by the court. Thus, no constitutional error requires the writ to be issued.

Contrary to Sutton's claim, the state-court decision is not based on an unreasonable determination of the facts. Moreover, based on the Court's research, Sutton's claim has no basis in Supreme Court precedent, as the Supreme Court has not determined whether the presence of a Bible in the jury room is an external influence upon the jury which denies a defendant his constitutional right to an impartial jury. With no Supreme Court precedent

105

establishing that the presence of a Bible in the jury room and its use creates a constitutional violation, the state appellate court's decision was not unreasonable. Accordingly, Sutton's claim in this regard will be **DISMISSED**.

### 2. Revelation of Manufacturer's Date on Headlight

During trial, Sutton's counsel introduced the headlights from his Camaro to show they were all burning the weekend in question. One of the jurors noticed the manufacturer's date was inconsistent with the defense theory and pointed it out to the other jurors in the jury box. Sutton contends the juror who first noticed the date became a witness against him and introduced evidence into the trial. Sutton contends the juror's unsworn testimony about the date of manufacture of the headlights was not subject to procedural safeguards of a fair trial, such as the right of confrontation, cross-examination, and of counsel. During closing, the State focused on the headlights, and Sutton contends he was prejudiced and relief is warranted.

The State response is that there is nothing in the record indicating Sutton ever raised this claim in state court. Notably, Sutton does not claim that he exhausted this claim but claims the issue was presented to the state court, without directing the Court's attention to its presentation or providing any documentation to support his contention.

Based on the record before it, the Court is unable to determine whether this issue was raised by Sutton in the post-conviction trial court. However, even assuming that it was raised in that court, the issue is not subject to habeas review because the claim that Sutton was denied an impartial jury because a juror first revealed the manufacturer's date on the

106

headlight was not raised in the state appellate court—neither Sutton's post-conviction appellate brief nor the appellate-court decision refers to such a claim [Addendum No. 18]. *See Sutton v. State*, 2006 WL 1679595, at *21–23. Because Sutton's claim that he was denied a trial by an impartial jury when a juror discovered and revealed the manufacturer's date on the headlight did not proceed through a complete round of state-court review, it is procedurally defaulted. *See O'Sullivan,* 526 U.S. at 845. Thus, absent any claim of cause and prejudice, and absent a viable claim of actual innocence, this claim is procedurally defaulted and will be **DISMISSED**.

### 3.     Juror Seaton

Sutton claims the jury was tainted by the prospective juror's statement that, "I've formed an opinion. I even know stuff that the boys done before they even committed the crime. Not being innocent, I don't believe[,]" and that he was therefore denied an impartial jury.

This cited ground of juror misconduct was not presented in the state appellate court on direct review or on appeal of the denial of his state post-conviction petition, thus violating the rule that a habeas petitioner must at a minimum, "invok[e] one complete round of the State's established appellate review process" for each of his claims to avoid procedural default. *O'Sullivan,* 526 U.S. at 845. Accordingly, because this claim was not pursued through one full round of state court review, it will be **DISMISSED** as procedurally defaulted.

107

### 4.    Improper Jury Sequestration

Sutton contends his Sixth Amendment right to an impartial jury was denied because the jury was not properly sequestered when it was allowed to have "family night" without being monitored. Sutton cites no controlling Supreme Court precedent.

The state appellate post-conviction court concluded that Sutton and Dellinger failed to present clear and unequivocal evidence that the jurors were outside the presence of the court officers during the family gathering. The court summarized the testimony as follows:

> Both jurors testified that the gathering was confined to one large room, and there is no evidence that any jurors left the conference room to visit with their family members without supervision. Although the jurors could not remember where the court officers were stationed during the gathering, Mr. Ballinger observed that the officers 'were always there assisting us.'

*Sutton v. State*, 2006 WL 1679595, at *23. Thus, relief was denied.

