(Back on the record.)

STANTON C. KESSLER

was first duly sworn and testified as follows:

COURTROOM DEPUTY: Please State and spell your name for the record.

A. Stanton Coleman Kessler, S-t-a-n-t-o-n C-o-l-e-m-a-n K-e-s-s-l-e-r.

**DIRECT EXAMINATION**

BY MS. BALES:

Q. Good afternoon, Dr. Kessler.

A. Good afternoon.

Q. Can you tell us what your occupation is?

A. I am an Associate Professor of Pathology of USC Medical School. I am a forensic pathologist and medical examiner. I consult with numerous medical examiner offices throughout the states and Alaska and legal offices.

Q. Okay. I would like to show you what has been marked as Plaintiff's Exhibit 12. If you can tell the Court what that is.

(Exhibit No. P-12 in evidence was referenced.)

A. This is my Curriculum Vitae.

Q. Okay. You have reviewed that before coming in today?

87

Attachment D
Case 3:07-cv-00030-TAV-CCS    Document 51-4    Filed 09/26/14    Page 1 of 83
PageID #: 330

A.   Yes.

Q.   It's current, is that correct?

A.   I have another appointment, but it was just last week.  It's separate.

Q.   Okay.

A.   Different from this.

Q.   What is a forensic pathologist?

A.   A forensic pathologist is first of all a pathologist, somebody who studies disease and how diseases affect the body.  A forensic pathologist studies the branch of pathology that studies sudden and unexpected death.  Other branches of pathology are neuropathology, pathology of the brain, anatomic pathology, study of gross orders, organs, cancers and infections, what have you and surgical pathology is part of that.  There are little branches of pathology, pediatric pathology of children.  Forensics is a separate unit to itself with its own governing body and own certification and training.

Q.   It basically studies causes of unexpected death?

A.   Causes and manner of sudden and unexpected death.

Q.   Would it study time of death?

A.   Time of death would be part of that, sure.

88

Attachment D

Q. You are a medical doctor?

A. I am.

Q. You have had training beyond that?

A. Yes.

Q. When did you first become Board Certified in forensic pathology?

A. I became Board Certified in anatomic and forensic pathology in 1985.

Q. Could that have been 1987?

A. Hold on one second. I am getting dates confused. You are right, 1987. It's before I came to Boston. Then I recertified in 2005.

Q. Okay.

A. Correct.

Q. Now, you have been practicing forensic medicine more than thirty years?

A. That is correct.

Q. I just want to touch briefly on some of your professional background work that you did in Massachusetts. You actually worked in forensic pathology for the Commonwealth of Massachusetts for 15 years, is that correct?

A. That is correct.

Q. During that time you had the opportunity to work with Harvard Medical School, is that correct?

89

A. Yes.

Q. Could you tell us briefly what that entailed?

A. Yes. When I first went to the Medical Examiner's Office in Boston, we had all of the bodies, the cadavers, the work in our office. Forensic medicine was a part of general pathology, general medicine. To become trained in general pathology pathologists in training needed to somehow get forensic training. There was very little of that to be had. We formed a relationship, a bond with Harvard Med School and Boston University Medical School where I would teach their pathology residents and in turn they would supply us with monies so we could establish a fellowship in forensic medicine. That is an official training program where people could come and become forensic pathologists and have their own offices later.

Q. You were in fact the Director of that fellowship program?

A. Yes, we accredited that on three separate occasions.

Q. When you were the Director did you have the opportunity to work with forensic pathology fellows?

A. Yes.

Q. Okay. How many would you work with at a time?

A. At any given time our office was accredited by

90

the standard board for three forensic pathology fellows. Two to three forensic pathology residents from general pathology programs would rotate through from many of the five or six hospitals that had pathology training programs in the area.

Q. Basically for more than ten years you trained and supervised medical doctors in how to become a forensic pathologist, is that correct?

A. That is correct. We took people that had never studied or done autopsies or studied about forensic issues, trained them to be forensic pathologists so to the point where they are Board eligible, meet a standard, and then many of these took boards and have their own offices in their own states in the United States. I trained about 30, 35.

Q. During that time would it be fair to say that you testified for the prosecution a fair amount?

A. Yes.

Q. Okay. Of course, you have testified as a consultant for the defense some?

A. Yes.

Q. In fact, you are in private practice now as a consultant in forensic pathology, is that correct?

A. That is correct. I testify for the Solicitor's Office in Richland County for the

91

prosecution. I testified for the federal prosecutor in Alaska, have cases with him, and I will be a consultant for either side.

Q. Okay. We contacted you to ask if you could render an opinion on the time of death of a man named Tommy Griffin, is that correct?

A. That is correct.

Q. Okay. Now, what scientific factors does a forensic pathologist look at in determining time of death?

A. Well, during the years and twelve thousand autopsies later, which is where I have been, I have looked at that many cases. You start reviewing cases knowing the time when someone dies because times are recorded and you examine these people when they come to the morgues. You look for scientific evidence of body stiffening, rigor mortis, body cooling, algor mortis, body settling, livor mortis and decomposition changes. These are scientific things you can start getting a feel of when you see bodies and relate them to known times of death; different environments, different subjects, different places where they pass.

Q. One of the things you are familiar with is the process of decomposition?

A. That is correct.

92

Q. Okay. Another factor you might look at is the appearance of the wound, is that correct?

A. Yes. Wound dynamics are a part and parcel of forensic medicine.

Q. We are going to discuss each of those factors in more detail in just a few minutes. First I want to ask, a forensic pathologist doesn't always get the opportunity to go to the scene where the body is discovered.

A. In my, well, when I trained, I trained in Miami. I was on every other day.

Q. So you have done that before. You have had the opportunity to do that?

A. Right. We had to go to all of the dead body scenes. We go to two or three a day when you are on. I was there for two years. That is a large number of scene investigations; little old ladies who die naturally in bed and homicides and accidents and any and everything we went to see.

Q. You can still, if you don't have the opportunity to go to the crime scene, you can still form an opinion as to time of death?

A. Oh, yes. Massachusetts was a huge State. Besides the 17 medical examiners for five different offices who worked in the State we had 75 what we call

93

district medical examiners who are MDs who would go to non -- natural scenes so to speak, natural cases. They would take photographs and write reports and I would, I was their head, so to speak, as being the Director. I would review all of the reports with photos to make sure everything matched. I would sign their paychecks too. They had to write a report, send photos and put this all together for me so I would review these from photographs. I did thousands of these.

Q.   You would look at photos taken from the crime scene?

A.   That is correct.

Q.   You would also consider autopsy photos?

A.   Yes.

Q.   You mentioned reports from other medical professionals.

A.   Yes.

Q.   Okay.  Would you look at reports or observations of what you might call a first responder?

A.   Yes.

Q.   People who do respond?

A.   Yes.  EMS and police, their reports were always sometimes enlightening for us.

Q.   Okay.  Would you look at climatological data?

A.   Yes.

94

Q. And is that what you did in this case?

A. Yes.

Q. Okay. What is your understanding of the State's theory of how long Mr. Griffin had been dead, when the body had been discovered?

A. The body was discovered on Monday, late afternoon and according to the State's theory he supposedly disappeared and was dead around midnight that Friday preceding. It's about 64 hours.

Q. It's 64 hours, they say he had been dead for 64 hours. Have you formed an opinion in this case as to whether the victim could have been dead 64 hours, when the body was discovered?

A. Yes.

Q. I want to get to that opinion, but first, let's look at what factors you considered in reaching that opinion. One of the factors you mentioned is called lividity. Can you tell us what that is.

A. Yes. Lividity is nothing more than settling of blood into the dependent areas of the body. Now, it has to do with lack of circulation. Can this occur while we are alive? Yes. Somebody with very poor circulation, gets livid limbs or a leg, a diabetic leg. It looks purple/blue because the circulation isn't moving. This happens with death. Circulation doesn't

95

move and things settle.

Blood settles in small capillaries that are tubes. These tubes are basically like soda straws lined by mosaics of cells almost like an aqueduct. They are kept together tightly because the cells are alive. If the cells are to die they spread open. It would be like taking the mortar out of an aqueduct and it starts to leak. Initially before that occurs, before they die there's a period when the cells still metabolize and they act as closed tubes. Blood will settle in areas that is dependent, it's lower than the rest of the body.

Q. So gravity is what pulls the blood down?

A. Gravity is what holds it down. If it's not the bottom of the body, but somebody is lying on their back, it could be in the posterior portion of the body.

Q. During the early post mortem phase, if the body is moved or turned over, what will happen to the lividity?

A. The lividity will shift as long, as these tubes are in tact, to another area of the body that is now dependent. Now, I say as long as the tubes are in tact. There are some diseases, some viral diseases and bacterial diseases which literally destroy the integrity of these capillaries. Diabetes is one. In these all bets are off. In a body that is not suffering from

96

Case 3:07-cv-00030-TAV-CCS   Document 51-4   Filed 09/26/14   Page 10 of 83
PageID #: 339

these illnesses, if a body is turned over, lividity will shift just as if you had a sponge that had blue ink in it and you threw it into a pool and moved it around. It would shift to where the sponge was. It would go to the dependent portion of the body. It would leave the area initially dependent and flow to the area that is now dependent like pouring it from one vessel to another.