A review of the record supports the state appellate court's factual findings. Thus, the trial court's findings are entitled to a presumption of correctness unless rebutted by Sutton with clear and convincing evidence. 28 U.S.C. § 2254(3)(1). Sutton offers no clear and convincing rebuttal evidence. This Court must defer to the state court unless its decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

At the time of Sutton's trial, Tennessee law provided that, "[i]n all criminal prosecutions except those in which a death sentence may be rendered, the judge of the criminal court may, in his discretion, with the consent of the defendant, and with the consent of the district attorney general, permit the jurors to separate at times when they are not

108

engaged upon the actual trial or deliberation." Tenn. Code Ann. § 40-18-116 (1992). To show that the jurors separated, Sutton must demonstrate they were not attended or controlled by the court officers. *State v. Bondurant*, 4 S.W.3d 662, 671 (Tenn. 1999) (the test is whether a juror passes from the attendance and control of the court officer). Sutton did not demonstrate any juror was not attended or controlled by the court officers.

To the extent Sutton asserts a violation of state law, such a claim is not cognizable for federal habeas review, *Pulley v. Harris,* 465 U.S. 37, 41 (1984), unless the state-law error resulted in the denial of fundamental fairness, *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Such did not occur here. The Sixth Amendment provides "that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI; *see also Irvin*, 366 U.S. at 722 ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors"). If Sutton's alleged sequestration violation was based on a claim of extraneous jury contact as described in *Remmer v. United States*, 347 U.S. 227, 299 (1954), then he would be entitled to a presumption of prejudice. Sutton, however, did not show "any private communication, contact, or tampering directly or indirectly with a juror during" the family night. *Id.* at 229. Consequently, because Sutton has failed to demonstrate by competent evidence that there was an extrajudicial communication, contact, or tampering, he has failed to raise a constitutional claim.

Sutton has not cited, and the Court's research did not reveal, any constitutional requirement that a jury must be sequestered. *See Powell v. Spalding*, 679 F.2d 163, 166 n.3

(9th Cir. 1982) ("The Fifth Circuit, the only circuit that has explicitly reached the issue, held that there is no constitutional right to sequestration." (citing *Young v. Alabama,* 443 F.2d 854, 856 (5th Cir. 1971)), *cert. denied,* 405 U.S. 976 (1972); *see also Powell v. Rose*, 581 F. Supp. 60, 63 (D.C. Tenn. 1983) ("[T]here is no constitutional right to sequestration." (citing *Young* and *Spalding*)).  Therefore, in the absence of a constitutional right to sequestration and in the absence of demonstrated prejudice, the alleged failure to sequester the jury during family night does not warrant federal habeas corpus relief.  Accordingly, Sutton fails to show that the decision of the Court of Criminal Appeals of Tennessee is contrary to or an unreasonable application of clearly established Supreme Court law.  28 U.S.C. § 2254(d)(1).  This claim will be **DISMISSED**.

### G.     *Brady* Claim (Claim VII)

Sutton contends the state suppressed law enforcement records favorable to him in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  In particular, Sutton contends that the State failed to disclose records of other possible suspects, which would have assisted in his defense.  The State contends the state appellate court properly applied *Brady* and determined that none of the evidence is exculpatory; thus, its denial of relief was not "contrary to" or "an unreasonable application of" Supreme Court precedent.  28 U.S.C. § 2254(d)(2).

### 1.     Applicable Law

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  773 U.S. at 87.

110

Therefore, if the government knows of material evidence favorable to the defendant in a criminal prosecution, it is obligated to disclose that information to the defendant. *See Kyles v. Whitley*, 514 U.S. 419, 431 (1995). *Brady* material encompasses exculpatory evidence, i.e., pertinent to the defendant's guilt or innocence, as well as impeachment evidence, i.e., pertinent to a key prosecution witness's credibility. *See Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (nondisclosure of evidence affecting credibility of government's star witness warranted new trial irrespective of good faith or bad faith of prosecution).