Q. You have also referred to that as transitional lividity.

A. Transitional. It means it's moving. It's not fixed. It's not set.

Q. And how long does it take before the lividity will become fixed?

A. Usually in twelve hours. It starts to fix in about six to eight to twelve hours. After about twelve hours, these vessels begin to break down. The little cells begin to lose their integrity. They begin to loosen their junctions. Then they are like little sieves. Blood cells can actually squirt out between the cells and into the surrounding tissue staining it the same color as the blood. That is what is call fixed lividity. Even if you turned the body over, the blood wouldn't shift out of that area once it's fixed in that area.

Q. Okay. I am going to show you what has

97

previously been identified as Plaintiff's Exhibit 2. Just for the record, if you can State what the title of that document is.

(Exhibit No. P-2 in evidence was referenced.)

A.  This is labeled Death Scene Check List.

Q.  Okay.  And on Page 2 of this check List just looking at lividity right now, what does it say about lividity?

A.  Color.  It says livor is front.  That means it's anterior.  The color is free, darkened. Extremities are pale.

Q.  Would that say the face is darkened?

A.  Yes, "face darkened -- extremities pale."  It tells me the person is laying face down and the blood is settled in his face and the extremities are pale.

Q.  Now, this report, what we have called the Death Scene Check List?

A.  Yes.

Q.  If we look on Page 3, does it give us an indication of who prepared this Death Scene Check List?

A.  Yes.

Q.  Does it indicate law enforcement prepared it?

A.  Yes.

Q.  And a report prepared by a first responder

98

like that, is that something a forensic pathologist would consider?

A. Yes.

Q. And did you in fact consider it in this case?

A. Yes.

Q. Okay. The fact that livor was described as in the face and that the face was described as darkened, what does that tell you about this body?

A. It tells me he is lying face down and blood is settling in his face. I saw photos from the scene not only that he is lying face down and the interior top portion of the body is lower than the rest because he is on a hill. That is where blood should be.

Q. I would like to show you what has been marked as Plaintiff's Exhibit 11. If you can describe that photo.

(Exhibit No. P-11 in evidence was referenced.)

A. That is the photograph of the scene. There is a police officer there and that is the decedent lying face down. His head is lower than his feet on a hillside.

Q. Okay. Just based on that photo alone, where would you expect to see lividity?

A. On the face and the chest and the anterior

99

arms, front portion of the body.

Q. That is because of the gravity?

A. Yes.

Q. And also the fact that the body is at an angle?

A. Yes.

Q. And this photo is consistent with what the first responders observed about lividity in the face?

A. Yes.

Q. And we have numerous photographs from the trial. I would like to look at the photos of crime scene first. At this point we are just talking about lividity. I am showing you what has been marked as Plaintiff's Exhibit 15.

(Exhibit No. P-15 in evidence was referenced.)

A. Correct.

Q. Can you describe that photo?

A. We are at the crime scene. The shirt of the decedent is pulled up a little bit. We are looking at his back. He is lying face down. There is no evidence of darkened area at all. There is no pink or plum colored or red area of lividity seen.

Q. Would you say it's a normal skin tone?

A. That is a normal skin tone.

100

Q. Okay. Now, the crime scene photos that we are going to look at, are those things you would look at in forming your opinion?

A. Yes.

Q. And did you look at this picture?

A. Yes.

Q. I would like to show you what has been marked as Plaintiff's Exhibit 16. If you can describe that photo?

(Exhibit No. P-16 in evidence was referenced.)

A. That is a photograph of the decedent. He is at the crime scene. I think he has been moved up. He is turned over. His shirt is half up. You can see a small bit of lividity still in his right arm and surface, but the lividity is actually shifting away from the front of his body. You can see he is in full rigor mortis.

Q. Let's get to that in just a minute. Right now we are just looking at lividity.

A. Sure.

Q. A photo like this, is that something you would consider in forming an opinion?

A. Yes. If I may, the face is darker than it usually is, as you can see. You just see a little bit

101

of the face there. It is sort of dusky looking. That would be a little bit of lividity there.

Q. Okay. I would like to show you what is marked as Plaintiff's Exhibit 17. If you can describe that picture for us.

(Exhibit No. P-17 in evidence was referenced.)

A. This is a photograph of the decedent. Again, we are looking at his side area. We can see where he was lying there is no lividity in the center. There is a little bit of light pinkish lividity towards the back and also in the front area. It looks like it is moving around.

Q. Okay. When you talk about moving around, you are talking about it's shifting from one part of the body to another part?

A. That is correct. As the body is being turned -- obviously, they had to turn him to get this photograph. The lividity, which we didn't see much in the back before, didn't see a lot of it going towards the back. The back is where the, I guess on the left-hand side of this photograph his hand is in the front. It is shifting, it's moving is this.

Q. Is this photo something you considered in forming an opinion?

102

A. Yes.

Q. I would like to move on to the autopsy photos. There is just a couple of those. And show you what has been marked as exhibit 13. The Court may want to look at the copy provided in the notebook. It is a little more, the color is a little distorted.

THE COURT: Go ahead.

(Exhibit No. P-13 in evidence was referenced.)

BY MS. BALES:

Q. Can you identify this picture, please.

A. This is a photograph of the decedent that I have been looking at. This is the same person that was on the hillside. He is now lying on his back on the autopsy table.

Q. Okay. Do you see lividity in the face?

A. I see something that looks purple/blue, but this is more related to the fact that his eyes are swollen. He has been face down. He has been shot in the back of the head. I think the picture that I have here shows the colors more truly than the photograph that you have. It is much --

Q. The Court has that.

A. You have this? It's much better. First of all, when you get shot in the back of the head or you

103

get a tremendous trauma to the back of the head, it can blow out these little areas of bone in your orbits. It's called orbital fractures. You can see when somebody has a nose job and they operate on the nose it blows it out. His lids are swollen. The contusion is from the trauma to the back of the head. You are seeing that. Other areas of the face, except for blood, do not show lividity. You see blood and you see the trauma from the back of the head that's seen under the eyes.

On the anterior surface of the neck you see there's no lividity. If you look at the shoulder area on the right side that is exposed, the lividity is actually moving. You can see a line of it. The lower portion of that right shoulder has lividity, purple/bluish lividity. The upper portion is pale.

What has happened is that it is still in the State where it's transitional and it is beginning to flow backwards. There is no real lividity on the face and the chest is becoming free of it.

Q. And is this photo something that you reviewed in considering your opinion?

A. Yes. Now, realize this photograph is going a day after he was at the scene. Lividity is beginning to fix now. As is evident by on the shoulder, why isn't that area totally free of lividity? Because some is

104

fixing into the tissues. You see half the shoulder has it, the other half doesn't. It's beginning to fix. This is consistent with a one-day period.

Q. Okay.

A. We didn't see this at the scene at all.

Q. I would like to show you what has been marked as Plaintiff's Exhibit 14, if you can identify that photo.

(Exhibit No. P-14 in evidence was referenced.)

A. This is a photograph of the decedent at autopsy. It is very similar to the last one that we saw showing the face, the upper neck, left and right portion of the chest, right shoulder.

Q. And is this photo something you would consider in forming an opinion?

A. Yes.

Q. Obviously autopsy photos and crime scene photos are things a forensic pathologist would look at in determining time of death?

A. That is correct. I wouldn't, the only thing I would have done different, if I was physically there was I would have pushed my thumb and a gloved hand on to the lividity to have shown it blanched. If it blanches, it moves away. You can actually see it is moveable.

105

Q. How long does it take for lividity to become fixed?

A. Usually it occurs, it starts in about maybe 8 to 12 hours and by 24 hours it's pretty much fixed. Realizing that if there is exposure to cold temperature, the little capillaries break sooner. They literally freeze and fracture. It happens much sooner. It can happen within hours with extreme temperature changes.

Q. That would be temperatures below freezing?

A. Above freezing. You only have to chill the upper half to quarter inch of the skin to get the change. I saw that in Alaska. I was surprised it was so fast, but it is fast there.

Q. You did not observe that in this case?

A. No. It tells me he was not in areas where he was in freezing temperatures.

Q. Okay. Could lividity shift on a body that is 64 hours old?

A. In my opinion, no.

Q. Okay. One of the things you have reviewed in this case is Dr. Harlan's testimony, is that correct?

A. That is correct.

Q. Okay. Do you recall that Dr. Harlan testified that transitional lividity has no real meaning in determining time of death?

A. Yes.

Q. Is that a true statement?

A. Not to me, it isn't. Maybe to him it is. I don't --

Q. Do forensic pathologists accept that statement as true?

A. No, it is not something I accept. Since I teach them, I still teach forensic pathology and have for years, that wouldn't be something I would tell them. I would give them the parameters we just talked about, the science behind it, the examples of when it's different and that is what I would tell them. I don't believe anything he said there is standard scientific fact.

Q. Okay. Another factor that you mentioned in determining time of death is decomposition. Could you just give us a real simple explanation of decomposition.

A. Sure. Unless we die in a hospital usually, and we are septic, that means bacteria everywhere in our body and we are dying in this horrible condition called sepsis, bacteria are in some isolated areas of our body; our nose and mouth, but mostly they are in our gastrointestinal tract and do not go out into our blood stream, especially if we have a sudden death. The organisms begin to multiply, billions and billions of

107

organisms, from the colon and one of the places that decomposition starts first usually is in the colon. If you look at a body as it slowly decomposes, you will see greenish coloring on the skin surface from the bacteria taking native sulfur in the body and converting it to a compound that is green, a sulfur compound. You will see it begin to bloat and swell because gases are given off. Sooner or later these bacteria can swim. They go throughout -- even though the heart isn't pumping they go throughout all of the capillaries in the body. They will actually begin to start decomposing the body tissue.