A *Brady* claim has three components: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Not only does *Brady* prohibit the prosecution's actual concealment of exculpatory or impeachment evidence, but it imposes an affirmative duty on the prosecution to disclose to the defense all such evidence in the possession of those "acting on the government's behalf." *Strickler*, 527 U.S. at 281; *Kyles*, 514 U.S. at 433; *see also Giglio*, 405 U.S. at 154 (holding non-disclosure of evidence pertaining to witness' credibility falls under *Brady* rule). In *Kyles*, the Supreme Court expressly extended the concept of constructive possession to all government agencies when it held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437. Thus, the *Brady* rule compels the prosecution to make a reasonable effort to discover favorable evidence for the defendant to ensure a fair trial.

111

To demonstrate prejudice, the evidence must be favorable, and thus material. To establish that the evidence is material, a petitioner must demonstrate a reasonable probability that a different result would have occurred had the evidence been disclosed. *Kyles,* 514 U.S. at 433; *Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (finding the *Strickland* formulation of the *Agurs* materiality test covers *Brady* claims).

### a. Lester Johnson

Sutton claims the State did not disclose records suggesting the deaths were "contract/revenge killings in retaliation for the arrest of . . . Lester Johnson." Specifically, Sutton contends the State failed to disclose a memorandum about Lester Johnson which would have provided evidence that other individuals had the motive and opportunity to kill Griffin and Branum.

The state appellate court noted that Sutton's general *Brady* request prior to trial fulfilled the first requirement of a *Brady* violation. The state appellate court then noted that the state post-conviction trial court found that the second *Brady* element (suppression) was fulfilled because "that information contained in the investigative offices of the Blount County Sheriff's Department, who investigated in [the Sevier County] case and who testified in this case, would be information that would have to be, under *Brady*, certainly disclosed." [Addendum No. 13, Vol. 2, pp. 52, 67–68]. Both the post-conviction trial court and the state

112

appellate court concluded that the information in the memorandum was not exculpatory. The state appellate court summarized the memorandum:

> Agent Gregory acknowledges that Mr. Johnson and Petitioners were "close associates." He states that [reportedly] Tommy Griffin and Connie Branum were scheduled to testify for the State, in a manner favorable to the victim at Mr. Johnson's trial for attempted first degree sexual assault offense. Agent Gregory stated, 'Griffin did not show up for the trial. It is unknown at this time if Branam [sic] did. Several places were shot up in Sevier Co. with a shotgun prior to the trial. Threats were made to most of the State's witnesses, judge and prosecutor.' Mr. Johnson was found not guilty and released from custody in Jackson County, North Carolina, sometime around 6:00 p.m. on February 21, 1992. While it is possible for Mr. Johnson to have traveled from the courthouse in Sylva, North Carolina, to Sevier County, Tennessee, before midnight, there is nothing in the record to indicate that he did so, nor is there any indication that he was in Sevier County when Ms. Branum was killed.

[Addendum No. 14, Exhibit 4]. *See also Sutton v. State*, 2006 WL 1679595, at *25. The state appellate court concluded that even if some of the information contained in the document was exculpatory, it did not satisfy the *Brady* materiality requirement as it did not lead it to conclude that there was a "reasonable probability" that the result would have been different had the information been disclosed. This is because there was no evidence that Lester Johnson was in Sevier County at the time of the offenses to elevate the connection beyond a "mere conjecture or possibility[,]" and the testimony presented at Sutton's trial clearly placed the victim in Sutton's and Dellinger's company shortly before the fire from her car was spotted by the Gordons. *Id*.