Realize that is one of the reasons that lividity fixes. It destroys the capillaries. Beyond that when the bacteria goes into the tissues, it begins to eat the tissue, produces gases, foul smells, foul odors, odors that attract animals, odors that attract insects, swelling, cadaverine are byproducts of decomposition. These changes are seen even in areas where the temperatures are almost to freezing. I have seen bodies decompose that are in the woods in Alaska. It happens. It is not warm there at nights. It is in the freezing temperatures. There are, these bacteria are everywhere. Some bacteria like cold cold weather just like some bacteria live in thermal vents in the

108

Attachment D
Case 3:07-cv-00030-TAV-CCS    Document 51-4    Filed 09/26/14    Page 22 of 83
PageID #: 351

ocean. These are not the bacteria we usually have during life that are growing.

Q. One of the first things you are going to see in decomposition is the greenish coloring in the abdomen?

A. It doesn't always have to be greenish. You will see bloating. You will see distention. It will be gassy and boggy and if it affects the skin, the skin will actually separate, the upper and lower layers. We call that skin slippage. It will affect the hair follicles. The hair can slip off. It bloats, bluish-black discoloration occurs also.

Q. Okay. How long after death, how much time after death would it take before you would start seeing decomposition?

A. It wasn't uncommon for me to have someone pass and be in the cooler all night -- somebody comes in the middle of the night from a heart attack or what have you -- they would be put in the cooler which is 38 to 40 degrees where we keep bodies. I would do the autopsy the next day and the rigor would be almost gone, if not gone, and they would, you would start seeing the greenish change initially. Then over a day or so because sometimes we would have to keep bodies until they were released, even in cold temperatures they would

109

be decomposed.

Q. So, possibly within 24 hours you would see the decomposition starting in the bowels?

A. Yeah. It starts immediately. You start noticing it within 16, 24 hours.

Q. Okay. Referring back to what is marked as Plaintiff's Exhibit 2 which is the Death Scene Check List.

A. Yes.

Q. Did you notice how it describes the preservation of the body? The second or third line there from the top.

A. Yeah. If you look all of the way to the top you can see preservation. This body is well preserved. There is no evidence of decomposition.

Q. And this type of observation by a first responder, is that something you would consider?

A. Yes. These are people that go there -- assuming when a first responder comes to start CPR or to help somebody who is dying. If they see signs of decomposition, obviously, they wouldn't. In this case it was an obvious cause of death. In other cases when they come to resuscitate someone they have to make a call whether the person is alive or not. Somebody that is decomposed is not somebody they are going to

110

Case 3:07-cv-00030-TAV-CCS   Document 51-4   Filed 09/26/14   Page 24 of 83
PageID #: 353

resuscitate.

Q. Okay. Have you reviewed the trial testimony of the emergency medical technicians who helped retrieve the body?

A. Was that Webb?

Q. Yes.

A. Yes.

Q. And is the sworn testimony of an emergency medical technician is that something -- who did in fact help retrieve the body -- is that something you would consider in forming an opinion?

A. I find him reliable, good source of information.

Q. What did, do you recall what he said about whether there was an odor of decomposition?

A. He did not note any odor of decomposition.

Q. Okay. I would like to show you what is marked as Plaintiff's Exhibit 15. We're going to be looking at the same photos you saw earlier. Now we'll be talking about whether they show decomposition. If you can describe this photo.

(Exhibit No. P-15 in evidence was referenced.)

A. This is a photograph of the back of the decedent lying face down at the scene. His shirt is

111

pulled up. You see the back of his waist and his jeans and there is no evidence of decomposition, nor insect nor animal activity.

Q. Okay. Looking at the photo in that regard with regard to lividity, would you consider this photo informative?

A. Yes.

Q. I would like to show you what has been marked as Plaintiff's Exhibit 16.

(Exhibit No. P-16 in evidence was referenced.)

A. A photograph of the decedent lying at the scene. His shirt is pulled up. You can see his abdomen quite well. In fact, the area where the colon starts is in the right lower quadrant. It's a beautiful shot of that showing no evidence of swelling or decomposition or greenish tinge at all. There is no evidence of decomposition at all in any portion of his body.

Q. I would like to show you what is marked as Plaintiff's Exhibit 17. Can you describe this exhibit?

(Exhibit No. P-17 in evidence was referenced.)

A. This is a photograph of the decedent. He is on his -- lying on, I assume, his left side. You are seeing this right side above his belt loop of jeans.

112

There is no evidence of decomposition. The skin is nice, pale with evidence of some shifting of lividity in the side there.

Q.   Okay.  So the photos that we have discussed that you noted did not reveal lividity, that will be Plaintiff's Exhibits 15, 16, 17, are those things that you would consider in forming an opinion on time of death?

A.   Yes.  The last one we had some lividity.

Q.   Excuse me, we are talking about decomposition.

A.   Decomposition.  I didn't see any change of decomposition.  Along with the statements that, the Sheriff's statements that they didn't notice any decomposition from the Sheriff's report and the person putting him in the body bag who literally had to bend his arms to get him in who was very up close and personal with this guy.  They would have smelled decomposition.  He didn't smell it, and somebody that is used to doing this.

Q.   You would expect to smell decomposition on a body that is 64 hours old?

A.   Yes, I would.

Q.   Especially if you are handling it, trying to force it into a body bag, is that correct?

A.   That is correct.

113

Case 3:07-cv-00030-TAV-CCS   Document 51-4   Filed 09/26/14   Page 27 of 83
PageID #: 356

Q. The lack of any kind of decomposition on the body, is that consistent with death occurring 64 hours earlier?

A. Not at all.

Q. Okay. Now, we mentioned you have reviewed Dr. Harlan's testimony. Do you recall he testified that he reviewed microscopic slides of organs for signs of decomposition in order to determine time of death?

A. Yes.

Q. Can a forensic pathologist tell time of death by looking at slides of organs?

A. I don't believe anyone can. Organs decompose at different rates and several organs autolyze immediately. Even when we sometimes get sections in the surgical pathology suite, if they are not handled properly within hours, kept on ice, kept frozen almost they begin to autolyze. Especially the pancreas. The liver can show changes, adrenals. It has to be handled properly, but you cannot determine time of death or any change of decomposition microscopically.

Q. Is Dr. Harlan's testimony that he can narrow the time of death down to roughly an eight hour window by looking at slides of organs, is that outside the realm of accepted scientific principles?

A. It is way outside the realm of any science

114

Attachment D

that I know of. The only thing that you will see in a body that is this old, okay, "64 hours old," if they believe it was, you usually you see bacterial colonies throughout all of the organs, and he didn't comment on that at all, something he would have seen, if the body was so many days old. You see bacteria literally growing in the tissues.

Q. Just to be perfectly clear about this, determining time of death from looking at slides of organs, this isn't a matter of competing scientific theories?

A. I had never heard of this theory and don't know anyone that ascribes to it.

Q. In fact, it's without any scientific basis whatsoever?

A. That is correct.

Q. In fact, it was false?

A. I think he made it up.

Q. Okay. I believe you said another factor a forensic pathologist would consider is the appearance of the wound. Is that correct?

A. That is correct.

Q. I would like to show you what is marked as Plaintiff's Exhibit 3. Could you describe that photo, please.

115

(Exhibit No. P-3 in evidence was referenced.)

A. This is a photograph of the back of the decedent at scene showing a large shotgun wound to the back of the head.

Q. I would like to show you next what is marked as Plaintiff's Exhibit 5. Could you describe that picture, please?

(Exhibit No. P-5 in evidence was referenced.)

A. This is the picture of the decedent at autopsy showing the back of the head, showing the large wound to the back of the head.

One of the things that I think is interesting is the first photograph which we showed at the scene, it was all shiny bright red and we're beginning to see now as this has been exposed longer to the air, portions of the this, or actually the lower portion, as opposed to the previous photo, are beginning to look like dry crusting blood. It's beginning to dry out. That is what happens to blood. It drys out.

When the photograph was done at the scene, you can see it was totally shiny and bright and you saw none of the dried blood. This is not a process of blood clotting. This is a process of blood turning dry and it

116

Attachment D

actually gets a sort of reddish brown. It begins to flake and begins to dry out. The last photograph was bright red blood and none of these drying out changes were seen. This happened in the morgue.

Q. Looking at exhibit 3. The appearance of the wound at the scene.

(Exhibit No. P-3 in evidence was referenced.)

A. Yes.

Q. Would you, this is the picture that you were looking at when you described the wound as appearing bright red?

A. Yes.

Q. And that looks like a fresh wound?

A. Within the past 12 hours, plus or minus, yes.

Q. Okay. Again, we have mentioned Dr. Harlan's testimony. Do you recall that he testified that the presence of bright red blood is irrelevant in determining the time of death?

A. Yes.

Q. Is that a true statement?

A. Not in my opinion.

Q. Okay. Now, another factor that you mentioned earlier in your testimony is that a forensic pathologist would look at stomach contents?