Given that Sutton made a *Brady* request and the State failed to provide him the information about Lester Johnson, the Court turns to the prejudice prong of the *Brady* test. The memorandum summarizing the evidence about Lester Johnson and that Griffin and

113

Branam were supposed to testify against him in his February 21, 1992 trial, where threats were made to most of the state's witnesses, the judge, and the prosecutor, arguably implicates Lester Johnson as a possible suspect. On the other hand, as noted by the state courts, the memorandum also reveals that Griffin did not appear at the trial, it was unknown whether Branam appeared, and Lester Johnson was acquitted.[28] Therefore, in order for the jury to have found Lester Johnson, rather than Sutton and Dellinger, committed these murders, the jurors would have had to believed that Lester Johnson traveled from North Carolina to Tennessee, immediately located Griffin and killed him, and then located Branam the next day, right after she left Howie's with Sutton and Dellinger, and killed her, all in retaliation for Lester Johnson's arrest on sexual and aggravated assault charges.

Sutton claims the state-court decision was unreasonable because it failed to recognize the highly contested nature of the case and that this evidence is material because it points to another suspect who actually had a motive for the killings. Notably, however, the memorandum also reveals that Lester Johnson was a close associate of Dellinger's and Sutton's,[29] and, as previously observed by a state court, rather than exculpating Sutton and Dellinger, the suggestion in the memorandum of a contract/revenge killing could also be interpreted as supplying their "missing motive to kill Griffin and Branam who were going to testify against [Sutton's and Dellinger's] friend, Lester Johnson." *Dellinger v. State*, 2007

---

[28]The warrant for Lester Johnson's arrest lists five witnesses. Neither Branam nor Griffin are listed as witnesses [Addendum No. 14, Exhibit 7].

[29]The memorandum also revealed Lester Johnson was from the same area as Sutton, i.e., Kodak, Tennessee [Addendum No. 14, Exhibit 4, page 2].

2428049, at *25 (Tenn. Crim. App. 2007) (internal punctuation omitted). To the extent the memorandum contains evidence favorable to Sutton, he has not shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. This evidence neither demonstrates Lester Johnson committed the murders nor exculpates Sutton. In addition, it does not undermine or eliminate any of the circumstantial evidence supporting Sutton's conviction. Consequently, the evidence is not material because the Court is unable to conclude that had this evidence been disclosed to the defense, there is a reasonable probability that the result of the proceeding would have been different.

Because the mere speculation that Lester Johnson may have been involved in this crime is insufficient to meet the *Brady* test—it does not undermine the Court' s confidence in the outcome of the trial—Sutton has failed to demonstrate the state appellate court's resolution of this claim was contrary to or an unreasonable application of federal law or an unreasonable determination of the facts. 28 U.S.C. § 2254 (d)(1)(2). Accordingly, habeas relief is not warranted and the *Brady* claim as to Lester Johnson will be **DISMISSED**.

### b.    **Federal Inmates Troy Turner, Bobby Floyd, and Jim Alexander**

Sutton claims Federal inmates Troy Turner ("Turner"), Bobby Floyd ("Floyd"), and Jim Alexander ("Alexander") had contacted either the prosecuting attorney and/or investigating detectives indicating they had information regarding the deaths of Griffin and Branam. The prosecuting attorney visited them in federal custody prior to trial. Sutton

115

maintains the information regarding Floyd was particularly important because Sutton had offered proof at trial that Griffin had previously brought drugs from Floyd and when Floyd was arrested for dealing drugs, there were rumors that Griffin had provided the information needed to make the arrest.

Sutton contends Detective Widener acknowledged he was aware of the rumors regarding Floyd's animosity toward Griffin and, despite the apparent relevance to his defense, the state court denied relief finding no error because counsel attempted to explore the Floyd/Griffin drug connection at trial. According to Sutton, the state-court opinion is unreasonable because it overlooks the fact that the additional evidence would have bolstered counsel's efforts to support this defense and would have made this defense more credible, thus the evidence is material.

Respondent does not address the claim as it relates to Alexander, but simply quotes the state appellate court's opinion and argues relief should be denied because Sutton did not show the denial of relief was contrary to or an unreasonable application of Supreme Court precedent.