117

A.   Yes.

Q.   Can you tell us why stomach contents are relevant, or the observation of that?

A.   It will tell you what someone's last meal is. You can get an idea of how long it's been since the last meal.  Obviously if it's a high fatty meal, it will take longer to digest than a non-fatty meal.

What happens is if someone is alive and they eat, unless they are shot as they are swallowing food, the gastric enzymes will be excreted by the stomach; pepsin, papain, pineapple juice, and other enzymes, lipases, stuff from the pancreas, enzymes from other areas of the body, they all come in there and they mix. Once they start mixing it would be as if you took that gastric contents and put it in a glass bowl somewhere. It would still digest.  It won't absorb because he is not alive and the stomach is not going to move that material through into the small intestine.  You see contents.  These contents should be turned almost to a mush because they would be dissolved.

Q.   Okay.  Let me, I think we have got to that just a little bit out of turn.  I would like to show you what is marked as Plaintiff's Exhibit 24.  If you can identify that, please.

(Exhibit No. P-24 in evidence was

118

referenced.)

A.    That is the autopsy report from Dr. Ellington.

Q.    The autopsy on Mr. Griffin?

A.    That is correct.

Q.    On Page 2 of that report where the Dr. Ellington is discussing his observations about the gastrointestinal tract, what does he notice about the food?

A.    Under gastrointestinal tract he said, "No gross abnormalities of the GI tract are noted."  So in reality there should be no reason for anything abnormal to be occurring.  "A small amount of partially digested food is present within the stomach."  It is still being digested.

Q.    Okay.  Now, how long -- what we have in this case is partially digested food?

A.    Correct.

Q.    And what does that tell you about how long Mr. Griffin had been dead?

A.    It tells me that it's a relatively short time frame.  If it was 64 hours, I think all of the food would be digested not absorbed, but digested.

Q.    And what does digested food look like?

A.    It looks like mush.  It is totally broken down.  The starches are totally broken down, the meats

119

are totally broken down.  You can't really determine what it is easily.

Q.   In this case we have got partially digested food?

A.   Correct.

Q.   Okay.  The final factor I want to talk about is rigor mortis.  Can you tell us what rigor mortis is?

A.   Yes.  In rigor mortis, we have an enzyme system called ATP-ADP.  In reality all it means is it's an energy system that during life one of these enzymes is replenished when it gets low.  When the muscle bends or moves or contracts it uses up energy.  Then energy is given back to this muscle so it can move in two directions.  When the person is dead, the metabolism isn't working so these muscles will contract, but the system isn't replenished so they'll stay contracted until the body begins to make enough acid byproduct from bacterial degeneration or decomposition so they begin to loosen these bonds.  That takes a while to happen.

It's not loosening up for any reason of physiological nature, but it's just part of decomposition.  It's actually because the body gets very acidotic post mortem.

This occurs -- initially the body will get stiff.  Then as time goes on and on and on, it

120

progresses throughout the entire body. It may start in the jaw and head and go down. Then it begins to loosen up. These changes go on so that when somebody is totally out of rigor, there is no stiffness at all.

Q. How long does it take for rigor to set in?

A. Rigor starts six to eight hours, twelve hours is usually full and it starts disappearing and usually gone within twenty-four hours.

Q. I would like to refer you back to the Death Scene Check List. What does it say about the presence of rigor?

A. Rigor. It says complete.

Q. Okay. So is an observation by the first responders that the body is in rigor, is that something you would consider in forming an opinion on time of death?

A. Yes.

Q. Okay. We earlier mentioned EMT Webb's testimony. Do you recall what he said about the body being in rigor?

A. I if I am not mistaken, he had to break the arms to get them in the bag because they were so stiff. They couldn't get them in the body bag.

Q. So he was one of the people who helped retrieve the body, is that correct?

121

A.   That is correct.

Q.   And he remembered having to, struggling to put the body in the bag?

A.   Yes.

Q.   Okay.  I would like to show you what is marked as photo 16 or excuse me, Plaintiff's Exhibit 16.  Can you describe that, please.

(Exhibit No. P-16 in evidence was referenced.)

A.   We're looking at a photograph of the decedent at the scene lying on his back and one of his arms is lying across -- his left arm is lying across his chest and the other arm is not totally touching his chest, but sort of lifted from the chest maybe about a half inch or so.  I saw that before.  It's an antigravity position. If he was --

Q.   What does that mean, an antigravity position?

A.   If he was out of rigor, that arm would be totally flat again his chest.  The arm that is sticking up at the elbow would be down at his side.  His arm is sticking up, as if it's stiff and contracted.  It's in rigor mortis.  If he was not in rigor, the elbow would be down flat and the hand would be tighter against the chest on the right side.

Q.   Is this amount of rigor consistent with death

122

64 hours earlier?

A. No.

Q. Again, you said -- tell us what was the time frame for when rigor would dissipate.

A. Rigor usually disappears totally in about 24 hours. If we look at a time frame of that 64 hours, this is that first portion of that time frame. It's not the middle of the time frame. It's not the end of it. Rigor would be gone by then.

Q. Okay.

A. Obviously nobody has a clock. These people don't carry clocks and rigor stops at exactly twelve-oh-one. It's in that earlier period where it is going through and out of rigor. He is not out of it yet. He is still in it.

Q. You have referenced this in your testimony, that temperatures can affect how quickly the body goes through these changes, is that correct?

A. Correct.

Q. How do the temperatures affect it?

A. Rigor mortis is something that can come on almost immediately, if you have a high fever, anything that increases the heat in the muscle. I have been called to death scenes where people said someone was chasing someone up a flight of stairs and they were

123

strangled. We got there within 20 minutes. Because she ran up the flight of stairs, she was in full rigor when we got there. That was witnessed. We had someone running a marathon in Miami where I trained and this gentleman was running into the finish line. He was one of the last to come in. He was struggling and he collapsed and his wife was there and grabbed him. She put him down. She had to pull herself way because his hands were like this (indicating) because he was in tremendous activity. He went into almost immediate rigor. Cold will slow down rigor, but not much.

Q. A very hot temperature would speed it up?

A. Speed it up. Very fast.

Q. When we are talking about temperature affecting these factors, we are not just talking about rigor. Temperature can affect the rate of decomposition?

A. Everything.

Q. The examples you gave were where the temperature was very high at the moment of death?

A. Yes.

Q. Tell us how colder temperatures will affect it.

A. As I said, often I would go to my morgue and pull a body out that had died the day before and they

124

would be out of rigor. The morgue is 38 to 42 degrees at most.

I would often find people who died in Alaska where I was for several months we would have people that could camp out and often would die from an overdose of drugs, or what have you. They would be out all night. We are not talking about the middle winter, but we are talking about maybe the upper or lower 30s. The next day they would come in and probably be in rigor for a little bit. They were out of rigor within 12, 24 hours. They were moving very fast. It is usually staying towards that standard.

Having been in the Alaska and seeing people die in cold climates, it doesn't change that much. It may change it a couple of hours here or there. It's not going to stop it, unless you freeze someone. If you froze them totally, you could keep them like that indefinitely. We are not talking about that here. It takes a long time to freeze a body.

Q. I would like to show you what has previously been admitted as Plaintiff's Exhibit 9. This is, this exhibit has several pages. If you can review the top page to identify --

(Exhibit No. P-9 in evidence was referenced.)

125

A. This is U.S. Department Of Commerce from Asheville, those are the national climatic data for that area from Asheville and it is sealed by Henry Ray who is the records custodian.

Q. I would like to show you what has been previously marked as Plaintiff's Exhibit 10. I am showing you Monday, as you can see Monday February 24th. All of these temperatures are greater than 50 degrees. Could you describe how these temperatures would affect these processes?

(Exhibit No. P-10 in evidence was referenced.)

A. The processes aren't going to change that much until it is in the low 40s or 30s. This is high moderate temperature for that time. I mean, it is not freezing, but, you know, it is not really going to affect it that much. What it will affect is the fact that this is within the realm that insects lay eggs. You should have seen that also.

Q. Okay. Certainly it's warm enough for decomposition?

A. Sure. It is in the 50s, 60s and mid-60s.

Q. It's warm enough for lividity?

A. All the changes should be pretty much normal.

Q. Again, that was on Monday, February 24th.

126

A. Realizing, of course, bodies in our morgue at 38 to 40 some degrees go through all of the changes we have talked about a little bit slower. That is why if -- to be very honest, if it worked at 50 degrees we would save a lot of money in our morgues because we could keep our morgues at 50 degrees. It doesn't do much. That is why we have them so low, because they rot so much faster even in 50 degrees.

Q. Let's look at the weather data for Sunday, February 23rd.

A. It is a much warmer day.

Q. Okay. Most of the temperatures are above 50, is that correct?

A. That is correct.

Q. And you have got several hours, well, three or four hours in the mid 60s?

A. Yes.

Q. So are these temperatures -- again on Sunday the temperatures are warm enough for these processes to occur?

A. They occur. It may have slowed it down about an hour or two. I don't think it is much significance.

Q. Then this is the weather data for Saturday February 22nd. Now, here we have some temperatures down in the mid 30s. How would that affect things?