The record contains a letter from Turner instructing Don Ogle and Jeff McCarter to get in touch with him about Sutton and Dellinger. Turner states "Bobby Floyd and I have agreed we should contact you before this goes any longer. Bobby has a lot, but won't agree to it without me, and together we can help" [Addendum 14, Exhibit 9]. There is also a letter from Floyd to the prosecuting attorney referencing a recent meeting between them. Although it talks about having information of other crimes, there is only a passing reference to this

116

case: "I also realize that information about the Griffins is also of a priority to you" [Addendum No. 14, Exhibit 9].

The state appellate court noted that although the state post-conviction trial court concluded the information was requested and that the state suppressed the evidence, the lower court found the evidence was not exculpatory and there was no evidence Floyd was connected to the case. The state appellate court affirmed the lower court's decision:

> We agree with the post-conviction court's finding that Mr. Floyd's general promises of information about the Griffins is not, in itself, exculpatory. Moreover, the letter by itself does not provide any 'information that would have enabled defense counsel to conduct further and possibly fruitful investigation regarding the fact that someone other than [Petitioners] killed the victims. . . . Although counsel may not have seen Mr. Floyd's letter, Counsel Daniel explored at trial the connection between Mr. Floyd and Mr. Griffin based on information provided by Petitioner Dellinger. That is, that Mr. Griffin had previously bought drugs from Mr. Floyd, and that when Mr. Floyd was arrested for dealing in drugs, there were rumors that Mr. Griffin provided the officers with the information needed to make the arrest. Detective Widener acknowledged at trial that he was aware of this information.

*Sutton v. State*, 2006 WL 1679595, at *24. The state appellate court concluded the letters did not lead them to conclude that there is a "reasonable probability" that the result would have been different had the information been disclosed. Specifically, the court noted that trial counsel were aware of and explored Floyd's connection with Griffin.

Initially, the Court observes that Sutton's allegation as to Alexander includes no factual support and therefore does not comply with Rule 2(c)(2) of the Rules Governing Section 2254 Cases in the United States District Courts. In addition, Sutton failed to raise

such a claim in state court. Accordingly, the claim as to Alexander will be **DISMISSED** as insufficiently pled and, alternatively, as procedurally barred.

During the trial of this matter, Sutton's trial counsel questioned Detective Widener about Sutton telling the detective about Griffin's involvement with drugs, his connection with Floyd, Floyd's arrest, rumors that Griffin had turned Floyd into law enforcement, and that he thought maybe his drug cohorts were responsible for his death [Addendum No. 3, Vol. 4, pp. 1346–48]. Notably, defense counsel were well aware of the drug connection between Floyd and Griffin, and could have pursued such a defense had it been viable. Therefore, it is even questionable whether this information could serve as the basis for relief under *Brady* as it appears trial counsel could have obtained any alleged exculpatory evidence prior to trial through the exercise of reasonable diligence. *See United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir. 1985) (concluding no *Brady* violation because the defendant could have subpoenaed the videotape allegedly withheld by the government from the witness who had custody of it), *cert. denied*, 474 U.S. 1086 (1986); *United States v. Perdomo*, 929 F.2d 967, 973 (3rd Cir. 1991) ("*Brady* does not oblige the government to provide defendants with evidence that they could obtain from other sources by exercising reasonable diligence.").

Nevertheless, assuming *Brady* is applicable, the burden is on Sutton to demonstrate the suppressed evidence was favorable to his defense and material to his case. *Bagley*, 473 U.S. at 678, 683. To be favorable to Sutton, the letters must either exculpate him or impeach a witness for the prosecution. *See Strickler*, 527 U.S. at 281–82. The letters do not contain exculpatory or impeachment evidence. In addition, Turner and Floyd contacted law

118

enforcement, and therefore it could be inferred that any information they had would assist the prosecution and not the defense. Moreover, there is no evidence that either of these two suspects actually had any credible information.