127

A. Well, when the temperature gets very low the capillaries can literally rupture sooner so you would get marbling and mottling at a faster rate. The higher temperature in the upper 60s can cause mottling and that dusky change in lividity you see when you have this range from very cold to relatively warm within the same day. To not see lividity changes in this person with marbling and things, you would be concerned that he wasn't there then.

Q. Okay. So all of the weather data that we have looked at, is this evidence you have reviewed in forming your opinion?

A. Yes.

Q. And it's customary for forensic pathologists to look at weather data?

A. Yes.

Q. Considering all of the factors we discussed; lividity, rigor, decomposition, the presence of the partially digested food and also looking at all of the crime scene photos, looking at the autopsy reports and looking at the weather data, have you formed an opinion to a reasonable degree of scientific certainty as to whether this body could be 64 hours old?

A. I have.

Q. And what is that opinion?

128

A.    In my opinion it could not be 64 hours old, it couldn't have been there for 64 hours.

Q.    Can you give us an exact time of death?

A.    No.

Q.    Why is that?

A.    Because the science is made up of a lot of things that you see.  There's a lot of data here, but every body is different.  I would say in my opinion this is 12 hours plus or minus a couple of hours given the fact that it was a little colder than it would have been and maybe I would stretch even further than that a little more.  I am not going to go beyond 24 hours at the most.  It's within that frame.  I think from my experience -- I have viewed over 6,000 to 12,000 bodies personally from the morgues.  We see them every day.  This is about that time frame, 12 hours, maybe 14 hours old, from what I have seen.

Q.    Would you -- so your opinion is that the body was 12 to 24 hours old?

A.    Correct.

Q.    Okay.  And again, that is to a reasonable degree of scientific certainty?

A.    Yes.

Q.    Okay.

MS. BALES:  Your Honor, may I have just a

129

moment?

Your Honor, it's been admitted into evidence during the cross of our previous expert, could we look at the Court's copy or perhaps opposing counsel has a better copy of the Sevier County weather data.

THE COURT: We'll give you the Court's copy that has been introduced. I believe that is Defendant's Exhibits 1 and 2.

MS. BALES: Counsel did provide us a copy of that.

(Exhibit No. D-1,2 in evidence were referenced.)

BY MS. BALES:

Q. Dr. Kessler, during the examination of the prior witness counsel for Respondent looked at the Sevier County, or with the expert looked at the Sevier County weather data. The Sevier County weather data shows -- you have mentioned a couple of different times what would happen, if the body were exposed to freezing temperatures.

A. Yes.

Q. Looking at this weather graph for Saturday, February 22nd, if these were the temperatures, could you tell the Court how low or how many hours the temperature is below freezing?

130

A. Well, actually freezing is 32. We are starting at 31 -- we have got about six hours where it's below 30.

Q. Okay.

A. If that were the case, I would think that the most exposed areas; his hands, his face, the nose, the ears, these areas would freeze and it's not so much they freeze, it's not going to hurt him, he has passed, but the vessels in those areas will rupture and that will lead to the imprint of the vessels on the surface. We would see the mottling, the definite, besides just the lividity, you would see definite changes in the surface of the skin where you would almost see the outlines, the red-black outline of these vessels in the surface of the skin.

I don't have a picture of that, but it's something that is commonly seen when these vessels break because the vessels break and then they stain the skin surface. Then it gets an almost like a purplish-blue lividity that is unmistakably there. We don't see that.

Q. Again, we are talking about just the freezing of the skin?

A. Well, the skin and the vessels. We are not talking about the whole body being frozen.

Q. Or the internal parts of the body, just the

131

skin?

A. We are talking about the first quarter inch to half inch. When those areas get real cold the blood in there, if there is blood in there, it causes these things to expand and they tear apart. It causes these small little vessels to tear apart a lot faster. It is not by bacterial action, it's by the freezing change which is what happens if everybody --

I used to -- I years ago did some work in the ski patrol. I used to see a lot of people that were frostbitten. Their tissues would be purple-blue and purple-black before amputation. It's that same change because the blood oozes out and there is nowhere to go. You have the swelling with this bloody mass that -- and you don't have circulation and the vessels are gone. That is what happens when it freezes in a live person. In a dead person it looks very similar. I saw nothing here that looked like that.

Q. In any of the autopsy or crime scene photos you didn't see anything that suggested that?

A. No.

Q. So would I be correct in saying that this condition of Mr. Griffin's body is inconsistent with these temperatures?

A. Yes.

132

This cause came on for hearing on the 2nd day of February, 2010, in the United States District Court for the Eastern District of Tennessee, Northern Division, the Honorable Thomas A. Varlan presiding.

The Court having been duly opened, the following proceedings were had, to-wit:

PETITIONER'S EVIDENCE (Continued.)

THE COURT:  Are we ready to proceed with cross examination at this time?

MR. SMITH:  Yes, Your Honor.

THE COURT:  All right.  You may proceed.

STANTON COLEMAN KESSLER, M.D.,

called on behalf of the Petitioner, having

previously been sworn, returned to the witness

stand and continued to testify as follows:

CROSS EXAMINATION

BY MR. SMITH:

Q    Good morning, Dr. Kessler.  How are you?

A    Good morning.  I'm fine, and you?

Q    Good.  My name is Andrew Smith.  I represent the respondent in the case.

And first of all, you are testifying today in the anticipation of being compensated for your testimony?

A    I get paid for my time, actually.

Q    Okay.  But you did not testify in either

Mr. Sutton's trial or state post-conviction case; is that right?

A    I testified in the hearing for the Post-Conviction Review Board in 2005 in Maryville.

Q    Was that on this case, or was that on the companion Dellinger case?

A    The companion case.

Q    Okay.  And that would have been in 2004?

A    I thought it was '05.

Q    Okay.  Somewhere in that area.

A    Okay.

Q    The testimony you gave yesterday is substantially similar to what you would have given in the Sutton case at the trial level had you testified at trial?

A    Yes.

Q    Or at the post-conviction level had you testified there?

A    Yes.

Q    In your preparation for this case and the post-conviction case on the Dellinger matter, did you have the opportunity to review the trial testimony of Dr. Wolf?

A    Dr. Wolf?

Q    Yes.

A    Yes.

Q    Would you say that your opinion as to time of death is substantially similar to Dr. Wolf's?

A    I actually read that so long ago, I would have to review it now.  And I could.  I have his testimony here.

Q    Okay.

A    Unless you want to show me some pages of his testimony.

Q    Okay.  Well, you said that you believe the time of death was within 12 hours of the body being found in this case; is that right?

A    Well, I said plus or minus some hours.  And I would even go as far as -- within a day.  It's a day.  Okay.  I mean, it's within that realm from my experience.

Q    All right.  You believe up to a day is possible.  But you believe it was around 12 hours.  Is that a fair statement?

A    It's consistent with that.  But as I said, you could -- it could be up to 24 hours.  But it looks like a 12-hour-old body.  Especially from the wound.

Q    And do you recall Dr. Wolf testifying that he believed the time of death to be 24 to 36 hours?  Does that sound familiar?

A    I will agree with you because it sounds familiar.  But I'm not 100 percent certain of that now.

Q    So Dr. Wolf had a longer time frame in which he

believed the time of death is possible than you do?

A    That is correct.

Q    So in that sense, had you testified in rebuttal of Dr. Harlan, you would not only rebutted Dr. Harlan but also Dr. Wolf?

A    I would have rebutted Dr. Wolf with the caveat that Dr. Wolf, if I remember, did community psychiatry and was a general practitioner, not a forensic person.  So I think his experience, training, and expertise were just not the same as mine.

Q    You also had the opportunity to review Dr. Harlan's testimony; did you not?

A    That is correct.

Q    And you disagree with his conclusion as to time of death as well?

A    Yes.

Q    And that disagreement is based on his scientific opinion, or his...  Well, I'll leave it open ended.

    What do you base that disagreement on?

A    First of all, his opinion in that case, personally knowing him, and also my experience and training.  That just is not the same as his.

Q    But aside from -- you mentioned personally knowing him -- despite personally knowing him, had his science been flawless, as a man of science, you would have

agreed in your opinion -- had you agreed with his scientific conclusions, you still would have agreed with his testimony?

A    I may not, or may have.  I would have to...  That's such a conditional statement, I'm having trouble following it.

In my opinion, Dr. Harlan did a lot of things that I thought were unconscionable as a forensic pathologist. For instance, he would come in at night and do his autopsies.  He would take his organs from each case and cut them --

Q    In this case?  Are you talking about this particular case?

A    In all of his cases.

Q    Okay.  I'm trying to keep it focused just on this particular case.

A    Well, I think that goes beyond me answering the question then.  Because I'm talking someone who I knew personally had bazaar and unscientific medical practices.

And if you want me to answer anything about Harlan, I can't be isolated from that.  I knew him.  I knew what he did.  I read his reports.  I met him at conferences. And I knew some of his forensic practices that he followed were things that just were bad science.

Q    Okay.  Let me ask it this way.  Your testimony --
had you testified in '96 or in 2004 relating to
Dr. Harlan's findings, it still would have been the same
testimony you gave yesterday?

A    Yes.

Q    Okay.  I believe you stated yesterday that weather
conditions do play a role in the decomposition of bodies
and determining time of death?

A    Yes.

Q    And from what I understood your testimony to be, the
colder it gets, the slower the decomposition occurs, so
long as the temperature is still above freezing.  Is
that a fair assessment?