Finally, Sutton and his counsel were well aware of Floyd[30] and could have investigated him further if they believed he possessed any exculpatory, material evidence. Speculation that suppressed evidence would have possibly led to exculpatory, material evidence is insufficient to establish materiality. *United States v. Agurs*, 427 U.S. 97, 109–110 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of he trial, does not establish 'materiality' in the constitutional sense"); *Maynard v. Government of v. Virgin Islands*, 392 F. App'x 105, 116 (3rd Cir. 2010) (speculation is insufficient to establish a *Brady* violation based upon an allegation that suppressed evidence would have led to additional exculpatory evidence). Consequently, there simply is nothing in either letter that leads this Court to conclude there is a reasonable probability that, had the State disclosed the evidence, the result of the trial would have been different.

Accordingly, Sutton's *Brady* claim as to Turner and Floyd will be **DISMISSED**.

---

[30]Sutton testified that he knew Floyd because he went to school with Floyd for years and had seen Floyd at Griffin's residence and when Floyd came to Sutton's residence to see Griffin [Addendum No. 3, Vol. 10, pp. 1916–17].

## 2. Conclusion

Neither the suppression of the Lester Johnson memorandum nor the letters from the federal inmates provide a basis for relief under *Brady,* as Sutton has not demonstrated the evidence itself was exculpatory and material or it would have led to evidence that was exculpatory and material to the defense. Accordingly, weighing this evidence "in the context of the entire record[,]" the Court's confidence in the outcome of trial is not undermined. Sutton's entire *Brady* claim will be **DISMISSED**.

## H. Evidentiary Hearing (Claim VIII)

Sutton contends he is entitled to an evidentiary hearing because the expert affidavits he submitted with his habeas petition "shatters the State's solely circumstantial evidence case" and demonstrates "it is impossible that Griffin died" at 11:55 p.m. on February 21, 1992, as theorized by the State. Respondent maintains Sutton did not raise failure to present lay or expert testimony rebutting Griffin's time of death as an ineffective assistance of counsel claim in his state post-conviction proceedings; thus, he is not entitled to an evidentiary hearing.

Even if a hearing is permissible, the Court has the discretion to grant an evidentiary hearing. *Campbell v. Vaughn*, 209 F.3d 280 (3rd Cir. 2000) (under AEDPA, evidentiary hearing is not required but is within discretion of court), *cert. denied*, 531 U.S. 1084 (2001). Because the time-of-death issue was presented for adjudication in Sutton's related death-penalty habeas case, the Court has taken judicial notice of the evidence presented during that evidentiary hearing, including but not limited to the expert testimony and exhibits. Among

the claims presented in that evidentiary hearing, wherein Sutton's experts testified, was an allegation that the state's time of death estimate was incorrect. Accordingly, because the Court takes judicial notice of the evidence presented on the time-of-death claim, there is no indication that an evidentiary hearing is required in the instant case under 28 U.S.C. § 2254(e)(2). This claim will be **DISMISSED**.

## I.    Actual Innocence (Claim IX)

Sutton contends he is entitled to have his procedurally defaulted claims reviewed on the merits because his new evidence, in the form of affidavits from Drs. Kessler and Haskell, presents a viable *Schlup* actual innocence claim because they demonstrate the State's entire theory about Griffin's death is scientifically and objectively impossible, which in turn, results in the failure of the State's theory for Branam's murder. Sutton also contends his new evidence "pointing the finger of guilt" at other potential suspects raises a viable *Schlup* actual innocence claim [Doc. 3, p.53]. Respondent argues that this "new" evidence proffered by Sutton is procedurally barred from consideration by this Court and that his claim is defaulted.