A    When it gets lower, it's less rapid.

The problem is, freezing stops everything.  And if
it doesn't freeze totally and stay frozen, until it
defrosts, decomposition is almost put to rest.

Q    In reaching your conclusions, the weather conditions
you were basing your conclusions on were those of the
Knoxville airport; is that right?

A    Yes.

Q    Did you also look at the temperature charts for the
Gatlinburg area?

A    Yes.  They were colder.

Q    And you were --

A    That was a different elevation.

Q    You were assuming that the temperature conditions in those locations would be similar to those where the body was found?

A    In all honesty, unless you actually do temperature recordings at the scene for several weeks, you can't be 100 percent accurate.  Because even moving 300 feet in an area that has to be shaded, or has water near it running there, or whatever, can change things tremendously.  So we're doing the best guestimate we can on these locations.

But I would think that something that's higher elevation is going to be colder and very different than where the body was found.

Q    You did mention shaded areas.  Do you recall in going through the pictures yesterday there were a lot of leaves around where the body was found?

A    Yes.

Q    So based on that, I believe there are also some pictures that show trees in that area?

A    Trees?

Q    Yes.  So it would be fair to say that the body was in a shaded area given the number of trees around and the leaves that had fallen?

A    Well, we're talking February --

Q    Yes.

A    -- and we're talking about time when the trees had already shed.  That's why he's lying in leaves.  We're not talking about evergreens.

So in reality, I don't see where that would mean much.

Q    So --

A    If we're talking about the middle of summer when these heavy foliage trees actually shade him, I think that's different than February when...  Because I saw pictures in the distance of the trees.  They are bare.

Q    Right.  But could the trees work to block at least some amount of sunlight coming in?

A    I can't answer that.  It didn't look like the trees did much blocking of anything.

Q    You did not actually have the chance to ever make it to the scene where the body was found; correct?

A    I did not.

Q    And you testified yesterday, I believe, that going to the scene, if possible, is beneficial?

A    It's always beneficial.  For instance, I would have done body temperatures.  I would have -- that would have been something I would have done at the scene.

But then again, there's only so much budget and so many medical examiners and so many ways you can do it.

You do the best you can.  They did a decent job with what they had.

Q   And we also don't know what the ground temperature was at the location where the body was found; is that right?

A   That is correct.

Q   Getting back to the air temperature issue, isn't it true that sometimes temperatures can vary pretty widely in a relatively close geographic area?

A   Well, that's what I had said before.  Yes.

Q   Right.

A   But not that widely.  I mean, we're not talking 100 degrees difference, or 50 degrees difference, or even 20 degrees, maybe a couple of degrees here or there.

Q   Okay.  Well, I would like to show you what I admitted yesterday as Respondent's Exhibit No. 3.  And this is Page 3 of that document.

This is the weather conditions from the National Climatological Center from Gatlinburg.

I would like to direct your attention to the weather, specifically on February the 23rd.  And that was one of the days when the body --

A   I'm sorry, that's too small.  I cannot read that.

Q   I'm trying to figure out how to enlarge it.

THE COURT: You can enlarge it from there.

Q Can you see that now?

A Yes. And where is the date?

Q February 23rd.

A The 23rd. Okay.

Q And that was one of the days when, under the State's theory, the body would have been lying at this location.

A Okay.

Q And on the 23rd, you see the high there is 66?

A Correct.

Q And the low there is 28?

A Correct.

Q I would like to compare that with the observations from the Knoxville airport, which is on Page 6 of Respondent's Exhibit 3. Also on the 23rd, you see the high temperature on that date, 65?

A Yes.

Q And the low from that station is 46?

A Yes.

Q And you recall what the low was in Gatlinburg that I just showed you moments ago?

A It was this the 20s.

Q It was 28?

A Yeah.

Q So there's a 18 degree differential between the

readings in Knoxville and the readings in Gatlinburg?

A    That's right.

Q    So that could be a valid 28 degree difference between two locations that are relatively close?

A    Well, how close are they, sir.

Q    Well, you studied the charts for both of these areas.  Are you not aware of how proximate they are to each other?

A    Well, I asked you a question.  I don't live in this area anymore.  I never did.  And I don't know how far apart they are.

Q    If I told you they were roughly 35 miles apart, I believe, would that sound familiar based on what you looked at when you originally studied this case?

A    Well, I didn't see any geographical charts at all. So I have no idea where one is versus the other.  I mean, I just knew the names.  But I did know one was at a higher elevation.

Q    Okay.  So --

A    And the higher up you go, the colder it is.  So you would have to give me the elevation to make any true judgment on this.  What were the elevation changes.

Q    If there were about a 500-foot elevation change, that wouldn't account for 18 degrees difference between two locations, would it?

A    It may.  Sure.  You could have snow in the mountains.  And when I was in Alaska outside my house my mountains were always snow covered, even in the middle of summer.  And the change would occur very rapidly.

I used to be hiking in areas and it would be warm and sunny.  And the next thing I know, it would be extremely cold.

So everywhere -- you would have these little temperature climbs.  You would have to put the thermometers in that area and see what happens.

Q    Right?

A    See what the temperatures are and then check the differences.  It's not a very...  You're showing me something and you want to make a decent -- very strong science out of it.

But in reality, unless somebody actually recorded in that area and the other area, and then compared the two over a couple months, it's not very good science.  You're making assumptions that may not be true.

Q    Right.  I guess that's exactly what I'm getting at.  Because no one was able to do that for the scene -- the site where the body was found?

A    For one caveat of difference.  If the body got into a temperature where it froze, which is under 32 degrees, at least the skin surface froze, not the whole body.

And you do have temperatures, 28 degrees, that you want to fix on.

In reality then you would see changes of freezing of the body which we do not show.  So I can say that that is not correct.

Q   Dr. Kessler, I'm not trying to get wound up on what the low was any given day.  But what I am trying to establish here, and I think what you have already stated, is that there can, in fact, be wide variations of temperature in a relatively close area in certain situations?

A   That's correct.

Q   So when you looked at the highs in Knoxville, you can't necessarily know with 100 percent certainty what the highs were at the site where the body was found?

A   Not with 100 percent certainty.

Q   And they can, in fact, vary pretty widely?

A   They may.

Q   And correct me if I am wrong, but are you aware of the distance between these Knoxville airport readings and the site where the body was found?

A   No.

Q   Are you aware of the distance between Gatlinburg, the weather station there, and site where the body was found?

A   As I said, I have never seen this on a map.  But more importantly is the elevation change.  If I remember correctly, having gone through Gatlinburg, it's through a pass.  And maybe 2800 feet high or something.  It's relatively high.  And as I said, for the elevation going up, I find that is more significant than the distance between the airport and Gatlinburg.  So the elevation change would mean a lot more to me than the distance between the two points.

Q   The body in the case was found on the side of the mountain; correct?

A   I don't know if it was found on the side of the mountain.  I never had that information.  A mountain?  It was laying against --

Q   It was laying on a --

A   I'm sorry.  Go ahead.

Q   It was laying on an incline of --

A   Does that make it a mountain?

Q   Well, I'm asking.

A   Tennessee has hollows and vales and dells and all kinds of hills.  And it could have been in a flat area that just happens to be hilly.

        MS. BALES:  Objection, Your Honor.  Counsel is mischaracterizing the record.  The body was found on the bank of the creek.

THE COURT: As in a trial, the questions of the attorneys are not evidence. So I'll allow this question. Proceed.

MR. SMITH: I'll move on.

BY MR. SMITH:

Q   Dr. Kessler, as I went through your testimony previously, I do recall that you observed in your, either 2004 or 2005 testimony, you did observe some insect activity in looking through the pictures in that case. Does that sound familiar?

A   No.

Q   Okay.

A   There were ants.

Q   I'm going to show you, from your testimony in that case, I'll show you the cover page just to show you that that was, in fact, yours.

I'm going to turn to Page 391 of that testimony. And I want to point your attention --

A   Wait a minute.

Q   I'm going to zoom out.

A   Wait a minute. Let me take a look here. Page 391?

Q   Page 391. Yes.

A   Can I see the top of your page there, please, sir, where it says the page number. Okay. Go ahead.

Q   It should be on the screen there if you want to look

from that view?

A     All right.

Q     Okay.  I would like to point your attention to the first cue on the page.  Do you see there where it says:

          "Question:  Okay.  In looking at a similar blowup, that's a little closer.

          "Answer:  Oh, that black dot does look like a fly."

Do you see where it says that?

A     Yeah.

Q     And then the following question says:

          "Question:  Looks like an fly, don't it?"

And the answer there:

          "Answer:  Looks like a fly.  It certainly does."

Do you see where it says that?

A     Okay.

Q     And you don't recall giving that testimony that you --

A     No.  But the photos are there.  I can look at the photos again and...  And...

          I just would like to see that on my own pages here.

Q     It's Page 391.

A     Okay.

Q     And you don't recall giving that testimony?

A     Not really.  But as I said, the paragraphs are still

here. I can look at it again and tell you if, in fact, that's what I still think. Realize, of course, that I'm not an entomologist and there is an entomologist who was part of this trial and I would defer any opinions of whether it is or isn't an insect to him.

Q Right.

A Because it wasn't the clearest photo. And it could have been, or may not have been. But I can't even say much without reviewing it. I would be happy to review it now.