At the outset, the Court notes that only circumstantial evidence regarding Griffin's time of death was presented in this trial; no expert testimony regarding Griffin's time of death was presented here. If Sutton were able to demonstrate he was factually innocent of Griffin's murder, however, the instant conviction arguably could be called into question because the motive for Branam's murder, although not an element of the crime, would be eliminated. Nevertheless, for the reasons explained below and *supra* in Sections B. and G., neither the affidavits nor the "other potential suspects" meet the stringent criteria necessary

121

to raise a viable *Schlup* actual innocence claim so as to show that this case is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Carrier*, 477 U.S. at 496; *accord Schlup*, 513 U.S. 298.

### 1. Applicable Law

As previously stated, a claim of actual innocence may be a procedural gateway to allow consideration of a constitutional claim otherwise procedurally barred from federal review. *Schlup*, 513 U.S. at 327. To meet the *Schlup* standard, a petitioner must demonstrate that, in light of all the evidence, including the evidence he presented during his habeas evidentiary hearing, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327–28. In the context of *Schlup*, a petitioner must establish his factual innocence of the crime, and not mere legal insufficiency. *See Bousley*, 523 U.S. at 623. The *Schlup* exception is limited to "certain exceptional cases involving a compelling claim of actual innocence." *House*, 547 U.S. at 522; *see Schlup*, 513 U.S. at 324 (noting that "experience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare"). In *House,* the Supreme Court stated that "it bears repeating that the *Schlup* standard is demanding and permits review only in the 'extraordinary' case." 547 U.S. at 538.

### 2. Discussion

Sutton claims that the affidavits of Drs. Kessler and Haskell (which the Court has already concluded do not demonstrate counsel was ineffective for failing to present expert time-of-death evidence, *supra* section B.) and the "new evidence pointing the finger of guilt

at other potential suspects" (which the Court has previously found was neither material nor sufficient to demonstrate ineffective assistance of counsel, *supra* Sections B. and G.) require the Court to conclude either that he has established the *Schlup* gateway actual innocence claim or that he is entitled to an evidentiary hearing. The Court disagrees.

The Court, in effect, has previously disposed of Sutton's actual innocence claims. In Section B.1.b., *supra*, the Court explained why Sutton's claims regarding Blair and Cogdill were insufficient to demonstrate ineffective assistance of counsel and insufficient to meet the *Schlup* actual innocence claim. Likewise, in Section G., *supra*, the Court explained why the memorandum pertaining to Johnson and the letters from Turner and Floyd do not exculpate Sutton or undermine the Court's confidence in the outcome of the trial. Accordingly, for those reasons and because none of the "other suspect" evidence exculpates Sutton or demonstrates his actual innocence, the actual innocence claim based on "other potential suspects" will be **DISMISSED**.

Similarly, the Court has, in effect, previously disposed of Sutton's actual innocence claim as it relates to the affidavits from Drs. Kessler and Haskell in Section B.1.a. The Court has taken judicial notice of the live testimony of these affiants and the other experts presented in Sutton's related capital habeas proceeding and determined these experts fail to submit any compelling evidence of Sutton's innocence.

As previously noted, the experts (including the ones who testified in the habeas evidentiary hearing) agree that the temperatures at which the body was exposed have a significant effect on the rate of decomposition and both parties' experts agree a body will not decompose as rapidly under cooler conditions. Although Sutton's experts estimated time-of-death consisted of a fairly narrow window, none of them knew the temperatures to which Griffin's body was exposed because there is no evidence of temperatures at the location where the body was found. In addition, two of Sutton's experts based their time of death opinions, in part, on scientific evidence of rigor mortis, livor mortis, and decomposition based, to some extent, on the standard times in which those changes occur after death. Those standard times, according to Dr. Levy's unrebutted testimony, are based on a body being exposed to environmental temperatures of 70 to 72 degrees—temperatures (according to climatic data introduced at the hearing) that were never reached in Sevier or Blount counties from the time of Griffin's disappearance until his body was discovered [Civil Case No. 3:06-cv-388, Doc. 138, p. 16; Respondents's Exhibits 1 and 2].[31]