Q You did testify yesterday that one of those -- one of the bases you gave for your opinion was the absence of insects; correct?

A That is correct. Insect, meaning definition of insect eggs.

Q But as you testify now, you don't remember whether you observed flies there or not?

A I did not see fly eggs. And I did not see any insect activity. Activity means the flies are there and they lay eggs. Okay.

And I don't know what that photo is. I don't recall it. But as I said, I would be happy to review it now.

Q You also stated, I believe, in that same testimony that you would have liked to have seen more testing being done on the body. Do you recall that?

A    Yes.

Q    And that would be because more tests would give a clearer picture of when the death actually occurred?

A    More tests would have been another window science -- scientific window that would have given us an idea of the time since death.

Q    So based on the fact that more tests would have been helpful, we don't have 100 percent picture-perfectly-clear picture of when the death occurred based on the information that we have?

A    I, in my mind, know 100 percent that the body was fresh.  Can I give you the exact time or date?

If all the tests were done, I would have been a lot happier.  If they did vitreus from the eye fluid, it gives you a different window.

If they did body temperatures from the scene, it gives you a different window.

But often we don't have everything, and we have to make our judgments.  And mine is based on seeing my own scientific review of about 12,000 bodies.  Dead bodies who were all different types of decomposition, all different states of rigor.

And in my opinion, based on my experience and training as a forensic scientist, and educator of other forensic scientists, the body is fresh within about 24

hours. I would think around 12 hours, plus or minus.

Q    But you also stated that toxicology reports would have been helpful?

A    Toxicology would have been helpful in one aspect. It would have given us the frame of mind of the decedent when he was shot. It wouldn't have done anything for time of death.

Q    You stated that gastric exams would have been helpful as well, didn't you?

A    We have an examination for the gastric tissue. A more in depth gastric examination would have been better to find out exactly what he ate. We may be able to trace back if it was pieces of pepperoni and pieces of pepper and onion and cheese -- starchy material. We may be able to say he had a pizza.

What he eats is important to try to find out where he was. That has nothing to do with time of death, but more of the circumstances about his death. So it would have been more scientific. Yes.

Q    In reaching your conclusion as to time of death, do you take factors -- would you take factors such as witness testimony about hearing a gunshot at a certain time? Is that something you wold take into account?

A    Well, having lived in Signal Mountain, and I'm sure you're aware... I mean, gun shots are things you hear

all the time in woods in Tennessee. And I heard them all the time. And people are always shooting off guns, and I wouldn't see that as significant.

Unless someone saw someone shoot somebody at that place, I wouldn't see that as any significance at all.

Q   Okay. And you've also testified that a vitreus evaluation would have been another piece of information that you could have used had it been done?

A   Yes. The serum -- the potassium in the body is usually fixed in cells, and the vitreus has a very specific level. And after death, the retinal cells begin to dissolve. And when they do, they give off potassium at a relatively standard rate, about 1.7 milliequivalents an hour up to a certain point.

And it would have given us a closer time frame as to whether this is the first third of that period that we're -- that what you're saying, 64-hour period -- that first portion of the first few hours, the first day or so before the end.

I mean, if the potassium is sky high, it's more consistent with 64 hours.

If the potassium is just a little bit elevated, it would be more consistent with 12 hours. But that's something we don't have, so we can't go either way with that.

Q   Okay.  And finally, Dr. Kessler, there was some statement in the record, I believe it came from Dr. Wolf.  And you did review his testimony as I recall. I'm trying to refresh my memory on what you testified to earlier.  But you did review Dr. Wolf's testimony at some point?

A   Yes.

Q   Dr. Wolf, as I recall, stated that rigor mortis was the least reliable factor in determining the time of death.  Is that a statement you agree with?

A   Well, coming from a psychiatrist, I think that's fair for him to say.  I think he was a community psychiatrist and general practitioner.  But I don't really think that.  I think rigor is pretty good to determine time of death.  He doesn't do the number of cases, and actually is not a forensic pathologist.

So I would think anything that I would say related to time of death is anecdotal.  And his own experience, which may not have the true scientific test related to it.

Q   Assuming that statement also came from another one of the experts in this case, do you still disagree with it?

A   I don't agree with that statement.  I think taken out of context, it is not the most reliable.  The most

reliable would be temperature -- in measuring body temperatures and looking at nomograms, rectal temperatures over two or three hours as the body is sitting there.  And I've done that in the past.  That's more accurate.  But we don't have that information.

Q    Okay.

A    Everything is comparison.  It's one of the better things we have though in this case.

Q    Is it your opinion that death probably occurred within 12 hours, and the maximum of 48 within the body being found, was based on the temperature conditions you reviewed in the two charts that were available to you -- the Knoxville and the Gatlinburg?

A    You said 48?

Q    I'm sorry -- 24.

A    Yeah.  It's based on everything.  The temperatures just tell me that he wasn't there during freezing temperatures -- during that 64-hour period.  It makes it highly unlikely that he could have been there when he was supposed to have been there, according to the State's summation of the case.  He would have had changes of freezing, marbling, marked decomposition, and modeling.

When the little vessels break, the blood spreads out and begins to get purple-blue, and you see it all over

the place. And it's a very striking sign. And even can get blue-black. We have none of that.

So if he was there, according to the State's case, when it was freezing temperatures, he shows none of the changes I should have seen. We don't have that.

Q    But we don't know for sure what the temperatures were at the spot where the body was found?

A    All I can tell you is that the temperatures are somewhere, obviously, between the two you gave me. But he was not in an area where he froze. And your temperatures do have him in an area where he froze.

Q    When you say "your temperatures," you're --

A    The temperatures you got from Gatlinburg had temperatures of 28 degrees, which is below freezing.

Q    Right. But we don't know the exact temperatures at the precise spot where the body was found?

A    We don't know the exact temperature. What we do know is, and I think it interesting having hiked and camped in the woods in Tennessee, that there are lots of animals out there who don't look at cold like flies do. And look at it as they're hungry and they have to have something to eat.

There's fresh blood. And a body out there in the woods would be nibbled on by voles, by varmints, by all kind of critters -- coyotes -- birds. And he has no

animal infestation or animal deformation of the tissues. Chewing marks, or what have you.

Q    And that's from --

A    Which is highly unlikely over that period of time that he wouldn't have any of that.  It's a free meal. It's a meal in the woods and they will be attracted to it.  And I always see people who are out there more than a couple of days having animal marks on them.  He has none on him.

Q    None that you could observe from the pictures you were given?

A    I can see enough from the pictures I was given to determine that there were no animal marks.  I've done lots of different animal deformations of the corpse.

Dogs go to certain areas of the corpse.  Rats go to other areas.  Rats do not eat hairy areas of the corpse. They have all different likes and dislikes.

I've done autopsies on big cats.  I've done autopsies on alligators.  All types of animals have different preditation marks on the body.  And bears are even in that area.  We see none of this here.  Which is highly unlikely that that body has been there for any prolonged period of time -- for more than a day.

Because animals would have been attracted to it from the smell.  Just the smell of blood.  You don't have to

have decomposing blood even. Blood smells. And they would have been attracted to that. They were not.

Q When the body was found, it was fully clothed; right?

A Yes.

Q And the amount of clothes could obscure at least some of view of what the condition of the body was?

A Did you see the pictures, sir? Did you see the picture where the back of his head was cut open and there's a large glob, about a foot by maybe six inches of congealed blood coming out from the head on the grasses? That's enough to attract animals.

He could have been totally clothed like an Eskimo. And the head wound is exposed. And the blood is exposed. And the brain is exposed. And all those things would attract animals if he was there long enough. But he wasn't.

MR. SMITH: No further questions.

THE COURT: All right. Thank you. Redirect.

REDIRECT EXAMINATION

BY MS. BALES:

Q Good morning, Dr. Kessler.

A Good morning, Counselor.

Q Respondent noted that Dr. Wolf gave a window of 24 to 36 hours when he was cross examining you?

A    Correct.

Q    And your opinion is that it was likely 12 to 24 hours; is that correct?

A    That is correct.

Q    Okay.  So you and Dr. Wolf have had 24-hour period in common?

A    Correct.

Q    Okay.  So to say that you would rebut Dr. Wolf's testimony is a stretch, is it not?

MR. SMITH:  Objection.  Leading.

THE COURT:  That's probably a fair objection. I'll sustain it.

Q    Okay.  But you do agree that the 24-hour period is consistent between both your and his opinions?

A    Correct.

Q    Okay.  Respondent also talked about the temperatures in Gatlinburg and then temperatures in Blount County. Do you recall from your testimony that both Gatlinburg and Blount County had similar high temperatures?

A    Yes.

Q    And we can --

A    They were 66 -- 68.  It got pretty warm for that time of year.  It was sort of this time of year and it's pretty cold then.  So that was a warm stretch.  It was in the sixties -- high sixties.  Almost in the

seventies.

Q    All right.  And if you'll notice, and this is not showing up very well.  Can you see that this is the Blount County temperature charts?

A    Yes.

Q    Okay.  So in Blount County where the body was found, on the 22nd can you tell us what the high was?

A    On the 22nd, the high was 67 degrees.

Q    Okay.  And what was the high on the 23rd?

A    65 degrees.

Q    Okay.  And what was the high on the 24th?

A    On the 4th, it's 65 degrees.