An evaluation of the strength of the evidence reveals that none of the circumstantial evidence offered at the Griffin murder trial corroborates the new evidence; instead the circumstantial evidence presented at trial corroborates the opinions offered by the State's

---

[31]According to the temperature evidence for McGhee Tyson Airport in Knoxville, Tennessee, and the climatological records from Gatlinburg, the body arguably was exposed, using the temperatures of both locations, to a temperature range of 24 to 66.9 degrees on Saturday, February 22nd; a range of 28 to 66 degrees the next day; and a range of 45 to 69 degrees on Monday, the day the body was discovered. And, on the latter two days, it rained in both locations [Civil Case No. 3:06-cv-388, Evidentiary Hearing Respondent's Exhibits 1 & 2].

experts. In rebuttal, the State presented an expert witness in support of its time-of-death theory.[32] The State's case did not hinge on its expert's time-of-death testimony, as that testimony was presented in rebuttal, but on all the circumstantial evidence from which Griffin's time of death could be inferred. Thus, in light of all the evidence presented at Griffin's trial, the time-of-death evidence Sutton now presents is cumulative to that given by his own trial expert and demonstrates that time-of-death testimony, which is based on many variables, can be inconsistent, even contradictory, and is not an exact science. Indeed, as Sutton's expert testified, the time-of-death opinion is not an exact time of death, but rather is a "guesstimate" [Civil Case No. 3:06-cv-388, Doc. 139, p. 10].

In sum, Sutton's new evidence presents a classic "battle of the experts." Sutton has not put forth or called into question the vast amount of circumstantial evidence against him. Instead, the evidence Sutton has presented merely calls into question the time-of-death opinion of the State's rebuttal expert witness, and amounts to nothing more than an attempt to discredit the State's expert. In light of the overall record in this case, the absence of corroboration of the experts' testimony militates against the conclusion that Sutton's newly presented expert opinion evidence is sufficient to allow him to pass through the *Schlup* gateway.

---

[32]Unbeknownst to the parties at the time of the Griffin murder trial, the State's rebuttal expert, Dr. Harlan, had been previously terminated as the State's chief medical examiner. While Sutton's post-conviction petition in the Griffin case was pending appeal, it came to light that, on May 4, 2005, Dr. Harlan's medical license had been permanently revoked based upon a "'pattern of continued or repeated negligence and incompetence.'" [Civil Case Number 3:06-cv-388, Addendum No. 41, p. 2, quoting *In the Matter of Charles Harlan, M.D.*, Board of Medical Examiners, Docket No. 17.18022307A].

Finally, to the extent Sutton claims the Court must look at each piece of "new evidence of innocence" cumulatively, his claim fails. In addition to the fact that none of the evidence he has presented meets the *Schlup* actual innocence criteria, there is other evidence of guilt that these alleged new pieces of evidence do not undermine. For example, the Court cannot overlook Sutton's credibility problems, which existed from the time he started giving law enforcement statements through his trial. Nor can it overlook all the circumstantial evidence pointing to Sutton's involvement in both of these murders. These facts are unaffected by the expert testimony on time of death or the "other suspect" evidence. Sutton has presented no evidence that Griffin was not in his company after walking out of the jail or that anyone saw Griffin after he was bonded out of jail by Dellinger and Sutton.

Accordingly, Sutton's *Schlup* claim will be **DISMISSED** because neither the "other suspects" evidence or the time-of-death testimony, considered individually and cumulatively, is "so strong" that it undermines the Court's "confidence in the outcome of the trial" such that "no reasonable juror would have found [Sutton] guilty." *Schlup*, 513 U.S. at 316.

## V. CONCLUSION

For the reasons stated in this Memorandum Opinion, the Court will **DISMISS** Sutton's habeas petition in its entirety [Doc. 3].

AN APPROPRIATE ORDER WILL ENTER.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

126