Q    Okay.  And moving over one column, that reflects the minimum temperatures.  And what do you have for the minimum temperature on the 22nd?

A    We actually have below freezing -- 30 degrees.

Q    Okay.  And for the 23rd?

A    It's 46 degrees.

Q    Okay.  And for the 24th?

A    It's 50 degrees.

Q    Okay.  Just calling your attention to the Gatlinburg data, you can see that says Sevier County at the top?

A    Uh-huh.  Yes.

Q    Okay.  Looking at the high on the 22nd, what do you see?

A    On the 22nd, the high was 64 degrees.

Q    Okay.  And then on the 23rd?

A    On the 23rd, 66.

Q    Okay.  And on the 24th?

A    It's 69.

Q    Okay.  So would you agree that the high temperatures for both of those locations are similar?

A    Yes.

Q    Okay.  Now, let's look at the minimum temperatures for the 22nd.

A    Okay.  On the 22nd, the minimum temperature...  Is it the last?  That's the 28 degrees.  Or is it --

Q    The minimum start here.  Let's see, does that help?

A    The minimum.  Okay.  Good enough.  I see it.  It's the second one.  It's 28 degrees.  On the 24th, it's -- on the 22nd, it's 24 degrees.  On the 23rd, it was 28 degrees.

Q    Okay.  So the primary difference between the data from the different locations is how cold is gets at night?

A    Yes.

Q    Okay.  And you testified that if the temperature had stayed below freezing for a few hours, you would have expected...  Could you describe the changes you would have expected to see?

A   Yes.  The small vessels, the capillaries in the skin would rupture due to the fact that when blood freezes -- and we are not talking about large quantities -- but it actually expands.  It's mostly water.  And when it expands, it ruptures these tubes and it puts it in the state of advanced decomposition, like you see marbling and you have blood going out into the tissues.  It fixes in the tissues.  It's not lividity that would shift.  And we have none of those changes.

Q   Okay.  So the body is not consistent with being exposed to freezing temperatures for several hours?

A   No.

Q   Okay.  On your cross, you discussed the fact that there were some tests that were done -- or that were not done --

A   That is correct.

Q   -- that might have provided information?

A   Yes.

Q   Okay.  Does every case that you work on have every single bit of information that you would like?

A   No.

Q   Does the absence of one piece of scientific information prevent you from reaching an opinion on the range?

A   No.  If it did, I would say I could not reach any

opinion, there's not enough information.

Q   Okay.  So that didn't prevent you from reaching your opinions within a reasonable degree of medical certainty?

A   No.

Q   You've looked at ranges of temperatures over the 64-hour period in question.

Would knowing the exact temperature change your opinion?

A   Not really, because we -- they are below freezing. Either way you have it, you have temperatures that are using one or the other.  The lowest is 30 degrees, which is below freezing.  The other goes to 28 to 24 degrees, which is below freezing.

So you would still have the thaw -- the freeze artifact, so to speak.  And it would affect the body.

Q   And which you stated you don't observe that?

A   That is correct.  I mean, you don't have to know exactly the temperature, but you know the temperatures in this area are freezing.  It's not going to get warmer because it's on a hillside.

I mean, the microclimate there is not going to be that tremendously different.

Q   But your opinion -- knowing more specifically the temperature is not going to change your conclusions in

this case.

A    No.  No.

MS. BALES:  No further questions.

THE COURT:  Thank you.  Any recross?

MR. SMITH:  Yes, Your Honor.

RECROSS EXAMINATION

BY MR. SMITH:

Q    Dr. Kessler, I would like to again show you the weather chart out of Gatlinburg, which is Respondent's Exhibit 3, Page 3.  And I would like to focus on the maximum temperatures for that date.  Let me grab a pointer.

Just take the first eight days of the month there. Do you see the high on the first is 59 degrees?

A    Yes.

Q    The high on the 2nd is 44?

A    Yes.

Q    On the 3rd, it's 54?

A    Yes.

Q    Now, compare that.  Compare those highs to those found in Knoxville.  As you recall, the high in Gatlinburg on the 1st was 59?

A    I would actually like to see those charts next to one another so I can look at them exactly.

Q    Let's see if we can get it all on here.

A    Perhaps if you bent the page back, you can put them right touching each other there.

Q    Let's do that.

A    Okay so.

Q    Just focusing in on the highs.

A    All right.

Q    Okay.  On the 1st.  And to my left is the Knoxville reading.

A    Yes.

Q    You have 46 for a high in Knoxville this day?

A    Correct.

Q    And 59 for a high in Gatlinburg?

A    Correct.

Q    So on this day the temperature in Gatlinburg is 13 degrees higher than the temperature in Knoxville?

A    Correct.

Q    And on the previous chart I showed you, the temperature, the low, in Gatlinburg was 18 degrees lower than the low in Knoxville?

A    Correct.

Q    Okay.  Let's look at the 2nd.  The high on the 2nd in Knoxville is 55?

A    Uh-huh.

Q    And do you see what the high is in Gatlinburg on the 2nd?

A    Yes.

Q    What is that?

A    It's 44.

Q    So it's 11 degrees difference that day in the highs.

On the 3rd, do you see where the high was 62 in Knoxville?

A    Yes.

Q    And you see where the high was 54 in Gatlinburg?

A    That is correct.

Q    On the 4th, there's only a difference of four degrees, 65 to 61.

But on the 5th, do you see where the high was 49 degrees in Knoxville?

A    Yes.

Q    Do you see what the high was in Gatlinburg that day?

A    Yes.

Q    And that's 65 degrees.  Do you see that?

A    Yes.

Q    So that's a 16-degree difference where at this time Gatlinburg is again warmer than Knoxville?

A    Yes.

Q    So therefore, it's not fair to say that the only difference between temperatures might be that it's colder in Gatlinburg than it is in Knoxville?

A    At any specific date taken by itself could be

different.  But not being a climatologist or a statistician, I can't really comment on what this means beyond it's interesting what you're saying.

Q    Okay.  Well, let's keep looking.  On February 6th, the high is 59 in Knoxville?

A    Okay.

Q    And what's the high in Gatlinburg that day?

A    It's 47.

Q    Okay.  And let's look at the 8th.  The high there in Knoxville is 40; is that right?

A    Yes.

Q    The high in Gatlinburg is 56; is that right?

A    Yes.

Q    So there are multiple occasions where there is a relatively large temperature difference in every direction in a very close geographic area?

A    Yes.

Q    So based on these observations for this part of Tennessee, temperatures at the site where the body was found could have been significantly different than the readings that you have from the Knoxville airport -- in any direction?

A    Well, as I was stating, I'm not a climatologist or a statistician.  I don't know what these do, or do not, mean.

But either way you look at it, we have freezing temperatures from either place. Some are 30 degrees. Some are 24 degrees.

If we go to Sevierville or we go to Knoxville, we do have freezing temperatures for the prolonged period of time that you're assuming that he would be there.

So all we need is one freezing night. And we have it if we go all the way back in time. And that's all that I'm looking at here.

Q    Okay. But if the temperature were 28 --

A    But it doesn't matter whether we're in Gatlinburg or in Knoxville. The point is, we had freezing times in both --

Q    If the temperatures were 28 --

A    -- if you go back to 64 hours.

Q    If the temperature were 28 degrees in Knoxville, it would have been 33 on the location where the body was found?

A    It may, or may not.

Q    So it may not have been below --

A    All I can say is, we have days in both areas where the temperatures are freezing if we go back far enough.

Which means that if he was there 64 hours, either using Gatlinburg temperatures or Knoxville temperatures, he would have been exposed to freezing temperatures

sometime. But based on what we have within the past so many hours, which is 12 to 24 hours, neither place gives us freezing temperatures.

Q    Right. And we don't know --

A    That's all I can say.

Q    But we don't --

A    He's not been exposed to freezing temperatures. And it doesn't look like he has in my calculation. I've taken that into point.

But if we go further back in time, in either place he would have been exposed to freezing temperatures. And he would have shown it on the body.

Which again fortifies the argument that he wasn't there for 64 hours. Because if he was, either way you look at it, he would have been exposed to freezing temperatures. I think you just proved my point.

Q    Well, we don't know that the temperatures in Knoxville or in Gatlinburg were exactly the same as those found on the mountain. It could have been a third temperature.

A    Anything is possible. That's right.

Q    So if it were 28 in one of those locations, it could have been 33 on mountainside -- or the hillside.

A    Well, I think we have to sort of go with something. The point is, we don't see that evidence.

But I don't see evidence that he's old. He's not been there for more than about a day -- at most. And my observations are from my experience and training. That's all I can say.

But I am not a climatologist. You know, I can't infer what you want me to infer. It's beyond me.

Q    You do use climate in making your opinion as to how long the body had been there?

A    He wasn't exposed to freezing temperatures in my opinion. That's all I can say.

MR. SMITH:  No further questions.

THE COURT:  All right.  Thank you, Dr. Kessler. You may be excused.

Is the respondent ready with the next witness?

MR. KISSINGER:  We are, Your Honor.

DARINKA MILEUSNIC-POLCHAN, M.D.,

the next witness called on behalf of the

Respondent, having been first duly sworn,

was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KISSINGER:

Q    Dr. Mileusnic, before we begin, if I repeatedly mispronounce your name, I apologize in advance.  I'm just not very good at that.  So I hope that you will understand.